IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

LAKSHMANAN PONNAYAN ACHARI,
VARGHESE VARKEY ABRAHAM,
KODAKERIL BABY BIJI, SUBHASHITHAN
BAHULEYAN, XAVIER DISOLIYAN,
RAJANKUNJU GEEVARGHESE, JOMON
GEORGE, SHAIJU VADAKKAL GEORGE,
PRAVEEN KULATHUM MURIYIL
GOPALAKRISHNAN, MOULESWARARAO
GUNTAMUKKALA, ELDOSE ISAC,
RAVEENDRANATHAN MOOKAPARAMBIL
ITTY, JOY JACOB, BIJU JOHN, SHIBU JOSEPH,
THANSILAS JOSEPH, KULATH
SOMANATHAN KALAYAM, SUNILKUMAR
MAROTTIKKAL KUTTAN, BHASKARAN
SREEDHARAN KUTTY, PARSHOTTAM
RAMCHANDRA MANGANI, PRAKASH MOSES
KANAGIAH MANONMONI, ADHARSAN
MANUEL, JACOB MAZHUKKATTU MATHEW,
JOHNY MATHEW, NANDHAKUMAR
NAGARAJ, SHAJI VELUTHALAKUZHIYIL
NANOO, MANGALAN CHANDRASEKHARAN
PILLAI, RADHAKRISHNA PILLAI SIVARAMA
PILLAI, ABY MOLATHU POULOSE, JUSTIN
POULOSE, APPUNNI ARUL PRAKASH, NIBU
RAJU, SREENIVASARAO RAPARTHY,
BALWINDER SINGH, RANJIT SINGH,
SAVINDER SINGH, SHANMUGAM
SUBRAMANIAN, NINAN JOHN THARAKAN,
KITTAYI SUNIL KUMAR THERATTIL, MONI
PANIKULANGARA THOMAS, THENOORAN
KUMARA UNNIKRISHNAN, BENNY
CHITTILAPPILLY VAREED, GEORGE
PULIKKEPARAMBIL VARGHESE,  ESTATE OF
KULIYANICKAL PAILY VARGHESE, BENNY
KATTUKARIYIL VARKEY, SHAHI VIJAYAN,
and JOHN YOHANNAN,

                                    Plaintiffs,


        v.


SIGNAL INTERNATIONAL, LLC, SIGNAL

Civ. No. 1:13-CV-00222-LG-JMR


**AMENDED COMPLAINT
AND
JURY DEMAND**

INTERNATIONAL, INC., MALVERN C.
BURNETT, LAW OFFICES OF MALVERN C.
BURNETT, A.P.C., GULF COAST
IMMIGRATION LAW CENTER, LLC, MICHAEL
POL, GLOBAL RESOURCES, INC., SACHIN
DEWAN, and DEWAN CONSULTANTS PVT.
LTD. (a/k/a MEDTECH CONSULTANTS),

Defendants.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

    Defendants' Conduct Violated Congress's Clear Prohibition Against Human
        Trafficking .......................................................................................................7

JURISDICTION AND VENUE ........................................................................................8

PARTIES ............................................................................................................................9

SUBSTANTIVE ALLEGATIONS ................................................................................16

    In the Aftermath of Hurricane Katrina, Signal Contracts with Dewan, Burnett, and
        Pol to Bring Temporary Workers to the United States at No Cost to Signal...............16

    Defendants File Petitions for Temporary H-2B Visas, Not Green Cards..........................17

    Plaintiffs Incur Substantial Debt to Afford High "Recruitment Fees" .............................20

    Plaintiffs Arrive in Signal's Pascagoula, Mississippi Man Camp and are Subjected
        to Degrading and Discriminatory Conditions..............................................................21

    Plaintiffs Experienced Other Discrimination by Signal and its Employees Due to
        their Race, Ethnicity, Religion, and Alienage...............................................................26

    Signal and the Agents Continued to Mislead the Plaintiffs About the Terms of
        their Employment..........................................................................................................29

    In an Attempt to Quell Rising Worker Dissatisfaction, Signal Sends Three
        Workers Back to India, One of Whom Attempts Suicide............................................32

    Signal, Assisted by Burnett and Dewan, Used Fraudulent and Coercive Tactics to
        Keep Plaintiffs in the Pascagoula Camp....................................................................34

    Malvern Burnett Purported to Act as Attorney to Plaintiffs, but In Reality Was
        Working Solely on Behalf of Defendants....................................................................35

    Plaintiffs Each Relied on the Defendants' Representations .............................................37

FIRST CLAIM FOR RELIEF ......................................................................................141

    THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
        ("TVPRA") OF 2003 ..................................................................................................141

SECOND CLAIM FOR RELIEF .................................................................................143

i

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866 42 U.S.C. § 1981 ..................143

THIRD CLAIM FOR RELIEF .....................................................................................145

FRAUDULENT MISREPRESENTATION ...................................................145

FOURTH CLAIM FOR RELIEF .................................................................................147

NEGLIGENT MISREPRESENTATION .......................................................147

FIFTH CLAIM FOR RELIEF ......................................................................................149

BREACH OF CONTRACT............................................................................149

PRAYER FOR RELIEF ...............................................................................................150

DEMAND FOR JURY TRIAL ....................................................................................150

## *INTRODUCTION*

1.      This is a human trafficking case brought by foreign workers trafficked into the State of Mississippi.  It is grounded in laws passed by the United States Congress to combat this very problem.  Rather than hiring new workers from the Gulf Coast in the wake of a devastating hurricane, the Defendants instead turned the Plaintiffs into an exploitable source of cheap labor. The Defendants then worked together to defraud each of the Plaintiffs out of tens of thousands of dollars, falsely promised them assistance in applying for and obtaining permanent residence in the United States, trafficked them into the United States, forced them to live in squalid and unsanitary conditions that damaged Plaintiffs' health and psychological well-being, discriminated against them on the basis of their race, ethnicity, religion, and alienage, and threatened them with financial ruin and adverse immigration action if they balked.

2.      Plaintiffs Lakshmanan Ponnayan Achari, Varghese Varkey Abraham, Kodakeril Baby Biji, Subhashithan Bahuleyan, Xavier Disoliyan, Rajankunju Geevarghese, Jomon George, Shaiju Vadakkal George, Praveen Kulathum Muriyil Gopalakrishnan, Mouleswararao Guntamukkala, Eldose Isac, Raveendranathan Mookaparambil Itty, Joy Jacob, Biju John, Shibu Joseph, Thansilas Joseph, Kulath Somanathan Kalayam, Sunilkumar Marottikkal Kuttan, Bhaskaran Sreedharan Kutty, Parshottam Ramchandra Mangani, Prakash Moses Kanagiah Manonmoni, Adharsan Manuel, Jacob Mazhukkattu Mathew, Johny Mathew, Nandhakumar Nagaraj, Shaji Veluthalakuzhiyil Nanoo, Mangalan Chandrasekharan Pillai, Radhakrishna Pillai Sivarama Pillai, Aby Molathu Poulose, Justin Poulose, Appunni Arul Prakash, Sreenivasarao Raparthy, Nibu Raju, Balwinder Singh, Ranjit Singh, Savinder Singh, Shanmugam Subramanian, Ninan John Tharakan, Kittayi Sunil Kumar Therattil, Moni Panikulangara Thomas, Thenooran Kumaran Unnikrishnan, Benny Chittilappilly Vareed, George Pulikkeparambil Varghese, Kuliyanickal Paily Varghese (represented by his estate), Benny Kattukariyil Varkey, Shahi

1

Vijayan, and John Yohannan, each a former employee at Signal International, LLC and Signal International, Inc.'s (collectively "Signal") Pascagoula, Mississippi facility, bring this action to recover for the unlawful and fraudulent behavior by Defendant Signal and Signal's agents Malvern C. Burnett, the Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, Sachin Dewan, Dewan Consultants Pvt. Ltd., Michael Pol, and Global Resources Inc. (referred to hereafter as the "Agents").

3.      Signal is a Gulf Coast-based marine and fabrication company.  In the aftermath of Hurricane Katrina, Signal set out to recruit several hundred foreign workers to work as temporary welders and pipefitters in Signal's Pascagoula, Mississippi facility.  Signal also recruited workers to work at a Signal facility in Orange, Texas.

4.      To assist in that process, Signal retained Michael Pol and his company Global Resources, Inc. ("Global"), a labor recruitment firm with operations in Mississippi; Malvern C. Burnett, an attorney based in Mississippi and Louisiana; and Sachin Dewan, a labor recruiter in India, to recruit workers on Signal's behalf.  Signal also executed a power of attorney authorizing Dewan's company, Dewan Consultants Pvt. Ltd., to recruit for Signal abroad.

5.      The cornerstone of the Defendants' scheme was the tantalizing prospect that Signal would be able to hire a skilled workforce at effectively no cost by forcing the Plaintiffs and their coworkers to foot the bill for their own recruitment, immigration processing, and travel. Indeed, an April 18, 2006 "Skilled Worker Recruitment Agreement" between Signal and Global that set this scheme in motion expressly stated that the workers would be delivered at no cost to Signal and that all other charges, expenses and fees would be paid by the workers themselves or by Global, who in turn would be reimbursed through deductions from the Plaintiffs' wages.  In short, Defendants paid nothing; the future employees paid everything.

2

6.      Beginning in mid-2006, Signal, both via its own employees and via its external Agents, traveled to India in order to recruit workers, including each of the Plaintiffs.  In printed advertisements and in-person meetings in India, Defendants promised Plaintiffs that in exchange for "recruitment fees" payable to the Agents ranging anywhere from the equivalent of $10,000 to $25,000, Defendants would provide Plaintiffs with jobs at Signal and assist them in applying for and receiving green cards.

7.      Defendants told Plaintiffs that because the permanent residency process could take up to two years to complete and Signal's need for workers was immediate, Defendants would first assist Plaintiffs in obtaining temporary work visas, known as H-2B visas, while simultaneously applying for green cards.

8.      Lured by the promise of, in the words of one of the Defendants' advertisements, the opportunity for "permanent lifetime settlement in the U.S.A. for self and family," Plaintiffs took on immense burdens to gather enormous fees, often by selling family assets and incurring significant debt at usurious rates.  Plaintiffs did this because they believed they would recoup the expense with the high wages they were promised at Signal, and through the long-term employment opportunities that would be available to them and their families as permanent residents of the United States.

9.      In actuality, the Defendants' promises regarding green cards for Plaintiffs were illusory.  Defendants had not taken, and had no intention at that time of taking, any steps to assist the Plaintiffs in applying for or receiving green cards.  To the contrary, Signal (with the knowledge and assistance of the Agents) represented to the United States government that it would employ the workers only <u>temporarily</u>, and that the workers would be returned to India

3

"within the. . .year."  At no point did Signal or any of the Agents take any steps to assist any Plaintiff in applying for or receiving a green card.

10.     Plaintiffs, of course, were never told of Signal's representations to the United States government.  The Plaintiffs were unaware that Defendants' promises of employment and permanent residency were false and relied on these false promises to their detriment.

11.     Put simply, Plaintiffs had been deceived into taking on life-altering debt for something that was never going to happen.

12.     Upon arrival at Signal's facilities in Mississippi, Plaintiffs' plight only worsened. Signal utilized psychological abuse, coercion, and fraud to leave Plaintiffs afraid and unable to leave Signal's facilities and employ.  Plaintiffs were required to live in camps on Signal's Pascagoula premises, enduring barbaric and prison-like conditions.  Plaintiffs were among several hundred men crammed into trailer-like bunkhouses that were far too small for the number of men housed therein, and otherwise unfit for human habitation.  Privacy was non-existent. Toilet and bathing facilities were insufficient.  Food was often rotten.  Private "security guards" patrolled the grounds like prison guards, prevented the Plaintiffs from leaving, and subjected the Plaintiffs to random searches of their persons and belongings.

13.     Signal sought to deflect as much of the housing costs as possible onto the Plaintiffs.  For the "privilege" of living in prison-like squalor, Signal deducted $35 per day from Plaintiffs' paychecks, seven days a week, which constituted over 34% of the workers' pre-tax earnings.  When workers requested permission to live off-site, they were told by Signal that they could do so, but that Signal would continue to collect the $35 per day.  This compulsory deduction essentially prohibited Plaintiffs from living in more humane conditions, lest their work

become even less remunerative, and consequently their "recruiting fee" debt become even more crushing.

14.    Non-Indian workers were not subjected to such squalid living conditions, degrading treatment, or extortionate room and board policies.

15.    Plaintiffs were also made to work in unsafe working conditions that non-Indian workers were not subjected to, and were forced to endure regular anti-Indian invective from Signal personnel, along with threats that they would be arrested and deported if they did not do Signal's every bidding.  Indeed, Signal housed Plaintiffs in the so-called "man camps" so that they would not mix with the Pascagoula community.  The Signal executive supervising the Pascagoula man camp referred to the facility—privately and in professional correspondence to other Signal employees—as "the Reservation," a term adopted from Signal's "shipyard folks."  Another Signal employee was more direct, promising Signal management on April 5, 2007 that if he were placed in charge of the man camp, he would not give in to the "misguided notion that some of these Indians can be reasoned with" but would instead "most defiantly [sic] go on a 'rat hunt.'"

16.    Signal even forced men of Sikh heritage to shave their beards upon arriving in the camp.  Wearing of a beard is an extremely important religious tradition to Sikh men, and Signal's coercion left the men, including Plaintiff Ranjit Singh, reduced to tears.

17.    Conditions were so poor at Signal's Pascagoula facility that, after just a couple of months, workers (including Plaintiffs) began to consider ways to convince Signal to improve conditions.  In retaliation for the workers' attempts to improve their lot, Signal terminated the employment of four of the most outspoken workers, forcibly removed them from the camp and told them they would be immediately returned them to India.  One of those expelled men, so

distraught over the thought of returning to India with the crushing debt of the "recruitment fees," attempted suicide in front of one of the Plaintiffs.

18.     Signal used this horrifying incident to its advantage.  In a meeting with the workers (including the Plaintiffs) days after the attempted suicide, Signal told Plaintiffs that if *any* of the Signal workers filed a lawsuit against Signal, Signal would send *all* of the workers back to India.  The Plaintiffs understood this to mean that they must remain quiescent and work, lest Signal retaliate and ruin them financially.

19.     Signal employed other methods of forcing the Plaintiffs to endure the abusive conditions.  In keeping with its focus on deflecting labor costs, upon Plaintiffs' arrival, Signal required workers to set up "direct deposit" bank accounts with a local bank, to which Signal also had access.  These accounts gave Signal control over the workers' ability to leave the facility because Signal could threaten to cut off the workers' access to the accounts at any point.  Indeed, this is exactly what happened—in April, 2007, after certain workers fled the Pascagoula camp, those workers were denied access to their accounts, at the behest of Signal.  This had the intended effect of intimidating and coercing the remaining workers, including Plaintiffs, into compliance.

20.     Deeply indebted, fearful, isolated, disoriented, and unfamiliar with their rights under United States law, Plaintiffs felt compelled to continue working for Signal, on Signal's onerous terms and in abusive conditions.

21.     In line with Signal's original intention as expressed to the United States government—but not to the Plaintiffs—to employ the workers temporarily, the vast majority of Plaintiffs were terminated within a year and a half of arriving in Pascagoula or left to escape the horrid conditions.

22.     At no point did Signal or the Agents ever apply for, or assist Plaintiffs in applying for, permanent residency.  Moreover, consistent with its never-failing effort to improve its bottom line by transferring as many costs associated with their employment as possible back onto Plaintiffs, Signal never refunded the tens of thousands of dollars in "recruitment fees" Plaintiffs had paid in exchange for less than one year of low-paid work.  None of the Plaintiffs earned enough money at Signal to make the exorbitant and debt-inducing "recruitment fees" even remotely worthwhile.  Moreover, Signal never compensated Plaintiffs in any way for the physical, emotional, and psychological degradations inflicted upon them at the Pascagoula camp.

23.     In short, and as will be alleged more fully below, Defendants' promises of employment-based green cards were fictional:

- Defendants never filed or otherwise supported green card applications for Plaintiffs, or took any other steps toward assisting Plaintiffs with securing green cards;

- Defendants told United States Department of Homeland Security under penalty of perjury that Signal's need for workers was <u>temporary</u>;

- Signal has stated in court filings that it never intended to provide the workers with green cards, but rather with temporary H-2B visas;

- Defendants segregated and confined Plaintiffs and other Indian workers to the man camp because Defendants did not want Indian workers mixing with other members of the Pascagoula community; and

- Internal correspondence among Signal management in May 2006 shows that "[a]ll [Signal is] doing now is bringing the workers in under the H2B program."

***Defendants' Conduct Violated Congress's Clear Prohibition Against Human Trafficking***

24.     In 2000, Congress enacted the Victims of Trafficking and Violence Protection Act to provide enhanced legal protections for victims of human trafficking and to supplement

existing forms of relief.  Congress specifically included protections for persons forced to work out of fear of serious harm, physical restraint, abuse of the legal process, or threats of the same.

25.     According to House Report 106-939, the new statute was "intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence."  In particular, Congress clarified that the statute covered "a broad array of harms, including both physical and nonphysical," and could apply where the perpetrator "intentionally caus[ed] the victim to believe that her family [would] face harms such as banishment, starvation, or bankruptcy in their home country."

26.     In 2003, Congress amended the statute to permit individual victims of trafficking to bring civil claims against their traffickers.  Plaintiffs do so here.  Plaintiffs also bring claims for violations of the Civil Rights Act of 1866, fraudulent misrepresentation, negligent misrepresentation, and breach of contract.

### *JURISDICTION AND VENUE*

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (pendent state law claims).

28.     This Court has personal jurisdiction over Signal pursuant to Fed. R. Civ. P. 4(k) and Miss. Code § 13-3-57 as Signal maintains a continuing business presence in the state, including but not limited to two shipyards in Pascagoula, Mississippi, where Plaintiffs worked and most of the wrongful conduct alleged herein occurred.  This Court also has personal jurisdiction under Fed. R. Civ. P. 4(k) and Miss. Code § 13-3-57 over Pol, a resident of Mississippi; Global Resources, Inc., which is incorporated under the laws of Mississippi;

Burnett, who is registered to vote and practices law in Mississippi; and the Law Offices of

Malvern C. Burnett and Gulf Coast Immigration Law Center, LLC, which have offices in Ocean

Springs, Mississippi and where much of the legal work alleged herein was performed.  This

Court has personal jurisdiction over Dewan and Dewan Consultants Pvt. Ltd. under Fed. R. Civ.

P. 4(k) and Miss. Code § 13-3-57.   Dewan Consultants Pvt. Ltd. contracted with Pol and Burnett

and served as Signal's agent to recruit workers and deliver them for employment in Mississippi.

Dewan, both individually and on behalf of Dewan Consultants Pvt. Ltd., traveled to Pascagoula,

Mississippi, in connection with the events described herein.

29.     Venue is proper in this district under 28 U.S.C. § 1391 in that much of

Defendants' trafficking activity, civil rights violations, fraud, misrepresentations, and breach of

contract occurred within this judicial district.

## *PARTIES*

### *Plaintiffs*

30.     All Plaintiffs are Indian nationals, of Indian race and ethnicity, and former H-2B

guest workers who were recruited from India by Defendants in or about 2006 and worked at

Signal's Pascagoula, Mississippi facility after arriving in the United States.  Plaintiffs each paid

the Agents the equivalent of between $10,000 and $25,000 in "recruitment fees" based on the

false promise that they would assist them in applying for and receiving green cards.  Plaintiffs

were each subjected to discriminatory, dangerous, and abusive treatment upon their arrival at

Signal.

31.     Plaintiff Lakshmanan Ponnayan Achari was recruited beginning in or about April

of 2006 and arrived in the United States on or about December 5, 2006.

32.     Plaintiff Varghese Varkey Abraham was recruited beginning in or about May of

2006 and arrived in the United States on or about November 28, 2006.

33.     Plaintiff Kodakeril Baby Biji was recruited beginning in or about July of 2006 and arrived in the United States on or about December 5, 2006.

34.     Plaintiff Subhashithan Bahuleyan was recruited in or about and between February and June of 2006 and arrived in the United States on or about November 27, 2006.

35.     Plaintiff Xavier Disoliyan was recruited beginning in or about June and July of 2006 and arrived in the United States on or about November 20, 2006.

36.     Plaintiff Rajankunju Geevarghese was recruited beginning in or about April of 2006 and arrived in the United States on or about November 28, 2006.

37.     Plaintiff Jomon George was recruited beginning in or about April or May of 2006 and arrived in the United States on or about November 28, 2006.

38.     Plaintiff Shaiju Vadakkal George was recruited beginning in or about April and May of 2006 and arrived in the United States on or about November 28, 2006.

39.     Plaintiff Praveen Kulathum Muriyil Gopalakrishnan was recruited beginning in or about June of 2006 and arrived in the United States on or about November 20, 2006.

40.      Plaintiff Mouleswararao Guntamukkala was recruited beginning on or about May 23, 2006 and arrived in the United States on or about January 24, 2007.

41.     Plaintiff Eldose Isac was recruited beginning in or about May of 2006 and arrived in the United States on or about November 23, 2006.

42.     Plaintiff Raveendranathan Mookaparambil Itty was recruited beginning in or about late 2005 and arrived in the United States on or about December 1, 2006.

43.     Plaintiff Joy Jacob was recruited beginning in or about the summer of 2006 and arrived in the United States in or about late 2006.

44. Plaintiff Biju John was recruited beginning in or about April or May of 2006 and arrived in the United States on or about November 20, 2006.

45. Plaintiff Shibu Joseph was recruited beginning in or about April or May of 2006 and arrived in the United States on or about November 28, 2006.

46. Plaintiff Thansilas Joseph was recruited beginning in or about June of 2006 and arrived in the United States on or about December 5, 2006.

47. Plaintiff Kulath Somanathan Kalayam was recruited beginning in or about June of 2006 and arrived in the United States on or about December of 2006.

48. Plaintiff Sunilkumar Marottikkal Kuttan was recruited in beginning in or about May or June of 2006 and arrived in the United States on or about December 7, 2006.

49. Plaintiff Bhaskaran Sreedharan Kutty was recruited beginning in or about May of 2006 and arrived in the United States on or about December 18, 2006.

50. Plaintiff Parshottam Ramchandra Mangani was recruited beginning in or about April or July of 2006 and arrived in the United States on or about November 6, 2006.

51. Plaintiff Prakash Moses Kanagiah Manonmoni was recruited beginning in or about July of 2006 and arrived in the United States on or about November 28, 2006.

52. Plaintiff Adharsan Manuel was recruited beginning in or about June of 2006 and arrived in the United States on or about November 16, 2006.

53. Plaintiff Jacob Mazhukkattu Mathew was recruited beginning in or about June or July of 2006 and arrived in the United States on or about December 7, 2006.

54. Plaintiff Johny Mathew was recruited beginning in or about March of 2006 and arrived in the United States on or about November 29, 2006.

55.      Plaintiff Nandhakumar Nagaraj was recruited beginning in or about May or June of 2006 and arrived in the United States on or about November 26, 2006.

56.      Plaintiff Shaji Veluthalakuzhiyil Nanoo was recruited beginning in or about April or May of 2006 and arrived in the United States on or about November 28, 2006.

57.      Plaintiff Mangalan Chandrasekharan Pillai was recruited beginning in or about June 2006 and arrived in the United States on or about November 20, 2006.

58.      Plaintiff Radhakrishna Pillai Sivarama Pillai was recruited beginning in or about May of 2006 and arrived in the United States on or about November 19, 2006.

59.      Plaintiff Aby Molathu Poulose was recruited beginning in or about March or April of 2006 and arrived in the United States on or about November 18, 2006.

60.      Plaintiff Justin Poulose was recruited beginning in or about the summer of 2006 and arrived in the United States on or about November 20, 2006.

61.      Plaintiff Appunni Arul Prakash was recruited beginning in or about April or May of 2006 and arrived in the United States on or about November 27, 2006.

62.      Plaintiff Nibu Raju was recruited beginning in or about May or June of 2006 and arrived in the United States on or about November 29, 2006.

63.      Plaintiff Sreenivasarao Raparthy was recruited beginning on or about June 26, 2006 and arrived in the United States on or about November 29, 2006.

64.      Plaintiff Balwinder Singh was recruited beginning in or about 2006 and arrived in the United States in or about 2006.

65.      Plaintiff Ranjit Singh was recruited beginning in or about May or June 2006 and arrived in the United States on or about October 30, 2006.

66.     Plaintiff Savinder Singh was recruited beginning in or about April or May of 2006 and arrived in the United States on or about October 30, 2006.

67.     Plaintiff Shanmugam Subramanian was recruited beginning in or about April of 2006 and arrived in the United States on or about November 28, 2006.

68.     Plaintiff Ninan John Tharakan was recruited beginning in or about May of 2006 and arrived in the United States on or about November 26, 2006.

69.     Plaintiff Kittayi Sunil Kumar Therattil was recruited beginning in or about July of 2006 and arrived in the United States on or about December 6, 2006.

70.     Plaintiff Moni Panikulangara Thomas was recruited beginning in or about May of 2006 and arrived in the United States on or about November 23, 2006.

71.     Plaintiff Thenooran Kumaran Unnikrishnan was recruited beginning in or about June of 2006 and arrived in the United States on or about November 28, 2006.

72.     Plaintiff Benny Chittilappilly Vareed was recruited beginning in or about May of 2006 and arrived in the United States on or about November 19, 2006.

73.     Plaintiff George Pulikkeparambil Varghese was recruited beginning in or about August of 2006 and arrived in the United States on or about January 24, 2007.

74.     Kuliyanickal Paily Varghese, who is deceased and whose interests are pursued by Plaintiff Estate of Kuliyanickal Paily Varghese, was recruited beginning in or about June of 2006 and arrived in the United States on or about November 27, 2006.

75.     Plaintiff Benny Kattukariyil Varkey was recruited beginning in or about February or March of 2006 and arrived in the United States on or about November 28, 2006.

76.     Plaintiff Shahi Vijayan was recruited beginning in or about March or April of 2006 and arrived in the United States on or about November 20, 2006.

13

77.     Plaintiff John Yohannan was recruited beginning in or about May of 2006 and arrived in the United States in or about November of 2006.

*Defendants*

78.     Defendants Signal International, LLC and Signal International, Inc. are corporations organized under the laws of Delaware, with facilities in the Gulf Coast region, including Pascagoula, Mississippi.  At all relevant times, Signal International, LLC acted as an agent and/or alter ego of Signal International, Inc., and took all conduct discussed herein with the knowledge and consent of Signal International Inc.  Signal International, LLC and Signal International, Inc. will be referred to collectively below as "Signal" unless a distinction is drawn between them.  Signal provides marine and fabrication services, including offshore drilling rig overhaul, repair, upgrade and conversion.

79.     Defendant Global Resources, Inc. ("Global") is a corporation organized under the laws of Mississippi that recruits workers from India for employment in the United States.

80.     Defendant Michael Pol ("Pol") was, at all relevant times, the President of Global Resources, Inc., and resides in Mississippi.  On information and belief, Pol was, at all relevant times, the sole corporate officer of Global.  Pol and Global Resources, Inc. are alter egos.  Global and Pol will be referred to collectively below as "Pol," unless a distinction is drawn between them.

81.     Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India.  Dewan Consultants has substantial business contacts with Pascagoula, Mississippi.  In 2004, Dewan Consultants contracted with Global and Burnett—through the Gulf Coast Immigration Law Center, LLC—to identify and recruit Indian workers for employment in the United States on permanent residency visas.

14

82.     Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants. Dewan resides in India and has, since at least 2005, had substantial business contacts with Pascagoula, Mississippi, including travel to Pascagoula on behalf of Signal and Dewan Consultants.  Dewan and Dewan Consultants will be referred to collectively below as "Dewan," unless a distinction is drawn between them.

83.     Defendant Malvern C. Burnett ("Burnett") is an attorney who is registered to vote in Mississippi and maintains offices in Ocean Springs, Mississippi.  Burnett used his Ocean Springs office to perform much of the legal work necessary to bring Plaintiffs and other Indian workers to the United States on H-2B visas.

84.     Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana that maintains offices in Ocean Springs, Mississippi.

85.     Defendant Gulf Coast Immigration Law Center, LLC ("Gulf Coast Immigration") is a limited liability corporation organized under the laws of Louisiana that maintains offices Mississippi.  Burnett is the registered agent of Gulf Coast Immigration.  On information and belief, Burnett is the sole member and/or corporate officer of Gulf Coast Immigration.  Burnett, the Burnett Law Offices and Gulf Coast Immigration operated as a joint venture and/or alter egos, and will be referred to collectively below as "Burnett," unless a distinction is drawn between them.

86.     At all relevant times, the Agents acted as the agents and/or representatives of Signal, and were acting within the course and scope of their agency, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of Signal in performing the acts alleged in this complaint.

15

87.     At all relevant times, the Agents were involved in a venture with each other to recruit the Indian workers, including the Plaintiffs, and bring them to the United States to work at Signal, as memorialized by various oral and written communications and agreements, and were acting within the course and scope of that venture and those agreements, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Agents in performing the acts alleged in this complaint.

## SUBSTANTIVE ALLEGATIONS

### In the Aftermath of Hurricane Katrina, Signal Contracts with Dewan, Burnett, and Pol to Bring Temporary Workers to the United States at No Cost to Signal

88.     The devastation caused by Hurricane Katrina presented both an opportunity and a challenge for Signal.  The rebuilding effort offered significant potential for new work fixing damaged oil rigs, ships, and other marine platforms.  At the same time, however, because the hurricane also destroyed or damaged thousands of homes along the Gulf Coast, including in Pascagoula, some of Signal's workforce had temporarily left the area.

89.     In early 2006, Michael Pol approached Signal with a purported solution to its problem.  At a meeting in January or February of 2006, Pol told Signal's Chief Financial Officer Chris Cunningham, Senior Vice President and General Manager Ronald Schnoor, and Vice President of Productions for Mississippi Operations Bill Bingle, that he could deliver first-class fitters and welders from India at no cost to Signal.  Pol informed Signal that he would work with local immigration attorney Burnett and India-based recruiter Dewan to bring skilled welders from India.  The workers themselves would pay for all costs and fees associated with the recruitment process, immigration processing, and travel to the United States, and Signal would not reimburse the workers for these fees.  Signal would pay the workers between $14 and $18 per hour, depending upon skill level.

16

90.     On April 18, 2006, Signal executed a document entitled "Skilled Worker Recruitment Agreement" (the "Recruitment Agreement") with Pol's company, Global, authorizing Global to recruit foreign skilled workers for employment at Signal "under the 'H-2B' temporary program and/or the 'permanent residence' process."  Pursuant to the Recruitment Agreement, Global would be responsible for all costs associated with recruitment, transportation, and entry of the foreign workers into the United States and would deliver the workers "at no cost to Signal" to the airport of Signal's choice.  The cost incurred by Pol would be deducted directly from the foreign workers' wages and paid to Pol/Global.

91.     On June 19, 2006, Signal executed a power of attorney with Dewan's company, Dewan Consultants, appointing Dewan Consultants as Signal's "representative in India to facilitate the recruitment of skilled workers to the United States of America" for employment at Signal.  The power of attorney authorized Dewan Consultants to advertise, conduct seminars and trade tests, and sign any necessary legal documentation on Signal's behalf.

92.     Also in mid-2006, Signal entered into an attorney-client relationship with Burnett to advise Signal on immigration issues pertaining to Signal's need for workers.  Signal and Burnett later memorialized their engagement in a written retainer agreement.  Pursuant to that agreement, Signal would not be responsible for any of Burnett's legal fees.  Rather, under the terms of the agreement, Burnett took funds from the "recruitment fees" charged to the workers to pay for the legal services he provided to Signal.

### *Defendants File Petitions for Temporary H-2B Visas, Not Green Cards*

93.     Signal requested that the Agents secure foreign workers and transport them to the United States as quickly as possible.  Signal and the Agents decided that Signal would sponsor workers on an H-2B visa, which could later be extended if Signal needed more foreign labor.

94.     In 2006, Dewan and Burnett placed newspaper advertisements in at least six Indian cities to recruit workers for Signal.  Some of the advertisements offered welders and fitters opportunities to go to the United States and obtain H-2B visas or "Employment Based Green Cards."  Other advertisements touted the opportunity for "permanent lifetime settlement in U.S.A. for self and family."

95.     In the spring, summer, and fall of 2006, Dewan, Pol, and Burnett traveled multiple times to India and the United Arab Emirates ("UAE") to conduct recruitment seminars with interested potential workers.  Several Signal employees, including Signal Special Projects Manager John Sanders and Vice-President of Productions for Mississippi Operations William Bingle, traveled to India and attended these sessions.  Sanders also oversaw the immigration interviews and served as contact between Signal and consular officials.

96.     At these various seminars, the Agents promised recruits, including Plaintiffs, that Signal would sponsor green card applications for them.  In their seminar presentations, the Agents promised that although all hopeful green card applicants would automatically be enrolled as H-2B candidates, this would not affect the employment-based green card process.

97.     Written agreements between Plaintiffs and the Agents also explicitly promised assistance in applying for and securing green cards—assistance that Defendants took no steps toward providing.  Dewan Consultants had some Plaintiffs sign "memoranda of understanding," which, among other things, informed the workers that "Signal International, LLC has orally promised the Facilitator [Dewan Consultants] . . . that . . . [Signal] will be willing to file and process their employment base [sic.] Green Card."  Dewan Consultants also issued form letters to some Plaintiffs, informing them that Signal "shall proceed with your Green Card for United States of America."  Likewise, the Burnett Law Offices and Gulf Coast Immigration signed

receipts memorializing the payment of "Part Fees for Employment Based Permanent Residence Visa Processing for Signal International," and Global issued a "Services Agreement" promising some Plaintiffs that Global would do "everything within its power to assist worker to obtain permanent residence status in the United States within 24 months."

98.     Signal and its Agents told the Plaintiffs that Signal would sponsor them immediately for green cards in order to induce them to pay large fees to travel to the United States—which had the net effect of defraying nearly all the costs Signal would have had to expend to recruit workers legitimately—and to induce them to pay exorbitant "recruitment fees" far in excess of what would actually be required by the Defendants to obtain H-2B visas or even the promised green cards.

99.     Unbeknownst to the Plaintiffs, however, Defendants did not take any steps to apply for permanent residence for the Plaintiffs.  Defendants only helped Plaintiffs obtain temporary H-2B visas that legally prevented Plaintiffs from working for any United States employer besides Signal.  Indeed, Signal made clear in its application to the United States Department of Homeland Security that its need for workers was <u>temporary</u> and short-lived.

100.    To ensure that their deception remained hidden, Defendants instructed Plaintiffs not to tell United States Department of Homeland Security officials during their forthcoming H-2B visa interviews that, in addition to applying for temporary worker status, Signal had promised them that it would sponsor them for green cards.  As Pol explained to Sanders in an August 24, 2006 email:

> Mal[vern Burnett], Sachin [Dewan] or I[ ] needs to be with each
> and every candidate going into the consulates before their
> interview [because] [t]hey sometimes say the dumbest things and
> need to be coached on the proper way to interview. . . . [T]here are
> some things that should not be known to the consulate personnel,
> such as the fact that we are going to process them for a green card.

> If one of those guys says he is going to the U.S. for immigration
> and Signal is sponsoring him for permanent residence (green card)
> . . . he is a goner.

### *Plaintiffs Incur Substantial Debt to Afford High "Recruitment Fees"*

101.    Lured by the Agents' promises of high-paying employment and permanent residency in the United States, Plaintiffs relinquished stable employment opportunities in India and as guest workers in the Persian Gulf.

102.    Apart from foregoing additional financial gains, Plaintiffs also sold personal and familial assets and incurred substantial debt to afford the fees demanded by Defendants for their recruitment and travel to the United States.

103.    These fees, quoted in various amounts to Plaintiffs, ranged from the equivalent of approximately $10,000 to $25,000.

104.    The Agents knew that these fees would cause the workers, including Plaintiffs, to incur substantial and potentially ruinous debt.

105.    Each Plaintiff paid the amounts Defendants requested, as detailed in further allegations below.

106.    Before receiving their visas, Plaintiffs were interviewed by officials at the U.S. consulate in India.  Prior to these interviews, Dewan and other employees of Dewan Consultants met with Plaintiffs, took their passports, collected payments for the consular interviews, and, at the direction of Burnett, instructed them to tell consular officials that they only paid a total of approximately $670 in recruiting and immigration processing fees.

107.    Dewan told Plaintiffs that if they told the truth about the significant fees they had paid, their visas would be cancelled and the Agents would keep the money they had already collected.

20

108.     Even in the face of significant delays in processing immigration paperwork, which left the Plaintiffs jobless and uncertain of their futures, Dewan, Pol, and Burnett refused to refund any fees for any reason.  When certain Plaintiffs, including Shaiju Vadakkal George and Aby Molathu Poulose, expressed reluctance to continue with the immigration process or pay the next fee installment, Dewan, Pol, and Burnett threatened forfeiture of all money paid to that point.  Defendants also loaded new, unexplained fees onto the workers, from minor fees (such as $45 "testing fees") to significant additional last-minute travel expenses.

109.     In the hours before their flights to the United States departed, Plaintiffs were required to wait in line to proceed through Dewan Consultants' cramped offices to make a final installment payment in cash.  Dewan then forced Plaintiffs to sign various documents—many written in English, which certain of the Plaintiffs could not read or understand—in a rushed fashion.  Dewan warned Plaintiffs that they would miss their flights if they did not sign quickly. He even refused to tell Plaintiffs what it was they were signing.  Only after Plaintiffs signed the documents did Dewan return their passports to them.

110.     Thereafter, each Plaintiff boarded a flight to the United States, where they were picked up from the airport by Signal personnel and taken to Signal's Pascagoula, Mississippi facility.

### Plaintiffs Arrive in Signal's Pascagoula, Mississippi Man Camp and are Subjected to Degrading and Discriminatory Conditions

111.     Signal assigned each Plaintiff to work at its Pascagoula, Mississippi fabrication facility.

112.     Signal required that each Plaintiff live in a man camp constructed in the fall of 2006 specifically to house Indian workers.  Signal employees and management referred to the Pascagoula man camp as "the Reservation."

113.    Signal personnel discussed among themselves, including in written email communications, that housing the workers in a secluded man camp on the outskirts of town was preferable, as it would keep the Indians segregated from the rest of the Pascagoula, Mississippi community.

114.    The Pascagoula man camp was isolated, over-crowded, unsanitary, and not suitable for human habitation.  Workers were not permitted to photograph the man camp.

*Overcrowded Bunkhouses*

115.    The camp bunkhouses themselves were not fit for long-term human habitation. Signal crammed up to twenty-four men into each bunkhouse.  The bunk beds were so tightly packed that it was difficult for the Plaintiffs to move between them.  The top bunks were so close to the ceiling and the bottom bunks so close to the top bunks that Plaintiffs could barely sit up in their beds.

116.    The bunkhouses had insufficient toilet and showering facilities.  Lines for the bathroom were consistently very long.  The showers themselves were dangerous.  Electrical conduit joints near the showers were unglued, exposing workers to potential electrocution.

117.    Privacy was impossible, and sleep was difficult, due to the noise from such close quarters, oppressive smells, and the comings and goings of workers who worked on different shifts.  Some workers reported rats in their sleeping areas.  Occasionally, rats ran across their bodies.

118.    These conditions fell far short of basic requirements of habitability.  For example, the federal government's Occupational Safety and Health Administration ("OSHA") guidelines state that bunkhouses of similar purpose should have a minimum of 50 square feet of floor space per habitant.  Signal's bunkhouses offered less than 18 square feet of floor space per worker. Likewise, OSHA guidelines require bunk beds to be at least 48 inches apart from other beds.

22

Signal's bunk beds were so tightly packed together that workers were essentially sleeping next to each other.

119.    Workers told Signal personnel on numerous occasions that they found these conditions to be intolerable.  Internal communications among Signal personnel discussed the "overcrowding," acknowledging that the Pascagoula camp was at least "3 bunk-houses" shy of appropriate capacity, and that "more toilet/sink capacity" was needed.

*Rotten Food*

120.    The food provided by Signal was deplorable.  Meals were offered exclusively in a mess hall, which was only open during limited hours.  Workers who showed up a few minutes late for a meal were denied food altogether.  Those who did eat were often served rotten food and, at times, workers found bugs in their meals.

121.    Plaintiffs frequently complained to Signal personnel that the food was so bad that they were left hungry.  Many became physically ill or suffered chronic gastric problems, conditions that they made known to Signal.

122.     In an email to other Signal personnel, Signal Senior Vice-President & General Manager Ron Schnoor acknowledged the "bad, stale, molded, and otherwise poor quality food."

*Rampant Disease*

123.    Even apart from the kitchen conditions, the man camp itself was a breeding ground for bacteria and disease.

124.    Workers frequently became severely ill.  As explained by the Signal's manager of the Pascagoula man camp:

> Our Indians have been dropping with sickness like flies. . . .
> [They] are getting worried and believe there are unhealthful
> conditions in the camp.  It is true.  The reason is because the
> plumbing was so shoddily done by GE's subcontractors, and water

has leaked everywhere and stagnated as a result, which serves as a
bacterial breeding ground.

*Perpetual and Abusive Oversight*

125.    Signal instilled in Plaintiffs a climate of fear through perpetual and invasive

oversight and surveillance.

126.    The Pascagoula man camp was located in an isolated industrial area that was

miles removed from other residential communities, shopping facilities, worship houses, and

other basic amenities.  The man camp was enclosed by fences and accessible only by a single

entrance, which was guarded by an armed security guard at all times.  When returning "home"

from work and entering the camp, Plaintiffs were required to show identification and subject

themselves and their belongings to search.  Their movements into and out of the camp were

logged.

127.    Guests were not normally permitted in the man camp.  Plaintiffs were permitted

visitors in the parking lot.

128.    Because the camp was isolated, Plaintiffs relied upon transportation from Signal

to and from work and also to other populated areas.  However, Signal would only take them to

Wal-Mart or the bank.  Even then, Plaintiffs had little privacy as Signal security would

occasionally follow them into Wal-Mart.

129.    Signal's private security forces entered the Plaintiffs' bunk areas at night.  Signal

personnel and camp security guards conducted "surprise searches" of the bunkhouses, including

searches of workers' personal belongings.

130.    Plaintiffs were not told when these searches would be conducted (again, in what

was supposed to be Plaintiffs' "home"), nor were they apprised of what it was Signal was

looking for.

131.     Signal prohibited Plaintiffs from drinking alcohol at the camp.  Violations subjected the workers to fines of $250 and suspension from work.  A second "offense" would result in a $500 fine; a third "offense," $750.

132.     The prohibition of alcohol was modeled after Signal's policies for conduct in the workplace despite the fact that the workers were living, not working, in the man camp.

133.     Signal did not bar its non-Indian workers from having visitors or drinking alcohol in their homes.  Nor did Signal confine its non-Indian workers to crowded bunkhouses or subject them to invasive searches of their homes or belongings and near-constant surveillance.

*Signal Charged Plaintiffs Approximately $1,050 Each Month to Live in These Conditions*

134.     For the "privilege" of living in these conditions, the Indian workers (including each Plaintiff) were charged $35 dollars per day (approximately $1,050 per month).  From this amount, $21 was allocated towards rent and $14 towards food.  The $35 daily fee was deducted automatically from the Plaintiffs' paychecks.

135.     Pol personally received $1.50 per day per worker from the $14 food cost in pure profit for having referred a caterer, Laxmi Catering, to Signal.  When Pol was later terminated by Signal, the $1.50 per worker per day profit was not remitted to the workers but was instead paid to another caterer, Anjay Keswani.

136.     Before the $35 per day value was set, Signal's Senior Vice President and General Manager Ronald Schnoor initially recommended that Signal charge the workers $53.50 per day.  Schnoor reached that figure by calculating the amount it would take to amortize over just ten months the entire cost Signal incurred building the man camps in Pascagoula, Mississippi, and Orange, Texas—a $7 million capital expenditure.  Schnoor shockingly dismissed the devastating impact of this exorbitant $1,600 per month fee by cavalierly asserting that the Plaintiffs and their

fellow workers would all be "happy campers" because Signal's living arrangements and wages were likely to be an improvement over conditions in India.

137.    After a short time in the camp, workers (including certain Plaintiffs) began complaining about the poor conditions and asked to live outside the camp in accommodations of their own choosing.  In response, Signal informed Plaintiffs that if they tried to live outside the camps, Signal would continue to deduct $35 per day from their paychecks.  Given their substantial debts, this wage deduction left Plaintiffs with no choice but to remain at the camp.

138.    Signal did not require any non-Indian workers to pay for Signal's capital expenditures, nor did it require any other workers to pay for living expenses, whether or not they were living in Signal-provided housing.

139.    Signal imposed this onerous policy in order to avoid paying any of its own expenses.  By exploiting the Plaintiffs' tenuous financial position, heavy debt load, precarious immigration situation and fear of job loss, Signal knew that they and their coworkers would have no choice but to continue working at the company.  Indeed, because of the grip in which Signal held its Indian workers, the Plaintiffs felt compelled to remain at the Pascagoula man camp.

140.    In contrast, workers of non-Indian race, ethnicity, or alienage were not required, or even allowed, to live in and/or pay for housing in the Pascagoula man camp.

### Plaintiffs Experienced Other Discrimination by Signal and its Employees Due to their Race, Ethnicity, Religion, and Alienage

141.    Defendants' racial animus and discrimination against Plaintiffs and the other Indian workers took other, equally abusive, forms.

142.    Signal employees ridiculed Plaintiffs and accused Indians of being dirty people who did not bathe.  Whether on "the Reservation" or at the worksite, Signal employees, including supervisors, repeatedly referred to Plaintiffs and the other Indian workers as "animals,"

26

"Indian pigs," or similarly offensive and racist slurs.  Signal supervisors laughed when Plaintiffs'

non-Indian co-workers harassed them.

143.     Management frequently referred to Plaintiffs by badge number, even though they

called non-Indian workers by their given names.  Some Plaintiffs were also referred to by

offensive nicknames.  For example, Plaintiff Thenooran Unnikrishnan was referred to by Signal

managers as "Raccoon," because they said his name was too hard to pronounce.

144.     In an April 5, 2007 email to Signal employees Bill Bingle and Tracey Binion,

Signal employee Darrell Snyder stated his opinion that it was a "misguided notion that some of

these Indians can be reasoned with," and discussed his plan to engage in a "rat hunt" in the

Pascagoula camp to determine who was causing "dissension" among the workers.

145.     Signal also displayed a shocking lack of respect for Plaintiffs' religious beliefs.

146.     Signal knew that many of the workers were highly religious.  In particular, Signal

knew that certain of its workers were Sikh.

147.     Wearing a beard is an article of faith in Sikhism.  In the Sikh tradition, a beard

demonstrates a love of God and respect for the natural form God bestows on man.

148.     Signal nevertheless demanded that Sikh workers shave their beards after arriving

at the Pascagoula camp and threatened to deport them if they would not do so.  When Plaintiff

Ranjit Singh and other Sikhs were forced to shave their beards, they sat on the floor and cried,

distraught.  Workers of non-Indian race, ethnicity, or alienage and not of the Sikh religion were

not subject to similar treatment.  Signal also did not take any steps to provide reasonable

accommodations to company policies or practices for its Sikh employees.

149.     In addition, Signal knew that many of the workers were Hindu, but it treated

Plaintiffs who practiced Hinduism differently than its Christian workers.  Hindu Plaintiffs found

it very difficult to pray in their living quarters due to the lack of space, but Signal did not provide any alternative areas for them to pray. Moreover, while Signal provided transportation to a local Christian church, Signal refused certain Plaintiffs' request that it provide transportation to a Hindu temple. Signal employee John Sanders even required certain Hindu workers, including Plaintiff Thenooran Unnikrishnan, to attend a Christian church.

150.    Signal also required Plaintiffs to engage in repeated "skills testing" evaluations that non-Indian workers were not required to take and subjected Plaintiffs to on-the-job discipline, periods without work, lower pay, and unfavorable job assignments to which workers of non-Indian race, ethnicity, or alienage were not subjected. For example, when Indian workers finished their assignments early, Signal required them to do extra janitorial work. Non-Indian workers were allowed to remain idle. In addition, Signal managers controlled and closely monitored Plaintiffs' bathroom breaks, while non-Indian workers were free to use the bathroom whenever they pleased.

151.    Signal also forced Indian workers, including Plaintiffs, to perform tasks that were more difficult and more dangerous than the jobs Signal assigned to non-Indian workers. For instance, Signal made the Indian workers work in poorly lit oil rig tanks that contained powerful chemical fumes and lacked proper ventilation. Signal also required Plaintiffs to work on shoddily-built scaffolding. Non-Indian workers were not required to work in the oil rig tanks or under similar dangerous conditions.

152.    Many Plaintiffs suffered injuries as a result of these and other unsafe conditions. Nonetheless, Signal refused them access to proper medical care. Signal knew that the conditions at the Signal man camp and work site rendered Plaintiffs reliant on Signal for transportation to care providers. But when Plaintiffs were injured, Signal refused to transport them. For

28

example, in or about January 2007, Plaintiff Johny Mathew fell from a scaffold when the platform broke.  He suffered chest pains, but Signal refused to take him to a doctor.  It was only one or two days later, after Mathew's symptoms persisted, that a Signal security officer took him to the hospital.  At the hospital, the security officer told Mathew not to speak to the doctors and informed them that Mathew had fallen in the bathroom.  Similarly, Plaintiff Thenooran Unnikrishnan suffered a head injury when he was struck with a pipe.  Instead of treating his injuries, and despite the fact that his head was still bleeding, the Signal medic tested Unnikrishnan for the presence of drugs and alcohol in his bloodstream and then sent him back to work.  When non-Indian workers suffered similar injuries, they were given proper medical treatment, were not forced to take tests for substance abuse, and were given time to recover.

153.    When Plaintiffs complained about the unsafe and illegal working conditions, Signal forced them to do additional cleanup work, demoted them, suspended them without pay, and/or threatened to deport them.  Plaintiff Parshottam Mangani was demoted after complaining about slippery floors at his worksite, while other Indian workers who complained about unsafe conditions were suspended for three days for "safety violations."  Workers of non-Indian race, ethnicity, or alienage were not treated this way.

154.    Defendants' discriminatory treatment of Plaintiffs and other Indian workers was motivated by racial, ethnic, and religious animus, as well as an animus against those of Indian national origin.

### Signal and the Agents Continued to Mislead the Plaintiffs About the Terms of their Employment

155.    On numerous occasions during October, November, and December 2006, Burnett and Signal personnel met with workers who asked about the prospect of receiving green cards. During these meetings, Signal personnel were told by workers that the Agents and Signal

personnel in India had promised that Signal would apply for and help the workers obtain green cards, and that the workers had paid as much as $25,000 for that opportunity.

156.     Rather than tell the workers honestly that Signal had not applied for permanent residency on their behalf and had no present intention to do so, Signal continued to deceive the workers into believing that Signal would apply for and help them obtain permanent residency status.  Notably, in or about January 2007, Dewan and Burnett traveled to the man camp and, with Signal employee John Sanders present, told Plaintiffs and other Indian workers that Signal would provide each Indian worker, including Plaintiffs, with a green card.   Later, in and about the first half of 2007, Signal posted notices in the man camp directing the workers to fill out certain legal forms and submit them, along with their passports, to Signal for green card processing.

157.     Beginning before the January 2007 meeting and continuing throughout 2007, Signal employees communicated and consulted with each other and with the Agents concerning what to tell workers, including Plaintiffs, about the status of their visas and green card applications.  Throughout that period, Signal and the Agents continued to assure Plaintiffs that they would receive green cards, both in private conversations and in meetings.

158.     Signal also did nothing to address the fact that the Plaintiffs' temporary employment at Signal (which Signal itself represented to the U.S. Department of Homeland Security, under penalty of perjury, would be completed "within the . . .year") was not economically justifiable in light of the crushing amounts of debt Plaintiffs incurred and the mandatory $35 per day deduction for room and board.

159.     By at least October 2006, shortly after the first workers (including Plaintiffs) arrived in Pascagoula, Signal personnel learned that each worker had been required to pay well over the equivalent of $10,000 to Pol, Burnett, and Dewan.

160.     In internal correspondence and conversation, Signal personnel (including Signal executives) concluded that these "recruitment fees" were excessive and a root cause of dissatisfaction and low morale among the Indian workers.

161.     Nevertheless, Signal did effectively nothing to remedy the situation.

162.     *First*, although Signal sent a letter to Dewan and Burnett requesting that they refund half of the fees that they had received, Signal did not terminate its relationship with Dewan or Burnett or impose any penalty or withhold any payment when those individuals refused to comply.  In fact, Signal did nothing even after Burnett (i) asserted to Signal that Dewan had refunded the workers' money, and (ii) furnished affidavits signed by workers attesting to the "fact" that they never paid any fees, both claims that Signal itself considered plainly false.

163.     *Second*, despite believing that the fees being charged were unreasonable and were generating problems, Signal never demanded that Dewan or Burnett cease collecting such fees from new recruits who were still in India.  Indeed, Signal continued to hire workers, including certain Plaintiffs, through Dewan and Burnett after it learned of the unreasonable fees that they charged, effectively ratifying the conduct of its Agents.

164.     *Third*, Signal did not itself refund the unreasonable fees charged by the Agents, nor did Signal offer any assistance to mitigate the cost or modify its contract with the Agents in which it had been agreed that neither Signal nor Global would shoulder any of the "recruitment fees" for its Indian workers.

### *In an Attempt to Quell Rising Worker Dissatisfaction, Signal Sends Three Workers Back to India, One of Whom Attempts Suicide*

165.    By the spring of 2007 (approximately 3 to 4 months after workers first arrived), it became increasingly clear that the conditions at the Pascagoula camp were intolerable.  Workers began to consider ways to convince Signal to improve the conditions and sought outside advice from local church goers and attorneys.

166.    In late February 2007, when Signal learned that certain workers had contacted a lawyer, Signal threatened to send the most vocal workers back to India.

167.    To exert additional pressure over Plaintiffs, Dewan and Dewan Consultants intimidated the families of certain vocal workers.  In or about March of 2007, a representative of Dewan Consultants called Plaintiff Aby Poulose's family in India and warned them that Poulose would be sent back to India if he did not stop making trouble at Signal.  Dewan called another vocal worker's family and issued a similar threat.  And around the same time, a Dewan Consultants employee called Plaintiff Ninan Tharakan's family and warned them that they would have trouble in India if Tharakan created any problems in the United States.

168.    News of these and other calls to India spread among the workers, and substantially heightened Plaintiffs' fears that Defendants would retaliate, perhaps even with violence, against them and their families if they complained about or tried to leave the discriminatory and degrading conditions.

169.    Signal escalated its pressure on the workers while continuing to mislead them about green cards.  In a meeting with Plaintiffs and other workers on March 8, 2007, Signal management assured the workers that Signal would "take care" of their green cards.  However, Signal management also told Plaintiffs that Signal would fight back against any "organizing"

efforts, and that Signal would not extend any of the workers' H-2B visas if a single worker took legal action against Signal.

170.     On that same day, Signal decided to terminate and forcibly send back to India five of the ostensible "camp leaders," and to do so in a way that would make an example out of them and intimidate the other workers into remaining scared and compliant.

171.     Early in the morning of March 9, 2007—when the workers for both the day and night shifts were present at the camp—Signal locked the gate to the Pascagoula man camp, thereby blocking the only exit.  At approximately the same time, Signal camp coordinator Darrell Snyder and five security guards swept through the bunkhouses carrying pictures of the men targeted for termination.  Because Mr. Snyder and the security guards could not differentiate the appearance of these Indian men, they accosted numerous workers to determine whether they were the individuals shown in the pictures.

172.     By 6:00 a.m., Signal had identified four of the five workers, taken them into "custody," and told them that they were fired and would be deported.  Distraught at what that meant for him and his family, one of these workers slashed his wrists and attempted suicide in front of Plaintiff Parshottam Mangani.  The fifth worker fled the camp.

173.     By early afternoon, local media, religious advocates, and other individuals had gathered outside the camp gates to express their concern over the attempted suicide and the forced detention of the other men.

174.     The incidents of March 9, 2007 caused great fear in each of the Plaintiffs.  Not only were they afraid of the worsening tension among the workers, they were scared of what Signal would do to them if they raised concerns about conditions at the camp.  Plaintiffs

believed, based on Signal's conduct, that protesting their plight would lead to arrest, imprisonment, bodily harm, and deportation back to India.

175.    Indeed, by its conduct over March 8 and 9, 2007, Signal intentionally created a climate of fear and intimidation in order to overawe the Plaintiffs and their coworkers into dropping their complaints about the camp and their treatment at the hands of Signal and its Agents.

### Signal, Assisted by Burnett and Dewan, Used Fraudulent and Coercive Tactics to Keep Plaintiffs in the Pascagoula Camp

176.    Following the March 9, 2007 incident, Signal and its Agents used additional fraudulent and coercive tactics to keep the workers, including Plaintiffs, under its control.

177.    In or about mid-March 2007, Burnett and Dewan traveled to the Pascagoula man camp to again reassure workers that they would receive green cards and warn them that they should not cause any trouble for Signal.

178.    That same month, Signal Senior Vice President Ron Schnoor addressed the entire Pascagoula man camp about what had happened on March 9.

179.    Schnoor used two tactics:  fraudulent promises of long-term employment, and threats to send the workers back to India.

180.    *First*, Schnoor assured the men that Signal would continue to employ them for the "long term."  That assurance was demonstrably false at the time, given that Signal still had not decided whether it would extend any of the workers beyond the initial ten-month visa period, and given that Signal had already begun to evaluate the Pascagoula workers and had decided to fire and not apply for visa extensions for certain workers.

181.    *Second*, Schnoor threatened the men, telling them that if *any one* Indian worker filed a lawsuit against Signal, Signal would refuse to extend *any* of the H-2B visas for *any* of the

workers, and would therefore send *all* of them back to India.  Signal knew full well that this threat would coerce the workers, including Plaintiffs, into staying at the camp, lest they return to India in crushing debt.

182.    Nevertheless, even given the threats and false promises, by March 2008, over three-quarters of the Indian workers in the Pascagoula camp had left Signal.  Many were terminated; others left of their own accord—often by running away in the middle of the night—due to the low pay, abusive treatment, and deplorable living conditions.

183.    No Plaintiff received a green card through the help of Signal or the Agents.  Indeed, neither Signal nor the Agents ever applied for a green card for any Plaintiff.

### *Malvern Burnett Purported to Act as Attorney to Plaintiffs, but In Reality Was Working Solely on Behalf of Defendants*

184.    At all relevant times, Burnett had an attorney-client relationship with each Plaintiff and, indeed, each Indian worker employed by Signal, for purposes of immigration issues and each Plaintiff's work for Signal.

185.    Burnett prepared the immigration forms required for Plaintiffs to apply for H-2B status.  In completing those forms, Burnett represented to the U.S. Department of Homeland Security, under penalty of perjury, that the Plaintiffs would stay in the United States only temporarily, returning to India "within the coming year."  At the same time Burnett was submitting those forms, he was affirmatively telling the workers, including Plaintiffs, that they would be eligible for permanent residency, and that he would assist them in applying for green cards.

186.    Further, Burnett learned that, after they arrived in the United States, the workers, including Plaintiffs, asked Signal personnel when they could expect to receive green cards.  After learning this, Burnett did nothing to correct his clients' misimpression.

187.    To further his deception, Burnett concealed from Plaintiffs where his true loyalties lay.  As noted above, by mid-2006 Burnett had entered into an attorney-client relationship with Signal for the broad purpose of applying for and obtaining lawful status for Indian workers to come to the United States.  Later, in 2007, Signal and Burnett entered into a written Retainer Agreement memorializing the arrangement as it had been operating—namely that Burnett would "represent you [Signal] in the matter of H-2B Visa extensions for MS and TX" on immigration matters at zero cost while the fees for his work on behalf of Signal were to be taken from the Indian workers, including Plaintiffs.

188.    Burnett never disclosed his attorney-client relationship or payment arrangement with Signal to the Indian workers, including Plaintiffs, much less received their waiver of the conflict of interest it caused.

189.    Burnett also entered into an attorney-client relationship with Dewan and Pol, starting no later than mid-2006.  Burnett never disclosed this attorney-client relationship with Pol and Dewan to the Indian workers, including Plaintiffs, much less received their approval for it.

190.    Burnett also had a "Multilateral Business Agreement" with Dewan and Pol, for the broad purpose of recruiting Indian workers to come to the United States.  Burnett never disclosed this "Multilateral Business Agreement" to the Indian workers, including Plaintiffs, much less received their approval for it.

191.    One incident in particular crystalizes the contempt with which Burnett viewed his Indian clients.  On December 16, 2006, Burnett sent an email to Dewan and Pol regarding Pravin Kumar N. Patel, a Signal worker and client of Burnett.  Patel had stopped payment on a check to Burnett.  Burnett told Dewan and Pol to ensure that "the idiot" Patel restore the payment and threatened to have Patel's visa "mysteriously" revoked if Patel did not pay. Later in the email,

36

Burnett referred to all the Indian workers, who were his clients, as "the idiots" and speculated about whether he should threaten them with "immediate deportation" in order to prevent them from stopping payment on future checks.

192.    Burnett also forwarded emails he received from his Indian worker clients to Dewan.  Burnett forwarded these attorney-client protected communications without permission from his clients, the workers.

193.    Such appalling behavior violates not only the Mississippi Rules of Professional Conduct for attorneys, but basic notions of loyalty, propriety, and honesty.

### Plaintiffs Each Relied on the Defendants' Representations

#### Lakshmanan Ponnayan Achari

194.    In or about the last week of April 2006, Achari was working as a fitter in Chennai, India.  A boy from Achari's hometown in Southern India called Achari and said that he had seen newspaper advertisements offering the opportunity to live in the United States and obtain a green card.  Achari subscribed to one of those newspapers, so he looked at the advertisement and confirmed that it promised the opportunity to get a green card.

195.    Achari then spoke with a friend, who had been working with Dewan Consultants. The friend knew the personal phone number of a man named Salimon and called Salimon on behalf of Achari.  Salimon said that Achari should come to an interview.

196.    In or about May of 2006, Achari traveled with a friend to the friend's interview with Dewan Consultants.  Achari spoke directly with Salimon, who told Achari that there were job openings for fitters in the United States.  Achari told Salimon that he did not have a passport, but Salimon assured him that this would not be a problem.

197.    On Salimon's recommendation, Achari took a written test for the fitter job. Salimon, Dewan, Pol, and, on information and belief, Signal employees were present for the test.

37

Pol reviewed the test results and informed Achari that he passed.  Dewan also reviewed the test results and made notations on Achari's testing paperwork.

198.    About two days later, Achari attended a group interview.  At that interview, Salimon explained that Achari could obtain a green card.  Salimon also told Achari that this process would cost 600,000 rupees (approximately $11,000).[1]

199.    Achari paid this amount to Salimon, Dewan, Burnett, and Pol in three installments in or about and between June and December of 2006.  To raise this money, Achari sold his wife's jewelry.  He also incurred substantial debt: he obtained two loans, each at a 36 percent interest rate.

200.    In or about November of 2006, Achari met with Dewan and, on information and belief, a Signal employee.  Achari told Dewan that he had recently heard from other workers that they were receiving H-2B visas and that this was the first time Achari heard that he might receive anything besides a green card.  Dewan assured Achari that Achari had paid for and would receive a green card.

201.    Also in or about November 2006, Achari again met with Salimon.  Salimon assured Achari that he would receive a green card within eight months.

202.    In or about late November or early December 2006, just before he left for the United States, Achari quit his job at a workshop where he had worked for 25 years.

203.    On or about December 4, 2006, the day he was scheduled to fly to the United States, Achari traveled to Dewan's office in India to obtain his passport.  Although Achari arrived in the morning, Dewan did not meet with him until the evening—just two hours before

---

[1]    Unless otherwise specified, all U.S. dollar approximations are determined through the use of a historical exchange rate calculator, available at http://www.oanda.com/convert/fxhistory.

his flight was scheduled to depart.  Dewan demanded that Achari sign blank pieces of paper and pay the final installment of his "recruitment fees" before Dewan would give him his passport. Achari felt intimidated and that he had no choice but to comply.  He signed and left for the airport.

204.    After arriving in the United States, Achari felt compelled to remain at Signal's man camp because Signal would deduct living expenses from his paycheck even if he lived elsewhere.  Moreover, he felt that he could not leave the job at Signal because he had taken out large loans at high interest rates to pay the "recruitment fees."  He knew he would not earn enough to pay those loans back and feed his family if he returned to India.

205.    Defendants also continued to assure Achari that he would receive a green card. For instance, shortly after he arrived in Pascagoula, Achari attended a meeting led by Pol, Burnett, Dewan, and Snyder.  At the meeting, Burnett said that Signal would apply for H-2B extensions for the workers three times, and would then apply for their green cards.  In or about early-to-mid 2007, Achari attended another meeting led by Pol, Burnett, and Snyder.  At that meeting, Burnett told the workers that he had applied for their H-2B extensions and that their green cards would also be processed.

206.    Achari relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Achari felt intimidated into acquiescence and compelled to continue working for Signal.

*Varghese Varkey Abraham*

207.    In or about May of 2006, Abraham was working as a welder in Dubai, when he saw a newspaper advertisement placed by Dewan Consultants.  The advertisement offered the opportunity to obtain an H-2B visa and a green card with permanent residency in the United States.  Abraham called Dewan Consultants and spoke to Salimon, who told Abraham to attend an interview in India.

208.    Based on Salimon's promises of a green card, Abraham quit his job in Dubai, purchased an airline ticket, and flew to India.

209.    On or about May 19, 2006, Abraham attended an interview with Michael Pol and Salimon.  Pol and Salimon told Abraham he could obtain permanent residency and a green card if he worked in the United States.  Pol and Salimon also asked Abraham to take a written test as part of his job application.  After Abraham passed the test, Pol and Salimon gave Abraham a letter from Signal that promised permanent residency and a green card.

210.    At the interview, Pol and Salimon told Abraham that the immigration process would cost about 600,000 rupees (approximately $13,187).  Abraham paid this amount to Dewan, Salimon, Pol, and Burnett in installments.  To raise the money, he used his savings, sold a small business that he had owned, and also took out a loan at a 10 percent monthly interest rate.

211.    On or about November 26, 2006, Abraham traveled to Dewan Consultants' office to pay Dewan the final installment of the "recruitment fees."  Dewan learned that Abraham did not have about 50,000 rupees (approximately $1,118) of the approximately 600,000 rupees that Defendants had demanded.  As a result, Dewan refused to give Abraham his passport or his plane ticket to the United States.  Dewan also opened Abraham's suitcase and confiscated all of Abraham's papers concerning permanent residency.

212.    Over the next twenty-four hours, Abraham's wife arranged for the remaining 50,000 rupees to be paid to Salimon.  Only then did Dewan give Abraham his passport and plane ticket.  He did not return Abraham's documents concerning permanent residency.  Abraham then flew to the United States.

213.    Upon arriving at Signal, Abraham learned for the first time that Signal would deduct approximately $245 per week from his paycheck for food and housing and that he would be sleeping in a trailer with 23 other men.  The food was terrible, and the work was much more dangerous than that to which he was accustomed.  Nonetheless, he felt compelled to stay at the man camp and work for Signal because he had depleted all of his assets and incurred enormous debt to pay the "recruitment fees" that Defendants demanded.  His H-2B visa only allowed him to remain in the United States if he worked at Signal, and he knew that if he returned to India, he would never be able to repay his loans.

214.    Signal officials also continued to assure Abraham that they would process his green card.  Throughout the first half of 2007, Abraham attended camp meetings approximately every two months at which Signal officials stated that they would extend the workers' visas and obtain their green cards.

215.    Abraham relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Abraham felt intimidated into acquiescence and compelled to continue working for Signal.

*Kodakeril Baby Biji*

216.    In or about July 2006, Biji saw a newspaper advertisement offering the chance to obtain an H-2B visa and then permanent residency in the United States.  In response, he called Dewan Consultants, and Salimon told Biji that he should attend an interview that would take place about one month later.

217.    Salimon, Dewan, and two Signal employees were present at Biji's initial interview.  The Signal employees gave Biji a written test, and Salimon explained that Biji and the other attendees would obtain a ten month H-2B visa and then a green card.  Salimon also explained that this process would cost over 600,000 rupees (approximately $12,500).  This money would be paid to Dewan Consultants, Pol, and Burnett.

218.    Relying on the Agents' promises of receiving a green card, Biji quit his job of nine years and paid the 600,000 rupees demanded by the Agents between approximately July and December 2006.  To raise the money, he used his savings and borrowed from a bank at an interest rate of approximately 10 to 13 percent annually.  Biji borrowed other funds at a 20 percent annual interest rate.

219.    Approximately one or two months after his initial interview, Biji brought a fee installment to Dewan and Burnett at a hotel in India.  Burnett told Biji that he would receive a visa and gave Biji paperwork promising an H-2B visa and permanent residency.  Then, on or about November 7, 2006, Biji met again with Salimon, who stated that Biji would travel to the United States for ten months on an H-2B visa, return to India, and then come back to the United States with a green card.

220.    Just before Biji left India, Dewan forced him to sign paperwork written in English.  Because Biji did not speak or read English, he could not understand what the paperwork said.

42

221.    After arriving in the United States, Biji learned that the living conditions at Signal were terrible and that Signal staff members treated the Indian workers like animals. After a few months, Biji and three friends rented a local apartment for approximately $740 per month. Nonetheless, Signal continued to deduct $35 per day from Biji's paycheck for room and board. Even though he was earning far less than he had been led to believe he would, Biji felt that he had no choice but to continue working for Signal because he had spent all of his savings and borrowed a great deal of money to travel to Mississippi. He believed that the only way he could earn enough money to repay his loans was to if he continue to work for Signal.

222.    Biji also continued to believe that Signal would provide him with a green card. In or about December 2006, Biji met with Burnett and Sanders at the Pascagoula camp. Biji asked both Burnett and Sanders when he would receive his green card. Both assured him that Signal would file for his green card. In or about mid-2007, Biji also attended a meeting at which a Signal official again promised that the company would apply for the workers' green cards.

223.    Biji relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Biji felt intimidated into acquiescence and compelled to continue working for Signal.

*Subhashithan Bahuleyan*

224.    In or about the spring of 2006, Bahuleyan saw a newspaper advertisement that Dewan Consultants had listed, offering an opportunity to work for a "Leading Marine and Fabrication Company" in Mississippi or Texas and obtain a "permanent-employment visa." The

advertisement listed interview and testing dates in July 2006. Bahuleyan attended one of these meetings, where he took and passed a written test administered by Dewan and a Signal employee.

225.     After the test, Dewan and Salimon told Bahuleyan that if he accepted the job at Signal, he would travel to the United States on a nine-month visa and Signal would obtain a green card for him. Dewan and Salimon assured Bahuleyan that he would become a permanent resident of the United States and would be able to bring his family to live with him. Dewan told Bahuleyan that this process would cost 600,000 rupees (approximately $13,200).

226.     Bahuleyan paid these "recruitment fees" to Dewan, Pol, and Burnett in installments between August and November 2006. To obtain the funds, Bahuleyan took out a loan with a monthly interest rate of approximately 7 percent. Due to the exorbitant interest rate, Bahuleyan ultimately paid over 1,800,000 rupees (approximately $39,600) to settle this debt.

227.     In or about early November 2006, Bahuleyan met with Dewan, Salimon, and Burnett to discuss his upcoming interview at the U.S. consulate.   They instructed Bahuleyan to tell the consular officials that he was only planning to stay in the United States for nine months.

228.     Shortly after the interview, a Dewan Consultants employee called Bahuleyan and told him to bring his final installment to Dewan's Mumbai office. On or about November 27, 2006, Bahuleyan traveled to Dewan's office. As he waited in line to meet with Dewan, he saw a Dewan Consultants employee tell another man that he had not brought enough money. When the man told Dewan that he had no more money, Dewan told him that he could not go to the United States; the man began to cry.

229.     Bahuleyan began to worry whether Dewan also would accuse him of not having enough money.  Indeed, when Bahuleyan gave his money to Dewan and Dewan's brother, they

44

claimed that Bahuleyan owed an additional 33,000 rupees (approximately $700). Bahuleyan protested that he had brought the requested amount, but Dewan and his brother said that it was not enough. Dewan did not give Bahuleyan his passport until Bahuleyan called his wife and arranged for the remainder to be paid to a friend of Salimon. Shortly thereafter, Bahuleyan left for the airport and flew to the United States.

230.    When Bahuleyan arrived in the United States, he learned that Signal would deduct $705 from his paycheck for tools and $35 each day for room and board. Bahuleyan felt like a prisoner at the camp. Signal regulated every aspect of his life, including where he went, what he ate and drank, and what he could bring into the camp. Eventually, Signal reduced his salary to $12 per hour without explanation. Bahuleyan spoke with the general foreman, who told Bahuleyan that, if he was unhappy with this pay, he could return to India. Bahuleyan knew that he could not risk losing all of his income from Signal because the interest on his loans was increasing daily. He felt that he had no choice but to agree to this wage deduction.

231.    In or about early 2007, Bahuleyan attended many meetings at Signal. Each time, Signal employees told the workers that the company would extend their visas and apply for their green cards. In particular, on or about March 7, 2007, Bahuleyan attended a meeting led by Signal's Vice President. A number of workers asked about the status of their green cards, and the Vice President assured Bahuleyan and other workers that Signal would "take care of everything."

232.    On the day that Signal fired several Indian workers in March 2007, Bahuleyan traveled to the hospital with the Indian worker who attempted suicide. Bahuleyan explained to a doctor that he and other Indian workers had paid up to $20,000 to travel to the United States and had been promised green cards. He explained the stress that they were all under from the

45

constant threats of deportation.  A Signal safety officer who had accompanied them to the hospital overhead the conversation and warned Bahuleyan not to say anything negative about the company.

233.    A few days later, Bahuleyan attended another camp meeting at which Dewan warned the workers not to make any trouble for Signal.

234.    Bahuleyan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Bahuleyan felt intimidated into acquiescence and compelled to continue working for Signal.

*Xavier Disoliyan*

235.    In or about June 2006, Disoliyan was working as a welder in Abu Dhabi and saw an advertisement in a local newspaper promising an opportunity to work for a "leading" United States marine company that would provide work visas and permanent residency.  In or about July 2006, Disoliyan attended a walk-in skills test in India, at which Dewan, Salimon, and Signal representatives were present.  At the skills test, Dewan and Salimon told Disoliyan and other workers that they would travel to the United States on H-2B visas.  Dewan and Salimon also said that, after six months, the workers would receive green cards and would be able to bring their families to the United States.

236.    Dewan and his agents told Disoliyan and others that they would need to pay over 700,000 rupees (approximately $14,436) for this opportunity.  Disoliyan spoke privately with Dewan and Salimon and told them that he did not have enough money.  Dewan and Salimon

explained that Disoliyan could pay in installments, and he should take advantage of the

opportunity because the job in the United Sates would allow him to save 150,000 rupees

(approximately $3,000) every month.  Based on Dewan's and Salimon's assurances, Disoliyan

believed that he would be able to pay back any loans in as few as six months.

237.    Disoliyan paid the fees demanded by Dewan, Pol, and Burnett by using family

property as collateral for loans.  He secured a loan for approximately 300,000 rupees by posting

the house that he had built and the property he had received as part of his wife's dowry as

collateral.  Disoliyan borrowed the remaining 400,000 rupees (approximately $8,200) through a

loan against which his brother-in-law offered his own house as collateral.  Pursuant to the terms

of this loan, Disoliyan was required to begin repaying the principal within one month, and a

default would mean foreclosure on his brother-in-law's home.

238.    In or about August 2006, Disoliyan met with Dewan, Salimon, and Burnett to pay

for what Burnett said was his permanent residency visa.  At this meeting, Burnett assured

Disoliyan that his permanent residency application would be granted.

239.    In or about November 2006, Disoliyan traveled to Dewan's office in Mumbai to

pay his final fee installment and receive his plane ticket and passport.  It was there that he first

learned that Signal would charge him $35 per day for food and accommodations.  Disoliyan was

upset about this additional cost and concerned that it would make it more difficult for him to

repay his loans.  Dewan assured Disoliyan he would be able to send 150,000 rupees

(approximately $3000) back to India each month.  Regardless, Disoliyan decided that he had no

choice but to agree because Dewan and his associates told him that if he refused, he would not

receive a refund of the fees that he had already paid.  Dewan also pressured Disoliyan to sign

additional paperwork without giving him an opportunity to read it because they were in a rush to get to the airport.

240.    Upon arrival in the United States, Disoliyan felt that Signal's work conditions were unsafe.  He did not express those concerns to Signal management, however, because he observed that Signal demoted, fired, suspended, or reduced the pay of Indian workers who complained about the conditions.  At times, Disoliyan was unable to send enough money home to repay his loans because of the charges Signal deducted from his paycheck.  Nonetheless, he was afraid to leave Signal because he had paid so much money to get there.  He knew that he would never be able to earn enough in India to repay his debts.

241.    Disoliyan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Disoliyan felt intimidated into acquiescence and compelled to continue working for Signal.

*Rajankunju Geevarghese*

242.    In or about April 2006, Geevarghese saw an advertisement in an Indian newspaper that offered jobs in the United States for pipefitters and welders.  The advertisement also stated that workers would receive work visas and green cards.  Geevarghese called Dewan Consultants and was told to attend one of a series of meetings scheduled for early May.

243.    On or about May 2 or 3, 2006, Geevarghese attended a meeting at the Trident Hotel in Cochin, at which Dewan, Pol, and Salimon were present.  Upon information and belief, Signal staff members were also present.  During the meeting, Dewan said that the workers would

48

initially receive H-2B visas, which would be extended for nine additional months.  At the same time that the workers were processed for H-2B visas, Signal would also apply for green cards for every worker.  Dewan stated that the cost for the entire process would be 700,000 rupees (approximately $15,630), which would be paid in three installments to Pol, Burnett, and Dewan.  Either Dewan or Pol also promised that the workers would have good accommodations, with only two people per room.  At Dewan's request, Geevarghese and other interested workers signed a "temporary contract," which documented what was discussed at the meeting, including the fees and the promise of a visa and a green card.

244.    Approximately three days later, Geevarghese received a call from Salimon, who told him to attend a welding test on or about May 8, 2006.   Geevarghese took two tests administered by two Signal employees.  Salimon then informed him that he had passed and should begin to collect the money needed for his fees.

245.    Although Dewan had initially told Geevarghese that the process would cost 700,000 rupees, the Agents ended up demanding even more from Geevarghese, which Geevarghese paid.  In order to raise the money necessary to pay the fees, Geevarghese depleted his savings and sold his wife's and his children's jewelry.  In addition, he took out one loan for 250,000 rupees (approximately $5,582) and another loan for 450,000 rupees (approximately $10,102), both at 24 percent annual interest rates.

246.    Following his skills tests, Salimon called Geevarghese regularly to provide him with updates concerning the status of his case and to inform him when and where to pay the fee installments.  Geevarghese paid these fee installments to Dewan, Pol, and Burnett in or about May through November 2006.

49

247.    On or about November 6, Geevarghese met with Dewan, Salimon, and Sanders, who told him not to mention the fees he had paid to Dewan, Pol, and Burnett during his interview at the United States Consulate.

248.    On or about November 24, 2006, Salimon arranged for Geevarghese to fly from Cochin to Mumbai so that he could make his final payment and receive his passport and plane ticket to the United States.   When Geevarghese met with Dewan that day, Dewan insisted that Geevarghese pay an additional 4,000 rupees (approximately $90) for the plane ticket to Mumbai. Geevarghese had not been told about this fee and only had 6,000 rupees left for travel expenses. Dewan, however, refused to give Geevarghese his passport and ticket to the United States until he paid the 4,000 rupees.  Intimidated by Dewan, afraid of being stranded in Mumbai, and fearful of losing the opportunity to work in the United States, Geevarghese paid Dewan.  Dewan then demanded that Geevarghese sign several contracts without offering him enough time to review them.

249.    In the United States, Geevarghese was shocked by the living conditions he was forced to endure.  He also learned for the first time that Signal would deduct money from his paycheck for the tools he used.  Nonetheless, Geevarghese was afraid to leave his position at Signal and return to India; he had sold everything of value that his family owned and knew he would never be able to pay back his enormous debts working in India.

250.    Moreover, Signal officials and the Agents repeatedly reassured him and the other workers that Signal would process their green cards.  In particular, Geevarghese attended a meeting in or about November or December 2006 at which John Sanders and a Signal Vice President stated that Signal would process the paperwork necessary to make the workers permanent residents.  In or about March 2006, Geevarghese attended another meeting led by

Signal senior management, Dewan, and Burnett.  They again promised that Signal would process the workers' green cards.

251.    Geevarghese relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Geevarghese felt intimidated into acquiescence and compelled to continue working for Signal.

*Jomon George*

252.    In or about April or May 2006, J. George saw an advertisement in an Indian newspaper for pipefitting jobs in the United States.  The advertisement stated that permanent residency status would be available to workers after six to nine months.  J. George called the listed number and spoke with Salimon, who told him about an interview and informational seminar.  Salimon and Dewan were present at the seminar, as were two or three men from Signal.  Salimon explained that in order to obtain their green cards, the workers would need to pay Dewan, Pol, and Burnett 600,000 rupees (approximately $13,400).

253.    J. George later took and passed a qualifying test.  After the test, a Signal representative assured J. George that he would receive permanent residency status if he accepted the job with Signal.  J. George then signed an agreement with Signal, which he understood to promise him a 10-month H-2B visa that would be extended and then converted into a green card.

254.    In or about August 2006, J. George met with Burnett and Dewan, who promised him that the workers would receive green cards that would enable them to live and work permanently in the United States.

51

255.     J. George paid the 600,000 rupees demanded by Dewan, Pol, and Burnett in installments in or about August through November 2006.  In order to raise this money, J. George took out a loan at 18 percent annual interest, using a piece of land that his wife owned as collateral.  He also sold all of his wife's jewelry and borrowed money from his brother and several friends.

256.     Before flying to the United States, J. George traveled to Dewan's Mumbai office to collect his passport and plane ticket and pay his final installment.  J. George asked Dewan if he could get his money back if he did not want to go to the United States, but Dewan told him "no."  J. George felt he had no choice but to continue on to the United States.  Dewan's agents required J. George to sign various documents, but because the documents were in English and the agents rushed him, J. George did not have an opportunity to read or understand what he was signing.

257.     In the United States, J. George and the other Indian workers were told by Sanders and other Signal officials that they would receive green cards, but that if they caused any trouble, they would be sent back to India.   In early-to-mid 2007, J. George also saw a notice in the man camp advising workers to give their legal documents to Darrell Snyder for green card processing.  Believing that Signal would finally begin to process his green card, J. George followed the directions.

258.     J. George believed that he had no choice but to endure the unsanitary and unsafe conditions without complaint because Signal controlled his immigration status.  He did not want to jeopardize his employment with Signal because he needed to earn enough money to pay off the debt he had incurred in order to pay Dewan, Pol, and Burnett.

259.    J. George relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, J. George felt intimidated into acquiescence and compelled to continue working for Signal.

*Shaiju Vadakkal George*

260.    In or about April 2006, S. George had been working as a welder in Oman for nine years when he learned from a friend about an advertisement for welding jobs and permanent residency in the United States.  After calling Dewan Consultants and speaking with Salimon, S. George took emergency leave from his job to attend a seminar in India led by Dewan, Salimon, and Burnett.  At the seminar, Burnett explained that the workers would travel to the United States on H-2B visas, which would be extended twice.  They would then receive green cards and be able to bring their families to the United States permanently.  Dewan explained that green card processing would cost 550,000 rupees (approximately $12,280), and H-2B processing would cost 200,000 rupees (approximately $4,460).

261.    Approximately one month later, S. George received a call from Salimon, who explained that the fee had been reduced to 600,000 rupees (approximately $13,070).  S. George said that he wanted to wait for a green card rather than start with an H-2B visa, but Salimon convinced him to start work on just an H-2B visa.  Shortly after this conversation, S. George completed a skills test administered by Salimon and several Signal employees.  After a Signal employee told George that he passed the test, Salimon instructed S. George to begin collecting money for his first payment.

262.     S. George paid the 600,000 rupees demanded by the Agents by borrowing money at an interest rate of approximately 5 percent per month.  He secured a second loan using his wife's jewelry as collateral.  Just before his consular interview, S. George resigned from his job in Oman.

263.     On or about November 28, 2006, S. George traveled to Dewan's office to pay his final fee installment and receive his ticket and passport.  Dewan refused to give S. George his ticket and passport, however, because Dewan claimed that he owed an additional 10,000 rupees. S. George knew that if he failed to pay the 10,000 rupees, he would forfeit all of the money that he had already paid to Dewan, Pol, and Burnett.  S. George also felt compelled to pay because he had already quit his job in Oman and he could not make enough money in India to repay his debts.  He begged some friends who were also at Dewan's office to help him, and together, they were able to raise 10,000 rupees.  After S. George paid his final fees, Dewan would not give him his ticket and passport until he had relinquished all of the receipts and documents that he had received in connection with his recruitment.

264.     After S. George arrived in the United States, John Sanders told him that Signal would process his green card application.  In or about March 2007, S. George attended a meeting at which Burnett, Dewan, and Sanders warned the Indian workers not to criticize Signal if they wanted to obtain green cards.  Sanders stated very clearly that if the workers worked hard and behaved well, Signal would process their green cards.

265.     S. George was very upset by the living and working conditions at Signal, as well as the sizable deductions that Signal took from his paycheck for accommodations and tools. However, S. George felt that he could not leave because he needed to earn enough money to repay the loans he had incurred in order to get to the United States.  Moreover, after the March

2007 incident in which Signal fired a number of workers, S. George was terrified that if he caused any problems, Signal would fire him and have him deported.

266.    S. George relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, S. George felt intimidated into acquiescence and compelled to continue working for Signal.

### *Praveen Kulathum Muriyil Gopalakrishnan*

267.    In or about June of 2006, Gopalakrishnan was working as a welder in Bahrain when he learned about a newspaper advertisement offering the opportunity to work for Signal in the United States and to obtain a green card.  Because of this advertisement, Gopalakrishnan quit his job and traveled to India so he could apply to work at Signal.

268.    On or about June 20, 2006, Gopalakrishnan traveled to a welding center in India to take a welding test for the Signal job.  Salimon, Dewan, and a Signal employee were present. Salimon and Dewan spoke to the applicants.  They said that applicants who were chosen for the job would work for Signal and obtain a green card.  This process would cost 600,000 rupees (approximately $13,100).

269.    Gopalakrishnan completed and passed the welding test.  After the test, he was told to complete and sign several documents.  He did not understand the documents, but he believed that they were part of the application process and would help him obtain a green card.

270.    Gopalakrishnan ultimately paid the "recruitment fees" demanded by Dewan, Pol, and Burnett between approximately June and November 2006.  To obtain this money,

Gopalakrishnan mortgaged his home to a private lender at an interest rate of approximately 15 to 16 percent.

271.     Approximately two to three weeks after he took the welding test, Gopalakrishnan met with Salimon to discuss the job at Signal.  Gopalakrishnan asked Salimon whether he would receive a green card, and Salimon assured him that Signal would help him obtain a green card.

272.     On or about August 23, 2006, Gopalakrishnan met with Salimon and Burnett to pay an installment of his "recruitment fees."  At that meeting, Burnett promised Gopalakrishnan that he would receive a green card through his employment at Signal.

273.     On or about November 18, 2006, Gopalakrishnan traveled to Dewan's office in Mumbai to make his final payment and obtain his plane ticket to the United States.  Dewan did not give Gopalakrishnan his passport until Gopalakrishnan gave Dewan his final fee installment.

274.     Upon Gopalakrishnan's arrival at the man camp, Signal employees informed him that he had to pay Signal $245 each week for room and board.  Gopalakrishnan asked if he could rent an apartment outside the man camp, but Signal employees told him that he had to remain at the man camp.  Gopalakrishnan felt like a prisoner at Signal.  He was monitored constantly, and his foreman repeatedly threatened to report him for poor workmanship.   Gopalakrishnan felt that he could not complain about the living and working conditions because he needed the job to repay his debts.  Moreover, he was afraid to leave the camp because he thought that Signal employees would find him and send him back to India.

275.     In addition, Signal and the Agents continued to promise Gopalakrishnan that he would receive a green card.  In particular, in or about February or March 2007, Gopalakrishnan attended a camp meeting led by Burnett and Dewan, who told Gopalakrishnan and other workers that Signal was in charge of their green card processing.

276.    When Gopalakrishnan finally escaped from the man camp, he attempted to access his bank account and discovered that Signal had frozen his account.

277.    Gopalakrishnan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Gopalakrishnan felt intimidated into acquiescence and compelled to continue working for Signal.

### Mouleswararao Guntamukkala

278.    On or about May 23, 2006, Guntamukkala read a newspaper advertisement placed by Dewan Consultants.  The advertisement offered the opportunity to work in the United States and obtain a green card.  That same day, Guntamukkala spoke with a representative of Dewan Consultants, who told him that he could obtain an H-2B visa, which would be converted to a green card if he worked at Signal for one year.

279.    Approximately one week later, Guntamukkala attended a small meeting at the office of Dewan Consultants, where Dewan explained the process in similar terms.  Dewan also stated that it would cost each worker the equivalent of approximately $20,000.  Shortly after the meeting, Guntamukkala took and passed a welding test, at which Dewan, Pol, and a Signal employee were present.  Dewan and Pol gave Guntamukkala a signed statement promising that he would receive a green card if he passed his welding test and worked at Signal.

280.    In order to raise the money to pay Dewan, Pol, and Burnett, Guntamukkala borrowed the equivalent of approximately $7,000 from a neighbor at approximately 3 percent interest per month.  He also borrowed approximately $12,000 from his closest friend at 2 percent

interest per month and sold his home—the only property he owned—to repay his friend.

Guntamukkala borrowed the remainder of the fees from his family.  Guntamukkala paid all of

the fee installments that the Agents demanded between June and November 2006.  Dewan

Consultants withheld his passport until he paid this money.

281.    After arriving in the United States, Guntamukkala asked a Signal employee when

he would obtain his green card.  The employee told Guntamukkala that the green card paperwork

was being processed slowly due to the large number of people who would be obtaining green

cards.  He told Guntamukkala not to worry, however, and assured him that he would receive a

green card.  In or about early-to-mid 2007, Guntamukkala also attended a camp meeting at which

Signal employees informed the workers that Signal was processing their green cards.

282.    Despite the dangerous and difficult work conditions at Signal, Guntamukkala was

afraid to complain.  When he told a supervisor that Signal was pushing him to work too hard, the

supervisor told him that Signal would send him back to India if he complained again.

Guntamukkala thought about leaving Signal every day, but he felt that he had no choice but to

stay.  He knew that he could not repay his debts if he returned to India.  Moreover, Signal had all

of his paperwork, and he could not work for any other employer in the United States under the

terms of his H-2B visa.

283.    Guntamukkala relied upon Defendants' promises of permanent residency and

good working conditions and would not have sold assets, incurred substantial debt, or agreed to

work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse

by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants'

"recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would take adverse immigration action against him, Guntamukkala felt intimidated into acquiescence and compelled to continue working for Signal.

*Eldose Isac*

284.    In or about May of 2006, Isac saw a newspaper advertisement in a local Indian paper offering the opportunity to work as a welder or pipe fitter in the United States, where he could obtain permanent residency.  The advertisement listed Dewan Consultants' contact information.  Isac called the phone number listed and spoke with Salimon.  Salimon told Isac to attend a skills test and interview, where Isac could learn more about this opportunity.

285.    Instead of traveling to Dubai, where he had secured a job as a pipe fitter, Isac attended the test and interview.  He met with Salimon and two or three Americans, who Salimon introduced as representatives of Signal.  Isac took a written test, and a Signal official informed him that he had passed.

286.    Isac then spoke with Salimon, who promised Isac that he would be able to leave for the United States within six months on an H-2B visa and would receive a green card in the United States.  Salimon told Isac that this process would cost 650,000 rupees (approximately $13,500). He assured Isac that once he received his green card, he could bring his family to the United States as well.

287.    Isac paid the 650,000 rupees to Burnett, Pol, and Dewan in installments between approximately August and November 2006.  To obtain this money, Isac used his sister's and mother's gold jewelry and his family's land as collateral to obtain loans from banks.  Isac also obtained additional loans from friends.

288.    On or about August 6, 2006, Isac paid his first installment to Burnett, Salimon, and Dewan.  Burnett gave Isac a receipt documenting his payment for "employment based permanent residence visa processing for Signal International."

289.     Shortly after this meeting, Isac's prospective employer in Dubai told Isac to travel to Dubai as soon as possible to beginning working.  Isac told Salimon that he was considering this opportunity, but Salimon promised Isac that he would travel to the United States soon, and it would not be worthwhile for Isac to travel to Dubai to work for a short time.  Isac declined the job opportunity in Dubai.

290.     In or about September or October 2006, at two different meetings, Salimon and Dewan told Isac not to tell United States consular officials that he would receive a green card. They assured him that this was part of the process, and any other answer would prevent him from traveling to the United States.  Isac felt compelled to follow Dewan and Salimon's instructions because he had already given up his job in Dubai and had incurred substantial debt.  In at least one of these meetings, Dewan assured Isac that he would receive permanent residency after arriving in the United States.

291.     On or about November 23, 2006, Isac traveled to Dewan's office in Mumbai to make his final payment.  Dewan's staff forced Isac to sign, quickly, documents written in English.  They did not allow Isac to read the documents and told him that the documents only contained formalities.  Only after Isac signed the documents and gave Dewan's staff all of the paperwork related to his recruitment did he receive his passport.

292.     After Isac had arrived at Signal, he asked John Sanders when he would receive a green card.  Sanders told Isac that his "paperwork would move forward" and would be ready for him.  Isac understood this to mean that he would receive a green card.

293.     Isac was very unhappy with the conditions at Signal.  When he arrived in the United States, he learned that Signal would deduct $35 per day from his paycheck for room and

board. Despite the fact that this deduction severely reduced Isac's wages, he felt compelled to endure the conditions at Signal because he needed the job to repay his debts.

294. Isac felt that he could not even complain about the conditions at Signal because Signal might deport him. Signal's camp manager told Isac that his H-2B visa prevented him from working for another company and he would be deported if he looked for another job. Signal employees also posted a notice in the man camp warning employees about the dangers of losing their immigration status. After the March 2007 incident during which several workers were fired, Isac felt particularly afraid that he would be deported or fired if he tried to leave the man camp or asked for help from someone outside Signal.

295. In or about July 2007, Isac attended a meeting at which Signal employee Darrell Snyder told Isac that Signal was applying for the workers' visa extensions and assured him that Signal would also apply for their green cards. When Signal posted a list of workers for whom they had submitted visa extension applications, Isac's name was on the list. Isac believed that this meant he would also eventually receive a green card.

296. Isac relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Isac felt intimidated into acquiescence and compelled to continue working for Signal.

*Raveendranathan Mookaparambil Itty*

297. In or about late 2005, Itty saw a newspaper advertisement in Abu Dhabi offering the opportunity to work in the United States. Itty called the phone number listed on the

advertisement and spoke with Dewan.  Dewan told Itty to attend an upcoming meeting at a hotel in Abu Dhabi.

298.    Approximately one month later, Itty attended the meeting.  Only two other potential workers were present.  Dewan gave a presentation and stated that the opportunity to work in the United States would cost 500,000 rupees (approximately $10,600).  Itty was hesitant to pursue the opportunity because he thought the cost was too high.

299.    In or about February 2006, a friend told Itty that he had given money to Dewan Consultants.  Itty called Salimon, who told Itty to attend another upcoming meeting at a hotel. Dewan and two other people led that meeting.  Dewan explained to the audience that they were looking for employees to work in the United States for Signal and obtain a visa and permanent residency.  Dewan explained that the workers would receive green cards after arriving in the United States and could bring their families for an additional fee.  He again said that this process would cost 500,000 rupees (approximately $10,600), which would include payments to Dewan, Pol, and Burnet.  Dewan explained that Pol and Burnett worked with Signal.

300.    Shortly after the meeting, Itty took a skills test administered by Signal employees. He was then interviewed by Signal's piping superintendent.  These Signal employees told Itty that he would obtain an H-2B visa within 6 months, and would receive a green card within 18 months to 2 years.

301.    Itty paid all of the fees demanded by Dewan, Pol, and Burnett in or about July through December 2006.  He raised the money for these fees by mortgaging his home and taking out a loan at an interest rate of approximately 13.5 percent.

302.    The day that Itty was scheduled to fly to the United States, he met with Dewan at his office in Mumbai.  Dewan refused to give Itty his passport until Itty paid the remaining

balance of his fees and gave Dewan all of the documents relating to his recruitment.  Then, just before Itty left for the airport, Dewan required Itty to sign several documents.  Itty did not understand the documents, but he felt that he had no choice but to sign because he had already paid so much money to the Agents and knew that they would not refund these fees.

303.    After Itty arrived at Signal, Signal deducted approximately $400 to $450 each week from his paycheck for room and board.  Because this cost would be deducted even if he lived elsewhere, he felt compelled to remain at the man camp.  He feared that if he complained, he would be fired or deported.  He was also afraid that if he left Signal, Signal would call immigration officials or the police, and he would be arrested or deported.  He knew that if he were sent back to India, he would not be able to repay his debts.

304.    Itty also felt compelled to remain at Signal because Defendants continued to promise him a green card.  For instance, in or about February 2007, Dewan came to Signal and explained to Itty and the other workers that their visas would be extended, and that they would eventually receive green cards.

305.    Itty relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Itty felt intimidated into acquiescence and compelled to continue working for Signal.

*Joy Jacob*

306.    In or about mid-2006, Jacob saw a newspaper advertisement offering jobs in the United States.  He called Dewan Consultants, and was invited to attend a meeting at which

Dewan, Salimon, Pol, and Burnett were present. At the meeting, Dewan and Salimon showed a video about Signal and told the attendees that Signal would provide green cards for the workers after they had been at Signal for approximately nine months. At this meeting, Jacob also signed some documents that were written in English. Although he could read some English, he could not understand what the documents said.

307.   During additional meetings with Dewan, Pol, and/or Burnett in India, the Agents made numerous representations that led Jacob to believe that in exchange for paying thousands of dollars in "recruitment fees," Signal and the Agents would assist Jacob with applying for and receiving permanent residency in the United States.

308.   In reliance on these promises, Jacob paid approximately 600,000 rupees (approximately $13,187) in "recruitment fees" to Dewan, Pol, and Burnett, and paid an additional 200,000 rupees (approximately $4,395) in travel expenses. In order to raise this money, Jacob took out private loans, using his house and his parents' house as collateral.

309.   Soon after arriving in the United States, Signal officials told Jacob that his visa would be extended and that he would receive a green card. However, Jacob was very unhappy with the squalid living conditions, the inedible food, and the dangerous working conditions. After Signal fired several workers in March 2007, Jacob became afraid to criticize Signal because he did not want to be deported. Jacob felt compelled to remain at the man camp and work for Signal because he needed to repay his debts and knew that he would not earn enough to do so in India.

310.   Jacob relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by

Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants'

"recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would institute adverse immigration action against him, Jacob

felt intimidated into acquiescence and compelled to continue working for Signal.

*Biju John*

311.    In or about April or May of 2006, John read an advertisement in an Indian

newspaper for a job in the United States that would pay $144 per day and promised H-2B work

visas or green cards.  John called Dewan Consultants and spoke with a representative of the

company.  The representative told John that Malvern Burnett would obtain a green card for him

and that the process would cost 650,000 rupees (approximately $14,515).

312.    John attended a seminar in or about May 2006, where he met Dewan, Salimon,

Pol, Burnett, and Sanders.  They confirmed that John would need to pay 650,000 rupees in

"recruitment fees."  They also told John that if he paid Burnett an additional $4,000, he could

work anywhere in the United States.

313.    John paid Dewan, Pol, and Burnett 650,000 rupees in three installments.  John

also paid an additional 400,000 rupees (approximately $8,350) in travel and other expenses

related to this process, resulting in a total cost of 1,050,000 rupees (approximately $22,865).

314.    John raised the money for these expenses and fees by selling a piece of property

that he owned, borrowing money from his brother, and borrowing money that his father raised by

selling land and other items.  He also borrowed 150,000 rupees (approximately $3,130) at 5

percent monthly interest.

315.    On or about November 19, 2006, John traveled to Dewan's Mumbai office to

collect his passport and plane ticket to the United States.  Shortly before John left to catch his

flight, Dewan gave him a "service agreement" document and told him to sign it immediately.

Dewan told John that he could not board the plane until he signed the agreement.  Dewan also said that if John missed his flight, he could not recover the money he had paid.  Because his flight was about to leave, John quickly signed the agreement without reading it.  When Dewan gave John his passport and plane ticket, John learned he had paid twice the value of the plane ticket.

316.     After arriving in the United States, John felt compelled to live at Signal's man camp because Signal would deduct living expenses from his paycheck even if he lived elsewhere.  John was shocked at the terrible living conditions and dangerous working conditions, but he was afraid to complain because Signal threatened to send him and other workers back to India if they misbehaved or spoke to others about Signal's actions.  John also felt that he could not leave his job at Signal.  He had sold all of his property and borrowed a large amount of money to come to Signal.  He knew that he could not make enough to repay his debts and support his wife and children if he returned to India.  John was even afraid to leave the camp, because he thought he would be arrested or deported.

317.     In addition, Signal and its Agents continued to promise him a green card.  In or about December 2006, John asked Sanders when he would receive a green card.  Sanders replied that Signal would apply for an H-2B extension and would then apply for his green card.  In or about late 2006 or early 2007, John also saw notices in the man camp advising workers to ensure that their names were spelled correctly on their immigration documents so that Signal could process their green cards.

318.     John relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his

need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, John felt intimidated into acquiescence and compelled to continue working for Signal.

*Shibu Joseph*

319.    In or about April 2006, S. Joseph read a newspaper advertisement offering the opportunity for pipe fitters to work in the United States and obtain green cards.  He spoke with a representative of Dewan Consultants, who invited S. Joseph to attend a seminar in May to learn more about the opportunity.

320.    On or about May 2, 2006, S. Joseph attended a seminar at which Pol, Burnett, Dewan, and Salimon were present.  Either Pol or Burnett (S. Joseph is uncertain of which) explained that workers would travel to the United States on H-2B visas, which would be extended for 18 to 24 months while their green card applications were processed.  After they received green cards, the workers would be able to bring their families to the United States. Dewan explained that this process would cost a total of 600,300 rupees (approximately $11,000) to be paid in installments to Burnett, Pol, and Dewan.  S. Joseph called Salimon after the seminar, and Salimon confirmed that workers would receive H-2B visas and green cards.

321.    In or about May 2006, S. Joseph took a written exam administered by a Signal official.  Salimon and Dewan were also present, and Salimon again assured S. Joseph that those who were hired would travel to the United States on H-2B visas while their green cards were being processed.

322.    To pay his "recruitment fees," S. Joseph posted his wife's jewelry as collateral for a loan, and borrowed additional money from his brother, a friend, and his wife's family.  S. Joseph also borrowed money from an acquaintance at approximately 3 percent interest per

month.  S. Joseph paid his first and second fee installments in or about August and November 2006, respectively.

323.    On the day of his flight to the United States, S. Joseph traveled to Dewan's office in Mumbai and paid his final fee installment.  At Dewan's office, either Dewan's assistant or his brother took all of S. Joseph's receipts and paperwork relating to his recruitment.  S. Joseph feared that if he refused to give up his paperwork, he would lose the money he had paid.  Dewan then demanded that S. Joseph quickly sign a number of papers, and said that he would not give S. Joseph his passport if he refused.  Afraid that he would lose all of the money he had already paid and the opportunity to work in the United States, S. Joseph signed the papers without having a chance to read what they said.

324.    At Signal, S. Joseph asked permission to live outside the man camp, but Sanders told him that the costs for room and board would be deducted from his wages even if he did not live there.  Because he could not repay his loans if he paid room and board both to Signal and outside the man camp, S. Joseph felt that he had no choice but to remain at the camp.  The living and working conditions were deplorable, and the food often made him sick.  However, he felt compelled to continue to work for Signal because it was the only way that he could repay his debts and keep his family from being cast into poverty.  S. Joseph also attended meetings in or about early 2007 at which Signal officials promised that they would obtain green cards for the workers.

325.    S. Joseph relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants'

"recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, S. Joseph felt intimidated into acquiescence and compelled to continue working for Signal.

### Thansilas Joseph

326.     In or about June of 2006, T. Joseph was working as a welder for a large company in India when he saw a newspaper advertisement offering the opportunity to work for Signal in the United States and to obtain a green card.  The advertisement stated that those interested in the opportunity should attend a meeting and interview session.

327.     Four or five people participated in T. Joseph's interview, including Dewan, Salimon, and two Americans.  Salimon assured T. Joseph that if he worked for Signal, the company would process a green card for him within 10 to 15 months.  Salimon said that T. Joseph would be able to bring his family to the United States, his wife would be able to obtain a good job, and that his children would be able to attend good schools.  Dewan and Salimon told T. Joseph that this process would cost 800,000 rupees (approximately $17,432).  T. Joseph told Dewan and Salimon that this was too much money.

328.     The following day, Joseph attended a second interview.  He spoke again with Dewan and Salimon, who agreed that T. Joseph could pay 600,000 rupees (approximately $13,074) instead of 800,000 rupees.  T. Joseph then took a welding test, which Dewan, Salimon, and the Americans supervised.  One of the Americans told T. Joseph that he had passed the test.

329.     Between approximately June and December 2006, T. Joseph paid at least 600,000 rupees in installments to Pol, Burnett, Dewan, and Salimon.  To obtain the money that they demanded, T. Joseph sold some jewelry belonging to his wife and children and posted the remaining jewelry as collateral for a loan at a 2 percent monthly interest rate.  In addition, he sold the land his wife had provided as dowry for their marriage.  Finally, T. Joseph borrowed

about 300,000 rupees (approximately $6,702) from a private lender at a 9 percent monthly

interest rate, using his family home as collateral.  T. Joseph sold these possessions and borrowed

money at such high interest rates because Salimon and Dewan had assured him that he would be

able to receive a green card, bring his family to the United States, and obtain a good job at

Signal.

330.    In or about early November of 2006, T. Joseph traveled to a hotel before his

interview with the U.S. consulate.  At the hotel, T. Joseph met with Dewan, Salimon, and some

American men, including Malvern Burnett.  Beginning soon after this meeting, Salimon and

Dewan repeatedly called T. Joseph and pressured him to pay the remainder of his "recruitment

fees."

331.    On or about December 5, 2006, T. Joseph traveled to Dewan's office to pay his

final fee installment and obtain his passport.  T. Joseph saw Dewan threaten other workers and

warn them that they could not take receipts detailing their payments to Defendants to the United

States.

332.    When it was T. Joseph's turn to meet with Dewan, Dewan demanded that T.

Joseph sign papers written in English.  T. Joseph could not read English, so he asked Dewan

what the paperwork said.  Dewan refused to answer and demanded that that T. Joseph sign

quickly.  T. Joseph was intimidated and feared that if he did not pay Dewan or sign the

documents, he would lose the money that he had incurred substantial debt to pay to the Agents.

T. Joseph therefore signed the documents and paid his final payment to Dewan.  Only then did

Dewan give T. Joseph his passport.

333.     Upon arrival in the United States, Signal employees required T. Joseph to sign several forms written in English.  T. Joseph could not read the forms, but he felt compelled to sign them so that he could begin working and repaying his debt.

334.     Approximately every two weeks between December 2006 and November of 2007, T. Joseph attended several camp meetings with Signal officials.  At these meetings, Signal officials repeatedly assured the workers that their visas would be extended and that they would receive green cards.  Dewan also spoke at a meeting in or about March of 2007.  At this meeting, Dewan told T. Joseph and other workers that if they continued to work hard and listen to Signal's instructions, they would receive green cards.

335.     After T. Joseph received his first paycheck, he learned that Signal was deducting approximately $240 per week for room and board.  When T. Joseph asked a Signal manager if he could live outside the man camp, the manager warned T. Joseph that he could not work for Signal if he lived outside the man camp, and would likely be deported.  T. Joseph felt that he had no choice but to stay at the man camp.  T. Joseph also felt that his only option was to continue to work for Signal for as long as he could.  He had incurred so much debt to come to the United States that he felt that he would rather die than face the shame of returning to India, where he would not able to repay his loans and support his family.

336.     T. Joseph relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

71

and his fear that Signal or Burnett would take adverse immigration action against him, T. Joseph felt intimidated into acquiescence and compelled to continue working for Signal.

*Kulath Somanathan Kalayam*

337.    In or about April 2006, Kalayam saw an advertisement in the Malayalam Manorama newspaper offering United States H-2B visas and "employment based green card[s]." Kalayam called the number listed in the advertisement and spoke with Salimon, who invited him to a meeting in Cochin that would take place later that week.  At the meeting, Salimon explained that workers would travel to work at Signal on H-2B visas and that Signal would provide them with green cards in approximately eighteen months.  Salimon also explained that applicants would have to pay 600,000 rupees (approximately $14,100) in three installments to Dewan, Pol, and Burnett.  Dewan, Pol, and Burnett were also present at the meeting.

338.    Kalayam paid the 600,000 rupees to Dewan, Pol, and Burnett between approximately June and November 2006.   In order the raise the money to pay these fees, Kalayam depleted his life savings, including money that he had saved to buy a house for his family.

339.    Kalayam also met with Burnett, Dewan, and Salimon several times between approximately June and November 2006.  In or about August 2006, Kalayam signed agreements with Dewan, Burnett, Global, and Signal.  The agreement with Dewan stated that Dewan would proceed with his "employment based permanent residence visa."  Shortly thereafter, Kalayam met with Burnett, Salimon, and Dewan.to make a fee payment.  He spoke with Dewan and Salimon, who assured him that they would process his green card.  He also received a receipt from Burnett memorializing his payment of $1,427.50 for "employment based permanent residence visa processing for Signal International."  Although Kalayam asked Salimon for a

receipt for the money he had paid to Dewan, Salimon said he could only give Kalayam a receipt if he paid additional fees.

340.    In or about September or October 2006, Kalayam was informed that the medical test he had taken was invalid and he needed to take another one.  He had to pay approximately 2,000 additional rupees (approximately $470) for this test.

341.    Soon thereafter, Kalayam met with Burnett, Dewan, and Salimon to discuss his upcoming interview at the U.S. consulate.  Salimon told Kalayam not to disclose the fees he had paid.   He also instructed Kalayam and to tell consular officials that he planned to return to India before the end of July 2007.

342.    In or about November 2006, Kalayam traveled to Dewan's Mumbai office to make his final fee payment and collect his passport.  Before Dewan gave Kalayam his passport, he demanded that Kalayam return all of the paperwork relating to the Signal opportunity. Kalayam told Dewan that he did not have his paperwork, and Dewan threatened to withhold his passport.  Kalayam was afraid that he would lose all of the money he had already paid to Dewan. He had seen Dewan forcibly take documents from several workers that day and refuse to give travel documents to other workers who failed to pay the amount demanded by Dewan. Ultimately, Dewan relented, but he insisted that Kalayam sign a number of documents quickly, without reading them.  Only after Kalayam had signed the documents did Dewan give him his passport.

343.    After arriving at Signal in or about December 2006, Kalayam was horrified to discover that he had to live in a crowded trailer and that Signal would deduct $35 per day from his paycheck for food and accommodations.  Nonetheless, Kalayam felt that he had no choice but to remain at Signal.  He had used all of his family's savings to travel to the United States to

get his green card, and he knew that all of that money would be lost if he went back to India. Kalayam was afraid to criticize Signal because Signal officials threatened to deport the workers if they caused any trouble.  He was even afraid to leave the camp because he thought that the police or immigration workers would arrest him.

344.    In addition, Signal officials and the Agents continued to promise Kalayam that he would a receive green card.  In or about early 2007, Kalayam attended a meeting at which Dewan, Burnett, and Sanders promised the workers that Signal would apply for their green cards. In or about March 2008, John Sanders called a meeting and reiterated that Signal would process the workers' green cards.

345.    Kalayam relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Kalayam felt intimidated into acquiescence and compelled to continue working for Signal.

*Sunilkumar Marottikkal Kuttan*

346.    In or about May or June of 2006, Kuttan read a newspaper advertisement offering the opportunity to work in the United States and obtain an H-2B visa and green card.  The advertisement listed the contact information for Dewan Consultants.  A few days after seeing the advertisement, Kuttan attended a large meeting, where Salimon, Dewan, Burnett, and Sanders were present.   Dewan and Salimon explained that Kuttan and other Indian workers would travel to the United States and work at Signal for eleven months while their green cards were

74

processed.  Afterwards, they would return to India for a very short time after which they could come back to the United States with their families.

347.    In or about May or June of 2006, Kuttan met with Sanders and another American to take a welding test.

348.    Kuttan ultimately paid Dewan, Pol, and Burnett approximately 600,000 rupees (approximately $13,170) in installments between June and December 2006.  To pay these fees, Kuttan sold his wife's wedding jewelry, borrowed money from his family, and took out a loan at 18 percent interest.

349.    In or about December of 2006, Kuttan traveled to Dewan's office to collect his plane ticket and passport.  Dewan required Kuttan to sign some documents before receiving his ticket and passport.  Because Dewan rushed him, Kuttan did not have time to read the documents or understand what he had signed.

350.    After Kuttan arrived at Signal, Signal and the Agents continued to promise that he would receive his green card.  In or about July 2007, he attended a meeting at which Signal officials stated that they would provide the workers with visa extensions and green cards.  Kuttan later made an appointment with Burnett to ask him when he would receive his green card.  Burnett also told Kuttan that Signal would apply for his green card.

351.    Kuttan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would take adverse immigration action against him, Kuttan felt intimidated into acquiescence and compelled to continue working for Signal.

*Bhaskaran Sreedharan Kutty*

352.    In or around May of 2006, Kutty saw an advertisement in an Indian newspaper that offered the opportunity to work in the United States and obtain permanent residency.  The advertisement instructed interested applicants to attend a meeting at a hotel in Cochin.  Kutty had recently completed interviews with a Singapore company and made arrangements to begin working there, but he felt that he could not ignore an opportunity to live and work in the United States.

353.    Kutty attended the meeting in Cochin, which was led by Burnett, Dewan, and a Dewan Consultants employee.  They told Kutty that they would provide workers with a job at Signal in the United States, a green card, and living accommodations.  The recruitment process would cost 700,000 rupees (approximately $15,564).   Soon after this meeting, Kutty took a written and practical test.

354.    In or about June 2006, Kutty was informed that he had passed the tests.  He decided to pursue the Signal opportunity and pass up the job in Singapore.

355.    Kutty paid Dewan, Pol, and Burnett the 700,000 rupees in "recruitment fees" in installments between approximately June and December 2007.  To raise the money, Kutty obtained a loan at a 13 percent interest rate by using gold and property as collateral.

356.    In or about June or July 2006, Kutty visited Dewan's office and asked whether he would receive a green card if he worked for Signal.  One of Dewan's employees assured him that he would.  On the basis of this promise, Kutty made his first fee payment.

357. On or about August 9, 2006, Kutty met with Dewan, Burnett, and another American to prepare for Kutty's interview with the U.S. Consulate. They instructed Kutty not to tell the consulate that he would receive a green card.

358. On or about December 17, 2006, Kutty traveled to Dewan's Mumbai office to make his final fee payment. Only after Kutty paid Dewan in cash did Dewan give Kutty his passport and airline ticket. Kutty was also required to sign several documents written in English, which he did not understand. Because the Dewan Consultants employees had left him very little time to get to the airport, Kutty quickly signed the documents so he would not miss his flight.

359. In the United States, Signal deducted approximately $400 from Kutty's paycheck for tools. Signal also deducted between $200 and $300 per week for food and housing.

360. Kutty felt compelled to endure the deplorable conditions at Signal. He saw Signal employees retaliate and threaten to deport Indian workers who complained. Kutty feared that if he complained, Signal would also retaliate against him or have him deported. He knew that he could not afford to be sent back to India, where he would not be able to repay the debts he had incurred to pay Defendants' "recruitment fees."

361. Kutty relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Kutty felt intimidated into acquiescence and compelled to continue working for Signal.

*Parshottam Ramchandra Mangani*

362.    In or about and between April and July 2006, Mangani read a newspaper advertisement for a job that offered permanent residency in the United States.

363.    In or about the summer of 2006, Mangani attended a seminar in New Delhi, where Dewan and an American gave a presentation about a job opportunity.  They explained that Mangani and other workers would travel to the United States on H-2B visas, which would then be converted into green cards.  Dewan then distributed documents which stated that the process would cost 700,000 rupees (approximately $15,155).

364.    Mangani paid Dewan, Burnett, and Pol these "recruitment fees" in installments in or about and between July and November of 2006.  To raise the money to pay these fees, Mangani sold a 2 acre farm that had provided much of his family's income.  He also sold a residential property he owned with a relative.  After these sales, the only property his family owned was his father's house, where Mangani and his mother, wife, and daughter also lived.

365.    Just before he flew to the United States, Mangani traveled to the office of Dewan's agent.  An employee demanded that Mangani sign paperwork.  Mangani asked if he could read the paperwork, but the employee insisted that Mangani's flight to the United States would leave soon, and there was no time to read the paperwork.  Mangani felt that he had no choice but to sign.  Only then did Mangani receive his passport.

366.    After Mangani arrived in the United States, Signal required him to sign paperwork agreeing that Signal could deduct $245 per week from his paycheck for food and housing.  When Mangani and other workers asked if they could live outside of the man camp, Signal employees said that they had to remain at the camp.  Signal also required Mangani to sign paperwork under which he agreed to pay for the tools that he used.  Because the Signal

78

employees threatened to send him back to India if he would not agree to this condition, Mangani signed the paperwork.

367.     Mangani had been told by Dewan, Burnett, and Pol that he would earn the equivalent of 200,000 to 300,000 rupees (approximately $4,300 to $6,462) per month at Signal. Based on these assurances, he had expected that he would be able to repay his debts and repurchase his land.  Only after signing the paperwork allowing Signal to deduct hundreds of dollars per week from his salary did Mangani realize how difficult it would be to realize these goals.

368.     On multiple occasions, Mangani observed Signal personnel threaten to suspend or deport workers who complained about the conditions at Signal or did not work hard enough.  As a result, Mangani felt compelled to work quietly and without complaint.  He was afraid of being sent back to India.  Employers there did not pay enough for him to repay his debts, and he needed to support his family.  He was also afraid that Dewan's agents might retaliate against him if he returned to India.

369.     In addition, Signal and the Agents continued to promise Mangani that he would receive a green card.  For example, in or about early 2007, Mangani attended a number of meetings at which Signal officials, Burnett, and Dewan assured him and other workers that Signal would process their green cards.

370.     Mangani relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would take adverse immigration action against him, Mangani felt intimidated into acquiescence and compelled to continue working for Signal.

*Prakash Moses Kanagiah Manonmoni*

371.    In or about June 2006, Manonmoni saw an advertisement in an Indian newspaper announcing a program under which pipefitters could work in the United States and receive green cards.  Manonmoni called the number in the advertisement and spoke to Salimon, who told him to attend an informational meeting in August 2006.

372.    At this meeting, Salimon explained that Signal would process permanent residency visas for the workers.  He stated that each worker would have to pay 850,000 rupees (approximately $18,700) plus airfare to the United States.  Salimon asked interested workers to sign a contract at the meeting, and said that they would be contacted about a test and an interview.  Manonmoni handed his signed contract to Dewan.

373.    Later that month, Manonmoni was invited to an interview attended by Salimon, Dewan, Pol, and a Signal project manager.  During this meeting, he also took and passed a written pipefitters' examination.

374.    Manonmoni ultimately paid Dewan, Pol, and Burnett 600,000 rupees (approximately $13,320) in "recruitment fees," plus approximately 170,000 rupees (approximately $3,673) in travel and other expenses.  In order to pay these fees, Manonmoni sold a parcel of land that he owned.  He also took out two loans using his wife's jewelry and his life insurance policy as collateral.

375.    Just before Manonmoni flew to the United States, he traveled to Dewan's office and paid his final payment.  That day, Dewan assured Manonmoni that if he followed Signal's rules, Manonmoni would receive a green card.

376.    When Manonmoni arrived in the United States, he was told that Signal would deduct $245 a week from his salary for accommodations, regardless of whether he lived at the man camp.  Because he could not afford to repay his loans and pay room and board twice, he felt that he had no choice but to live at the camp.  Manonmoni was also afraid to leave Signal or complain about the conditions, because he knew that he could not return to India and still repay his loans.

377.    In addition, Manonmoni believed that if he continued to work at Signal and do a good job, he would receive his green card.  In or about December 2006, Manonmoni attended a camp meeting at which Burnett stated that Signal would secure visa extensions and green cards for the workers.  In addition, throughout Manonmoni's time at Signal, John Sanders told him and other workers that Signal would "take care" of their green cards.

378.    Manonmoni relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Manonmoni felt intimidated into acquiescence and compelled to continue working for Signal.

*Adharsan Manuel*

379.    In or about June 2006, Manuel saw an advertisement in an Indian newspaper offering positions for welders in the United States and the opportunity to receive a green card. Manuel called the number listed in the advertisement and spoke with Salimon, who told him to attend a meeting at a hotel.

380.     During this meeting, at which Dewan, Salimon, and Pol were present, Dewan told Manuel and other prospective workers that they would travel to the United States on H-2B visas to work at Signal.  Shortly thereafter, Manuel met with Dewan at his office, where Dewan explained that Manuel would also be able to receive a green card if he took the job at Signal.

381.     On or about November 7, 2007, Manuel met with Salimon, Dewan, and Burnett to discuss his upcoming interview at the United States Consulate.  They instructed Manuel not to mention Signal's promise that he would receive a green card during his consular interview, though Dewan and Burnett assured him that it would be taken care of once he arrived in the United States.

382.     Manuel paid approximately 700,000 rupees (approximately $15,000) to Dewan, Pol, and Burnett for the opportunity to work for Signal.  In order to raise this money, Manuel depleted his savings and secured a loan at approximately 4 percent interest by offering his sister's and wife's dowries as collateral.

383.     After he arrived in the United States, Manuel learned for the first time that he had to pay $35 per day for accommodations that were much worse than any he had ever experienced.

384.     Despite the squalid living conditions and the unsafe work environment, Manuel felt compelled to remain at Signal.  He was afraid that if he left, he would be sent back to India and would not receive the green card he had been promised.  Manuel believed that remaining at Signal was the only option that would allow him to repay his substantial debt, because he could never earn enough money to repay that debt in India.  Manuel also felt compelled to remain because of Signal's conduct.  Signal foremen constantly monitored Manuel—even when he went to the bathroom—and threatened to notify the police and immigration officials if Manuel left Signal.  Signal employee John Sanders threatened to send Manuel and other workers back to

82

India if they complained about the conditions at the man camp.  Manuel also feared that Signal employees or Dewan might retaliate against him or his family if he left or complained about the horrible conditions.

385.    Manuel received repeated assurances from Signal personnel throughout early-to-mid 2007 that he would receive his green card.  In addition, in or about March 2007, Burnett and Dewan traveled to Signal and met with the workers, assuring them that Signal was processing their green cards.

386.    Manuel relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Manuel felt intimidated into acquiescence and compelled to continue working for Signal.

*Jacob Mazhukkattu Mathew*

387.    In or about June 2006, J.M. Mathew read a newspaper advertisement offering temporary and permanent work visas and employment with a marine company in Mississippi and Texas.  He called Dewan Consultants and spoke with Salimon, who invited him to a meeting at a hotel.

388.    Approximately one week later, J.M. Mathew attended the meeting, where Dewan, Salimon, and Burnett were present.  At this meeting, Burnett said that the workers would travel to the United States on H-2B visas.  The workers would receive green cards after the H-2B visas had been extended.  Dewan explained that this process would cost 600,000 rupees (approximately $13,000).  After the presentation, J.M. Mathew spoke separately with Burnett,

who assured Mathew that his wife could also come to the United States after he received a green card.  An employee of Dewan Consultants also assured J.M. Mathew that he could bring his wife and family to the United States after obtaining a green card, which the employee claimed would occur within two years.  J.M. Mathew also spoke with Salimon and asked him about the accommodations at Signal.  Salimon said that two workers would share each room and that food and accommodations would be free.

389.    Soon thereafter, J.M. Mathew took a skills test in the presence of Dewan, Salimon, and two Signal employees.  The Signal employees supervised the test and told J.M. Mathew that he had passed.

390.    In order to raise the 600,000 rupees that J.M. Mathew paid to Dewan, Pol, and Burnett, J.M. Mathew's mother-in-law borrowed 125,000 rupees (approximately $2,693), posting her home and land as collateral.  J.M. Mathew mortgaged his home and land and borrowed the remainder at an interest rate of approximately 12 or 13 percent per year.  J.M. Mathew paid Agents three fee payments in or about and between August and November of 2006.

391.    In or about December 2006, J.M. Mathew traveled to Dewan's office where he paid his final fee payment.  There, he learned that Signal would deduct $35 per day from his paycheck for room and board.  Although he believed that this amount was too high, he felt that he had no choice but to continue with the process because he had already paid Dewan, Burnett, and Pol a substantial amount of money that he could not recover.

392.    In the United States, J.M. Mathew remained at Signal because he continued to believe that he would receive a green card.  J.M. Mathew met regularly with Sanders and other Signal employees to discuss his immigration concerns, and he attended a number of meetings at which Signal and the Agents discussed green cards.  In or about early 2007, Dewan spoke at two

separate meetings and stated that workers would receive green cards.  During this same time period, Burnett also came to Signal and promised the workers green cards.   In addition, on or about March 8, 2007, a Signal Vice President called a meeting and assured Mathew and other workers that they would receive green cards soon.

393.   J.M. Mathew was also afraid to leave Signal because if he returned to India, he would not be able to repay his debts and would lose his house and land, as well as his mother-in-law's house and land.  He felt trapped.  He could not travel from the man camp without transportation provided by Signal. He felt that he could not even criticize Signal's treatment of himself and other Indian workers due to Signal's threats of deportation.

394.   J.M. Mathew relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, J.M. Mathew felt intimidated into acquiescence and compelled to continue working for Signal.

*Johny Mathew*

395.   In or about March 2006, J. Mathew saw a newspaper advertisement in India offering welding jobs in the United States and the possibility of receiving a green card.  J. Mathew called Dewan Consultants in response to the advertisement.

396.   In or about May 2006, J. Mathew attended a meeting led by Dewan, Pol, Burnett, and Salimon.  At this meeting, Dewan explained that workers would travel to the United States on 10-to-11 month H-2B visas, which would be extended three times.  During this time, Signal would apply for green cards for the workers.  Dewan also stated that the workers would

eventually be able to settle permanently with their families in the United States.  Visa and green card processing would cost 750,000 rupees (approximately $16,750).

397.    In or about May or June 2006, J. Mathew attended and passed a skills test, at which both Salimon and Dewan were present.

398.    J. Mathew later met with Burnett, who reiterated that J. Mathew would first receive an H-2B visa and would then get a green card.  At this meeting, J. Mathew signed an agreement with Signal, which Salimon interpreted for him, and which J. Mathew believed to promise that he would receive a green card.

399.    J. Mathew ultimately quit his job and paid almost 700,000 rupees (approximately $15,633) to Dewan, Pol, and Burnett in approximately three installments.  In order to raise this money, J. Mathew sold his wife's wedding jewelry, used additional money that he had saved to buy a house, and took out a loan at 12 percent monthly interest.  In or about the fall of 2006, J. Mathew refused a job in Kazakhstan so that he could stay in India and complete the necessary steps to receive his visa and green card.

400.    In or about late November 2006, a few days before his flight to the United States, J. Mathew traveled to Dewan's office.  Dewan's staff forced him to sign several documents in a rushed manner and did not give him time to read or understand the documents.  Dewan also demanded that J. Mathew return to Dewan his copy of the original signed agreement that promised him a green card, as well any receipts and papers related to the Signal opportunity.  When J. Mathew hesitated, Dewan said that J. Mathew would not be able to go to the United States unless he returned the documents.  Dewan refused to give J. Mathew his passport and plane ticket until he returned these documents to Dewan.

401.    After arriving at Signal, J. Mathew attended two or three meetings in or about early-to-mid 2007 at which Burnett promised that Signal would process the workers' green cards.  J. Mathew also attended a meeting, in or about March 2007, at which Dewan stated that the workers would receive green cards.

402.    Despite these promises, J. Mathew was very unhappy at Signal.  The living and working conditions were terrible, and Signal deducted $35 from his pay each day for room and board.

403.    J. Mathew felt trapped and unable to leave Signal.  He was afraid that if he were sent back to India, he and his family would be thrust into poverty because of the debt he had incurred.  He was also afraid that he would suffer mistreatment at the hands of Dewan and his associates.

404.    J. Mathew relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, J. Mathew felt intimidated into acquiescence and compelled to continue working for Signal.

*Nandhakumar Nagaraj*

405.    In or about May or June of 2006, a friend of Nagaraj told him about a newspaper advertisement offering the opportunity to obtain an H-2B visa and green card.  Nagaraj responded to the advertisement and called Salimon.  Salimon confirmed that Nagaraj and other workers could obtain H-2B visas and green cards and told Nagaraj to attend a meeting in approximately three weeks to learn more.

406. Dewan, Salimon, Burnett, and Pol were present at this meeting. They explained that workers would travel to the United States on H-2B visas, and that during this time, Signal would process their green card applications.

407. Approximately one month after the meeting, Nagaraj took a welding test administered by an American. Approximately one month after the test, Nagaraj met with Salimon at a hotel. Salimon told Nagaraj that he could obtain an H-2B visa and work in the United States for ten months. After ten months, Nagaraj would automatically receive a green card and could bring his family to the United States.

408. Nagaraj ultimately paid Dewan, Pol, and Burnett 800,000 rupees (approximately $17,787) for this opportunity. Nagaraj borrowed approximately three-fourths of these fees at a monthly interest rate of 10 percent. He also depleted his savings and sold property and jewelry that his mother had received for her wedding from Nagaraj's grandfather.

409. Just before Nagaraj left for the United States, he traveled to Dewan's office in Mumbai. Dewan refused to give Nagaraj his passport until Nagaraj had paid the final installment and signed various documents. Nagaraj asked if he could read the documents, but Dewan refused and insisted that Nagaraj sign quickly so that he would not miss his flight to the United States.

410. After arriving in the United States, Nagaraj learned that Signal would deduct $245 from his paycheck each week for room and board. When he asked Signal employees if he could live outside the man camp, he was told that he was not permitted to live elsewhere. Nagaraj felt compelled to remain at Signal's man camp because he would not be able to repay his substantial debt if he was required to pay additional money for housing and food.

88

411.    Nagaraj attended a meeting in which Dewan promised Nagaraj and other Indian workers that they would receive green cards if they continued to work at Signal.

412.    Nagaraj relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Nagaraj felt intimidated into acquiescence and compelled to continue working for Signal.

*Shaji Veluthalakuzhiyil Nanoo*

413.    In or about April or May of 2006, Nanoo saw a newspaper advertisement placed by Dewan Consultants offering the opportunity for welders and pipefitters to work in the United States, and promising green cards and legal status for the workers and their families.  Nanoo called the phone number listed in the advertisement and spoke to Salimon.  Salimon said that the opportunity would include green card processing and that the process would cost 530,000 rupees (approximately $11,850).

414.    In or about May 2006, Nanoo traveled to Cochin, India for an interview and skills test attended by Salimon and Dewan.  At the interview, Salimon said that Signal would apply for Nanoo's green card once he arrived in the United States. Soon thereafter, at a meeting attended by Pol, Burnett, Dewan, and Salimon, Burnett also assured Nanoo that Signal would begin to process his green card once he arrived in the United States.

415.    Nanoo faced considerable difficulties raising the money that he ultimately paid to Dewan, Pol, and Burnett.  He mortgaged his land at approximately 12 percent interest and used jewelry belonging to his wife, sister, and sister-in-law as collateral for an additional loan.  He

also sold more family jewelry.  Nonetheless, he was still unable to raise the total amount required.

416.    Before he was scheduled to leave for the United States, Nanoo visited Dewan's office to pay his final fee installments and collect his ticket.  Nanoo signed various documents, but because Dewan's assistants rushed him, he did not have a chance to read or understand what he was signing.

417.    Before Nanoo was able to collect his ticket and passport, Dewan's assistants determined that Nanoo still owed a portion of his fees.  Dewan refused to give Nanoo his passport until he had paid the remainder of the fees.  Nanoo called his brother-in-law, who helped him raise some additional money.  Only after Nanoo paid the full amount demanded by the Agents was he allowed to board the next flight to the United States.

418.    In the United States, Nanoo learned that Signal would deduct $245 per week for food and housing from his paycheck, regardless of whether he lived in the man camp.  Despite the terrible living conditions, the fees that Signal charged him made it prohibitively expensive to live elsewhere.

419.    Nanoo's debt also made him feel compelled him to continue to endure the unsafe working conditions at Signal.  Once, after Nanoo complained that the ships he worked on were unsafe, a Signal foreman suspended Nanoo for six days without pay.  Nanoo knew that other Indian workers had experienced threats, retaliation, and deportation when they expressed their concerns about the conditions.  Nanoo feared that if he were sent back to India, he would not be able to repay his debt, he would lose the land that he had mortgaged, and he and his family would become homeless.  He was also worried that Dewan or his associates would hurt him or his family.

420.     Nanoo relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Nanoo felt intimidated into acquiescence and compelled to continue working for Signal.

*Mangalan Chandrasekharan Pillai*

421.     In or about June 2006, M. Pillai saw an advertisement in a Dubai newspaper offering the opportunity for pipefitters to work in the United States and receive green cards.  The advertisement invited interested workers to attend a meeting at a Dubai hotel.

422.     At this meeting, Dewan explained that Signal was looking for Indian workers to travel to the United States under H-2B visas to repair oil rigs.  The H-2B visas would be renewed two to three times.  After that, the workers would receive green cards and would be able to bring their families to the United States.  Dewan also explained that workers would be required to pay Burnett, Pol, and Dewan visa and green card processing fees.

423.     M. Pillai later took a skills test.  When he was notified that he had passed, he returned to the hotel.  There, Dewan gave him a letter stating that M. Pillai would receive an H-2B visa and green card in exchange for processing fees.

424.     M. Pillai ultimately paid approximately 600,000 rupees (approximately $13,056) to Burnett, Pol, and Dewan.  In order to raise this money, M. Pillai pawned his mother's and wife's jewelry and borrowed money from a friend.  M. Pillai also took out two loans at 7 to 10 percent monthly interest, and an additional loan at 18 percent annual interest.

91

425.    In or about November 2006, M. Pillai traveled to Dewan's office to pay the final installments of his fees and receive his passport.  After he gave the money to Dewan's brother, Dewan's associates rushed him out of the office before he could ask any questions or ask for a receipt.

426.    After arriving in the United States, M. Pillai learned for the first time about the terrible living and working conditions and the substantial deduction that Signal took from each worker's paycheck for accommodations.  M. Pillai did not complain about the living and working conditions, however, because he saw that Signal threatened to deport workers who "caused trouble."  M. Pillai also feared that if he were sent back to India, he would be unable to repay his debts.  He had attended meetings in which Signal officials had promised that the workers would receive green cards, and he believed that his continued employment in the United States was the only way he could repay his debts.

427.    M. Pillai relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, M. Pillai felt intimidated into acquiescence and compelled to continue working for Signal.

### Radhakrishna Pillai Sivarama Pillai

428.    In or about May 2006, R. Pillai saw an advertisement in a local Indian paper offering job opportunities for pipefitters in the United States.  He called the number in the advertisement and eventually met with Salimon.  Salimon told R. Pillai that Signal would begin

his green card application when he arrived in the United States, and that the process would take approximately ten months.

429.     In or about June or July 2006, R. Pillai traveled to Cochin, India for an interview and skills test.  Salimon and another representative of Signal reaffirmed that Signal would apply for R. Pillai's green card.

430.     R. Pillai also attended a meeting in October 2006, at which Salimon, Dewan, and at least one other Agent were present.  They explained that as soon as the workers began working in the United States, Signal would begin their green card applications.  The process would take approximately ten months, at the end of which the workers would be able to bring their families to the United States.  At the October meeting, R. Pillai was required to sign several documents. The Agents told him that he had to sign each document to come to the United States, but they did not explain the contents of the documents, and R. Pillai did not understand what they said.

431.     R. Pillai left a well-paying job as a pipe-fitting supervisor and ultimately paid Pol, Burnett, and Dewan approximately 900,000 rupees (approximately $19,855) in "recruitment fees."  To raise the money for these fees, R. Pillai took out three loans at 8.5 percent monthly interest, secured by his brother's house and all of his family's jewelry.

432.     On or about November 17, 2006, R. Pillai met with Dewan to collect his plane ticket.  At this meeting, he signed additional documents that were not explained to him.  Dewan also demanded that R. Pillai relinquish all of his documents relating to the Signal opportunity. Fearing that he would lose all the money he paid to Dewan and would not be able to work at Signal, R. Pillai complied.

433.     When he arrived in the United States, R. Pillai was appalled by the unsanitary living conditions, the unsafe work environment, Signal's discriminatory behavior, and the

substantial fees Signal required him to pay for room and board. He also developed a bad cough from sleeping near the ventilator in his trailer, which still bothers him to this day. R. Pillai felt he had no choice but to endure these conditions and continue to work for Signal, however, because he was afraid that if he complained, he would be sent back to India, where he would be unable to repay the debt he had incurred to pay Dewan, Pol, and Burnett. Signal officials also continued to promise him that they would process all of his paperwork.

434.    R. Pillai relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, R. Pillai felt intimidated into acquiescence and compelled to continue working for Signal.

*Aby Molathu Poulose*

435.    In or about March or April of 2006, A. Poulose saw an advertisement in a Dubai newspaper that promised an opportunity to work in the United States and to obtain an H-2B visa and a green card. A. Poulose called Dewan Consultants and was told to attend a meeting in Dubai.

436.    At that meeting, Dewan explained that workers hired by Signal would travel to the United States on H-2B visas and would receive green cards within nine to nineteen months. Dewan explained that this process would cost 700,000 rupees (approximately $15,764) and that, in the United States, the workers would earn 250,000 rupees (approximately $5,630) per month after taxes. Dewan also told A. Poulose that workers from Signal would be coming to India to administer employment tests.

94

437.    Soon after the meeting, A. Poulose called Dewan to ask if he could meet Signal's representatives in India for the job testing.  Dewan agreed.

438.    At the test, Signal personnel explained to A. Poulose that Signal was the "number one shipyard" in America and that Signal had sufficient political power that A. Poulose need not to worry about his visa.  They also assured A. Poulose that Signal would apply for his green card and that it would be processed while A. Poulose was working in the United States.

439.    In or about August 2006, A. Poulose attended another meeting at which Burnett, Dewan, and Salimon were present.  Burnett told A. Poulose and other workers that he was a famous immigration lawyer and that 600 H-2B visas with green cards had been approved for Signal.

440.    A. Poulose ultimately left his job in Dubai and paid almost 800,000 rupees (approximately $18,061) to Dewan, Pol, and Burnett.  In order to raise this sum, A. Poulose borrowed 300,000 rupees (approximately $7,038) at 11 percent interest using his parents' house and land as collateral.  Because he was unable to secure money elsewhere, A. Poulose and his family eventually sold this property to finance the balance of his "recruitment fees."  Nonetheless, by the time he was scheduled to depart for the United States, A. Poulose still needed to raise an additional 20,000 rupees (approximately $450).

441.    On the morning of A. Poulose's flight to the United States, Dewan threatened to burn A. Poulose's passport unless A. Poulose paid the missing 20,000 rupees.  He stated that he would not refund any of the money that A. Poulose had paid.  A. Poulose ultimately paid the full amount after his father offered Dewan the money that he intended to use to pay rent that month.

442.    Before Dewan gave A. Poulose his passport, he required A. Poulose to sign paperwork.  A. Poulose did not have time to read the documents because his flight would leave soon.

443.    After arriving in the United States, A. Poulose felt compelled to remain at Signal. His H-2B visa prevented him from working for another employer in the United States, and he could not earn enough money to repay his debts if he returned to India.  He also believed Defendants' continued assurances that he would obtain a green card.  Consequently, he felt that he had no choice but to continue working for Signal, despite the deplorable conditions.

444.    A. Poulose relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, A. Poulose felt intimidated into acquiescence and compelled to continue working for Signal.

*Justin Poulose*

445.    In or about the summer of 2006, J. Poulose was working as a welder in Kerala, India, when he saw a newspaper advertisement offering jobs for welders and pipefitters at Signal. The advertisement mentioned green cards and said that workers could obtain visas that would allow them to travel to the United States immediately.  J. Poulose called the phone number listed in the advertisement and spoke to Salimon.  Salimon told J. Poulose that he could learn more about the immigration process and job opportunity at a meeting.

446.    J. Poulose attended the meeting that week.  He met with Pol, who was introduced an official of the American company recruiting workers.  He also met with Dewan and Salimon.

96

Pol explained that J. Poulose could work for Signal. Pol said that J. Poulose would travel to the United States on an H-2B visa and would obtain permanent residency status within one year, at which point he would be able to bring his family. Pol also stated that J. Poulose could earn around $16 to $19 per hour at Signal.

447.    At the meeting, Dewan and Salimon explained that this process would cost 800,000 rupees (approximately $18,000). J. Poulose felt that this would be a good opportunity, but he was worried that he would not be able to afford the fees.

448.    Approximately four to six weeks later, a woman from Salimon's office called J. Poulose. She explained that the fees could be reduced to 650,000 rupees (approximately $14,163). She told J. Poulose that he should obtain the money and take a skills test. J. Poulose was hesitant, but based on the salary he had been promised, he believed that he would be able to afford the lower price and repay his debts.

449.    On or about July 5, 2006, J. Poulose took and passed a skills test administered by Signal representatives. Dewan and Salimon were also present. Dewan said that J. Poulose would be able to receive permanent residency status in the United States. At a later meeting, Salimon also gave J. Poulose a letter promising employment at Signal, an H-2B visa, and permanent residency.

450.    To raise the 650,000 rupees that he paid to Dewan, Pol, and Burnett, J. Poulose took out multiple loans, including two with monthly interest rates of approximately 10.5 percent. He used his mother's wedding jewelry as collateral for one of these loans, and the deeds to his family's house and land as collateral for the other. He also took out a third loan with a monthly interest rate of approximately 6 percent. J. Poulose paid all three fee installments totaling approximately 650,000 rupees by November 2006.

451.    On the morning of J. Poulose's flight to the United States, he traveled to Dewan's office in Mumbai to obtain his passport.  The office was crowded, and J. Poulose was forced to wait in a long line before he could meet with anyone.  Eventually, J. Poulose met with a Dewan Consultants employee who insisted that J. Poulose quickly sign paperwork written in English.  The employee rushed J. Poulose to sign and did not give him time to read the documents, emphasizing that his flight would leave soon and that there were several people in the office.  At the same time, J. Poulose saw Dewan threaten a worker who did not have enough money to make his final payment to Dewan.  Dewan told the worker that he could not go to the United States and stapled his passport shut.  This made J. Poulose nervous, and he felt pressured to sign immediately.  Only after he signed the documents did he receive his passport and plane ticket.

452.    After J. Poulose arrived in the United States, he learned that Signal was deducting $35 per day from his paycheck.  Signal's camp manager informed J. Poulose that the company would deduct this amount from his wages even if J. Poulose lived outside of the man camp.  Because he could not afford to repay his substantial debt and pay room and board outside the man camp with these deductions, J. Poulose felt compelled to remain at the man camp.

453.    Months later, Signal held a camp meeting where Dewan, Burnett, Sanders, Snyder, and other officials were present.  Both Dewan and Burnett assured J. Poulose and other workers that they would receive their visa extensions and that Signal would continue with their green card processing.  Dewan warned, however, that the workers had to follow Signal's instructions at all times if they did not want to be deported.  After this meeting, J. Poulose feared that if he did anything to make Signal management unhappy, he would be deported and would not be able to repay his debts.   This caused J. Poulose to suffer severe mental stress.

454.    On or about March 10, 2007, J. Poulose attended a camp meeting led by John Sanders.  Sanders assured J. Poulose and other workers that if they followed Signal's rules, they would receive green cards.  However, if they organized against Signal, then they would not be able to stay.  After the meeting, J. Poulose saw notices on the man camp's notice board instructing workers to bring documents to an office at the camp in order to obtain green cards.  J. Poulose followed these instructions, and as a result believed that his visa would be extended.

455.    In or about July of 2007, J. Poulose again met with Burnett.  Burnett told J. Poulose that if he continued to work for Signal, his H-2B visa could be extended, and it would eventually be possible to file a green card application.  Based on this promise, J. Poulose continued to work at Signal.

456.    J. Poulose relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, J. Poulose felt intimidated into acquiescence and compelled to continue working for Signal.

*Appunni Arul Prakash*

457.    In or about April of 2006, Prakash's wife told him about a job advertisement offering work as a welder or fitter in the United States and the opportunity to obtain a green card within 18 to 24 months.  Prakash called Dewan Consultants and spoke to a representative who said that he could work at Signal and obtain a green card.  The representative said that this process would cost about 700,000 rupees (approximately $15,650), and invited Prakash to attend a general meeting in May.

99

458.     At the May 2006 meeting, Dewan explained that Prakash and other workers would work for Signal.  Pol stated that Signal would file for green cards within 18 to 24 months, and that after the workers received their green cards, they would return to India then go back to America with their families.  Pol and Dewan also assured those at the meeting that the green card processing would proceed as promised.   Pol stated that this process would cost workers 700,000 rupees (approximately $15,650); Salimon repeated this price as well.

459.     In or about August 2006, Prakash attended another meeting where Dewan, Salimon, and Burnett were present.  Burnett explained that Prakash would receive a green card within 24 months and that he could bring his family to the United States.

460.     In or about November 2006, Prakash attended another meeting with Burnett, Dewan, Salimon, and Sanders.  Burnett explained that Prakash would travel to the United States on an H-2B visa, which Signal would extend twice.  Prakash would then receive a green card. Sanders also assured Prakash that Signal would take care of his visa.

461.     Prakash ultimately paid the 700,000 rupees demanded by the Agents.  To raise this money, Prakash's family mortgaged their home and land in exchange for a loan of about 400,000 rupees (approximately $9000) at twelve percent monthly interest.  Prakash obtained another loan of approximately 100,000 rupees (approximately $2,250) at a monthly interest rate of approximately 23 percent.  He also borrowed 150,000 to 200,000 rupees (approximately $3300 to $4500) at 9 or 10 percent interest using as collateral jewelry that his wife and sister had received for their weddings, and that had significant sentimental value.

462.     On the day of Prakash's flight to the United States, he traveled to Dewan's office in Mumbai to obtain his passport and plane ticket.  Dewan demanded that Prakash return to Dewan his copies of original signed agreements.  When Prakash resisted, Dewan threatened that

Prakash would not receive his passport or plane ticket.  While Prakash was waiting at the office, he saw Dewan threaten to burn another worker's passport until that man paid Dewan the remaining money that Dewan demanded.  Prakash therefore feared that he would not be able to travel to the United States unless he gave Dewan his paperwork.  Prakash gave Dewan all of his original documents.  Dewan then insisted that Prakash sign paperwork written in English if Prakash wanted to receive his passport or plane ticket.  Dewan also demanded that Prakash give him all of his paperwork relating to the Signal opportunity.  When Prakash resisted, Dewan said that unless Prakash complied, he would withhold Prakash's passport and Prakash would not receive a refund for the money he had already paid.  Prakash feared that he would lose this money and miss his flight, so he gave Dewan the documents he had with him and quickly signed the paperwork without understanding what it said.

463.    Although Prakash knew Signal would be deducting money from his paycheck for room and board before he left India, he did not realize until he arrived at Signal that the amount to be deducted was almost $1,050 per month.  Because of Prakash's heavy debt burden and because he would have to pay this amount even if he lived outside of the man camp, he felt that he had no choice but to continue living at the man camp.  Prakash also felt compelled to remain at Signal because Signal assured him that he could obtain a green card if he stayed and performed well.  In particular, in or about March 2007, Prakash attended a meeting at which Burnett told the workers that if they behaved well and worked hard, they would receive green cards.  If they caused trouble, however, they would be fired.  Prakash feared being sent back to India, because he believed that he would not be able to earn enough money there to repay his debts.

464.     Prakash relied upon Defendants' promises of permanent residency and good
working conditions and would not have sold assets, incurred substantial debt, or agreed to work
for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by
Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants'
"recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,
and his fear that Signal or Burnett would soon adverse immigration action against him, Prakash
felt intimidated into acquiescence and compelled to continue working for Signal.

*Nibu Raju*

465.     In or about May or June of 2006, Raju was in India on a break from his job in
Dubai when he saw a newspaper advertisement offering the opportunity to work as a welder or
fitter in the United States and obtain and H-2B visa and permanent residency.  Raju called the
phone number listed on the advertisement and spoke to an employee of Aravind Associates, a
sub-agency of Dewan Consultants.  The employee informed Raju that he would travel to United
States on an H-2B visa and would then obtain a green card that would allow him and his family
to become permanent residents of the United States.  She told Raju to call Salimon the next day
for additional information.

466.     Raju called Salimon, who reiterated that Raju could work in the United States and
obtain an H-2B visa and permanent residency.  When Raju explained that he would soon return
to Dubai for work, Salimon told Raju to contact Dewan Consultants' Dubai office and attend an
interview in Dubai in June.

467.     Raju attended the interview, at which Dewan and two Signal employees were
present.  Raju took a written test, which a Signal employee informed him that he had passed.

468.    Raju also spoke with Dewan, who explained that Raju would travel to the United States on an H-2B visa, and that Raju's employer, Signal, would handle Raju's green card processing.  Dewan also explained this process would cost approximately $18,000.

469.    Between approximately June and November 2006, Raju paid this amount in installments to Pol, Burnett, and Dewan.  To raise this money, Raju and his family borrowed 600,000 rupees (approximately $13,068) from a bank, at a monthly interest rate of approximately 7.5 percent.  Raju also borrowed about 100,000 rupees (approximately $2,179) from a friend, at a monthly interest rate of approximately 3 percent.  Raju borrowed additional money from another friend.  To pay the remainder of the fees, Raju sold his mother's and cousin's gold jewelry, including jewelry that his mother had received as a wedding gift.

470.    On or about August 22, 2006, Raju met with Dewan and Burnett at Dewan's Dubai office.  Dewan introduced Burnett as Signal's lawyer.  Burnett explained that Raju and other workers would obtain green cards and be able to bring their families to the United States. As a result, Raju signed an agreement that day.

471.    On or about August 29, 2006, Raju traveled to Dewan's Dubai office to pay a fee installment.  Raju again asked Dewan if he would receive a green card, and Dewan assured Raju that he would.

472.    On or about November 7, 2006, the day before Raju's interview at the United States Consulate, Raju met with Salimon and Dewan.  Dewan repeatedly told Raju that he would not receive a refund if he failed his interview.  After the interview, Dewan emphasized that Raju must pay the remainder of the money that he owed Dewan in order to go to the United States.

473.     In or about the middle of November of 2006, Salimon called Raju and told him to be ready to travel to United States on November 29, 2006.  Salimon told Raju to bring his final fee installment and all the documents relating to the job at Signal to Dewan's Mumbai office.

474.     On or about November 29, 2006, Raju traveled to Dewan's office in Mumbai. Approximately 50 other Indian workers were waiting, and Dewan called each worker individually into a room.  When Raju met with Dewan, Dewan required Raju to sign a number of documents.  Dewan refused to give Raju time to read the documents and emphasized he would miss his flight unless he signed quickly.  Dewan also demanded that Raju give Dewan all of his documents relating to the Signal opportunity.  Raju refused at first, but Dewan told him that he could not travel to the United States unless he gave Dewan the paperwork.  Because he had already given Dewan so much money and had mortgaged his parents' home, Raju felt that he had no choice but to sign the documents and give Dewan his paperwork.  Dewan then gave Raju his passport, and Raju left for the airport and flew to the United States.

475.     After arriving in Mississippi, Signal employees and officials repeatedly promised Raju that he would receive a green card.  For example, when Raju explained to his foreman that he had incurred substantial debt to work at Signal, the foreman assured Raju that Signal would apply for a green card for him.  Raju also attended several meetings at which Burnett and John Sanders promised the workers green cards.  During a meeting in or about January or February of 2007, Dewan and Burnett told the workers that they would receive green cards and urged the workers to continue working at Signal.  On or about March 8, 2007, Sanders and other Signal officials, including Signal's Vice President, held another meeting.  The Signal officials told Raju and other workers that they would receive green cards.  Based on these repeated promises of

green cards and the substantial debt he had incurred to finance his trip to the United States, Raju continued working at Signal.

476.     Raju also felt compelled to continue living at the man camp because Signal deducted $35 each day from his paycheck for room and board, which made it financially impossible for Raju to live elsewhere.  Signal officials told Raju that he could go back to India if he did not like living at the man camp.

477.     Several months after Raju began working at the man camp, Signal told him and other workers that Signal would re-test all the Indian workers.  If anyone failed their test, Signal would reduce their salary by one-half.

478.     After the March 2007 incident during which a number of workers were deported, Raju began to fear that Signal would deport him.  He told his father about the incident, and his father called Salimon.  Salimon threatened Raju's father, saying that if he continued to ask questions, Raju would experience the same fate as the worker who had tried to commit suicide. When Raju's father told Raju about his conversation with Salimon, Raju became even more afraid that Signal would arrange for his deportation.

479.     Raju relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would soon adverse immigration action against him, Raju felt intimidated into acquiescence and compelled to continue working for Signal.

*Sreenivasarao Raparthy*

480.     On or about June 26, 2006, Raparthy learned from a friend about newspaper advertisements offering the opportunity to work as a welder or pipefitter at an American shipyard.  In response to the advertisement, Raparthy attended an interview session, where Dewan and Burnett were present.  At the interview session, Dewan and Burnett told him that if he worked in the United States, he could obtain an H-2B visa and then a green card.

481.     The same day, Raparthy took a written test administered by Signal employees. Raparthy passed the test, and the employees gave him paperwork promising an H-2B visa and permanent residency.

482.     Approximately three days later, Raparthy attended a meeting with Dewan.  At that meeting, Dewan assured Raparthy that he could travel to the United States on an H-2B visa. Dewan also told Raparthy that an H-2B visa extension and a green card application would be filed without Raparthy needing to take additional steps.  Dewan gave Raparthy a document signed by Burnett, which promised an H-2B visa and permanent residency.

483.     Following Dewan's instructions, Raparthy paid approximately 600,000 rupees (approximately $12,500) to Dewan, Burnett, and Pol.  To raise the money for these fees, Raparthy borrowed approximately 150,000 rupees from a bank at three percent monthly interest using his wife's and mother's gold jewelry as collateral.  He borrowed another 300,000 rupees at six percent monthly interest.  He borrowed the balance from friends.

484.     On the day of his flight to the United States, Dewan's agents insisted that Raparthy sign additional paperwork if he wanted to receive his passport or plane ticket. Raparthy asked if he could read the paperwork but was told that he would miss his flight if he reviewed the paperwork.  Raparthy signed, and only then received his passport and ticket.

106

485.     After Raparthy arrived in the United States, he discovered that Signal deducted approximately $245 from his paycheck each week for room and board.  Raparthy asked Darrell Snyder and other Signal management if he could live outside the man camp, but Snyder told Raparthy that Signal would deduct the amount from his paycheck even if he lived elsewhere. Raparthy felt compelled to continue living at the man camp because he could not afford to repay his debt if Signal continued to deduct room and board and he paid for rent elsewhere.

486.     Raparthy relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Raparthy felt intimidated into acquiescence and compelled to continue working for Signal.

*Balwinder Singh*

487.     B. Singh was recruited in or about 2006.

488.     During meetings with Dewan and Burnett in India in or about mid-2006, Dewan and Burnett made numerous representations that led B. Singh to believe that in exchange for paying thousands of dollars in "recruitment fees," Signal and the Agents would assist B. Singh with applying for and receiving permanent residency in the United States.

489.     In reliance on these promises, B. Singh incurred substantial debt and paid thousands of dollars in "recruitment fees" to Dewan, Burnett, and Pol.

490.     After arriving in the United States, B. Singh felt compelled to remain at Signal's man camp despite crowded housing because, among other reasons, Signal would deduct living expenses from his paycheck even if he lived elsewhere, his H-2B visa did not permit him to work

107

for another U.S. employer, Signal constantly monitored the workers and threatened to deport them if they complained about the horrible conditions at Signal, and he believed that he would face financial ruin and bankruptcy if he returned to India.

491.     B. Singh relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, B. Singh felt intimidated into acquiescence and compelled to continue working for Signal.

*Ranjit Singh*

492.     In or about May or June of 2006, R. Singh saw an advertisement in a Dubai newspaper for a welding job at Signal.  The advertisement included Dewan Consultants' name and stated that permanent residency visas would be available for workers and families.  R. Singh called Dewan's office and spoke with one of his employees, who told R. Singh to travel to the New Delhi office with 40,000 rupees (approximately $873) to apply for the job.

493.     At Dewan's office, Dewan's employee explained to R. Singh and approximately twelve other applicants that they would travel to the United States on a visa, which would be extended, and that Signal would obtain green cards for the workers within two or three years. The employee assured them that American lawyers would handle the permanent residency visa process.  The employee also explained that the process would cost between 650,000 and 700,000 rupees (approximately $14,000 and $15,000) after travel expenses.  At another meeting approximately two weeks later and in subsequent conversations, the employee explained that R. Singh would pay the fees to Dewan, Burnett, and Pol.

494.    R. Singh paid these "recruitment fees" in approximately three installments in or about and between May and October of 2006.  To raise the money for the fees, R. Singh emptied his savings, borrowed money from friends and his wife's parents, and sold his wife's jewelry.  R. Singh's father also gave up title to two acres of property, which included his farm and home, in exchange for loans of totaling approximately 400,000 rupees (approximately $8,800).

495.    After R. Singh had raised the money needed to pay the fees, he met with Dewan and Burnett.  They both assured R. Singh that he would receive a green card.

496.    In or about October 2006, R. Singh quit his job in Dubai in order to attend his interview at the United States Consulate.

497.    Just before R. Singh's flight to the United States, Dewan forced him to sign several papers in English, which R. Singh does not speak or read.  Dewan and his employee assured him that the papers were related to legal work.  Dewan refused to explain to R. Singh what he was signing.  R. Singh only received his passport back after he signed this paperwork.

498.    R. Singh was appalled by the horrible conditions at Signal.  Nonetheless, he knew that he would not be able to repay the money he had borrowed if he returned to India.  He felt that he had no choice but to stay at Signal and wait to receive the green card that Signal and its Agents continued to promise.  In particular, in or about July 2007, Signal officials and Burnett led a meeting at which they told the workers that they would apply for the workers' visa extensions and green cards.

499.    R. Singh relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants'

"recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, R. Singh felt intimidated into acquiescence and compelled to continue working for Signal.

*Savinder Singh*

500.     In or about April or May of 2006, S. Singh was working in the UAE when he saw an advertisement promising the opportunity to work in the United States and obtain a green card. S. Singh called Dewan Consultants and spoke with someone who invited him to attend a meeting at Dewan Consultants' office.

501.     In or about May of 2006, S. Singh traveled to Dewan Consultants' UAE office and spoke with Dewan's sister, who told him that Signal workers would travel to the United States on a green card and that Dewan Consultants would help him obtain permanent residency.

502.     On or about May 25, 2006, S. Singh took and passed a welding test at which Dewan, Pol, and a Signal employee were present.  A few days later, S. Singh met with Dewan at his UAE office.  Dewan told S. Singh that he would receive a green card after arriving in the United States.

503.     At the May 2006 meeting, Dewan told S. Singh that the visa and green card process would cost approximately $11,250.  However, Dewan, Pol, and Burnett ultimately demanded approximately $14,250.  S. Singh paid this amount in installments.  To obtain the money, S. Singh borrowed money from friends, gave the title to his home as collateral to obtain a large loan, and depleted his life savings.

504.     In or about October 2006, S. Singh met with Dewan and Burnett, who told him to tell U.S. consular officials that he was only traveling to the United States on a temporary basis. During this conversation, Dewan again assured S. Singh that he would receive a green card if he followed their instructions.

505.     On or about October 30, 3006, S. Singh traveled to Dewan's office in Mumbai to collect his ticket and passport.  Dewan demanded that S. Singh sign several documents written in English, which S. Singh could not read.  Dewan also demanded that S. Singh give him the paperwork regarding his "recruitment fees."  When S. Singh resisted, Dewan told him that he would lose the money that he had paid and his passport if he did not comply.  Because he had incurred so much debt, S. Singh felt that he had no choice but to comply.  Only after S. Singh relinquished his paperwork, signed the documents, and gave his final payment to Dewan did Dewan give S. Singh his passport.  Dewan assured him that Malvern Burnett would process S. Singh's green card.

506.     After his arrival in Mississippi, S. Singh repeatedly inquired about his green card. Approximately every two weeks until he left Signal on or about December 17, 2008, S. Singh met with Signal employees, including John Sanders, who told him that if he listened to Signal's instructions, he would receive a green card.  In addition, on or about March 8, 2007, S. Singh attended a meeting at which Signal's Vice President, Snyder, and Burnett told S. Singh that they would process his green card application.  Approximately two months later, S. Singh complied with a notice that Signal had posted at the man camp stating that workers should submit copies of their I-94 forms and passports for green card processing.

507.     S. Singh felt compelled to remain at Signal in order to recoup the money he had paid in "recruitment fees."  In addition, S. Singh felt compelled to live at man camp because Signal would deduct approximately $245 each week for room and board regardless of whether he lived at the man camp.  S. Singh was also afraid that if he complained, he would lose his job and be sent back to India.  In or about March of 2007, Dewan traveled to the man camp and instructed S. Singh not to complain about the conditions at Signal.  Around the same time, S.

Singh learned that Dewan had threatened another worker's family in India.  S. Singh feared that he and his family might be hurt if he complained about the conditions at Signal or did not follow Signal's instructions.  Signal employees also threatened to deport him if he caused problems.  S. Singh had no friends or family in the United States and felt that he had no choice but to endure the conditions at Signal if he wanted to repay his debts.

508.    Signal's assurances that S. Singh would receive a green card continued into 2008. In or about March of 2008, Snyder and Signal attorney Patricia Bollman assured S. Singh that Signal was processing S. Singh's green card extension and that he would receive an H-2B visa extension.  In or about November 2008, Signal representatives told S. Singh that if he helped Signal by signing an affidavit supporting the company, Signal would complete the paperwork necessary for S. Singh to obtain a green card.  Signal's translator, Ramesh Gunisetti, told S. Singh that the document stated that S. Singh had not paid any money to Pol, Burnett, or Dewan to obtain his immigration paperwork.  S. Singh could not read English sufficiently to understand the affidavit, but he felt compelled to sign because he feared that if he did not, he would be deported and would not be able to repay his debts.  S. Singh later learned that this affidavit stated that he was very happy working at Signal and that he could read, write and speak English.

509.    S. Singh relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, S. Singh felt intimidated into acquiescence and compelled to continue working for Signal.

*Shanmugam Subramanian*

510.    In or about 2006, Subramanian was working as a pipefitter in Singapore when a friend in India sent him a newspaper advertisement offering jobs in the United States.  It stated that workers would travel to the United States on H-2B visas and would then receive green cards. Subramanian quit his job in Singapore and traveled to India to respond to the advertisement.  He arrived in India in or about April 2006.

511.    In India, Subramanian attended a meeting where he met Salimon and filled out an application.  He later met Pol, Dewan, and Salimon for an interview.  After the interview, Salimon assured Subramanian that if he was selected and accepted the job, Signal would apply for his green card once he arrived in the United States.  Salimon soon called Subramanian to tell him he had been selected for the job.

512.    Soon thereafter, Subramanian met with Salimon, who gave him a document stating that Subramanian would need to pay Dewan, Pol, and Burnett a series of payments totaling over 600,000 rupees (approximately $13,200).

513.    Subramanian paid all the fees demanded by the Agents.  In order to pay these fees, Subramanian used the money he had saved from his job in Singapore and pledged his mother's and sister's jewelry as collateral in exchange for a loan of 350,000 rupees (approximately $7,700) at 5 percent monthly interest.  Subramanian also turned down a job opportunity in Canada, because he felt obtaining a United States green card would offer him better work opportunities.

514.    The day before Subramanian flew to the United States, he travelled to Dewan's office in Mumbai to make his final payment.  However, Dewan told him that he still owed approximately 10,000 to 15,000 rupees.  Dewan informed Subramanian that if he did not pay this amount immediately, he would not receive his visa, passport, or plane ticket.  Dewan also

informed him that he would not receive a refund for the money he had already paid. Subramanian called a friend in Mumbai, who was able to raise the missing amount. Only then did Dewan allow Subramanian to fly to the United States.

515.   When he arrived at Signal, Subramanian was appalled at the squalid living conditions. He also learned that approximately $1,050 per month would be deducted from his wages, regardless of whether he chose to live at the man camp. Subramanian felt that he had no choice but to stay with Signal, however, because he needed to repay the substantial debts he had incurred in order to take the job. Subramanian was afraid to complain about the living and working conditions because he knew that Signal fired workers who complained.

516.   At Signal, Subramanian attended meetings with Signal officials approximately once each month. At those meetings, Signal officials repeatedly assured Subramanian and other Indian workers that Signal would apply for their green cards.

517.   Subramanian relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods. Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Subramanian felt intimidated into acquiescence and compelled to continue working for Signal.

*Ninan John Tharakan*

518.   In or about May 2006, Tharakan was working in Dubai when a friend told him about an advertisement offering pipefitting jobs in the United States. Tharakan called the number that his friend gave him and spoke with a representative of Dewan Consultants. The representative invited him to an informational meeting at a hotel in Dubai.

114

519.     At the meeting, Dewan told Tharakan that those who were hired would work for a large U.S. company.  They would receive a green card after working for eighteen months.  At that point, they would be able to bring their families to the United States.

520.     In or about June 2006, Dewan and a Signal employee interviewed Tharakan and administered a written test.  After being notified that he had passed the test, Tharakan again met with Dewan.  Dewan told him that he would travel to the United States on an H-2B visa, which would be extended until his green card had been processed.  Dewan said that Signal would take care of the immigration paperwork.

521.     During this meeting and later meetings in or about June and July 2006, Dewan and his employees told Tharakan that he must pay 700,000 rupees (approximately $15,344) to Dewan, Pol, and Burnett for visa and green card processing.

522.     Tharakan raised the money to pay the fees by selling his and his wife's wedding rings.  He used the remainder of his wife's jewelry as collateral for a loan at 13 percent interest, and took out another loan at 21 percent interest.  Tharakan also used money that he had previously borrowed to buy property in India.  Tharakan paid the first three installments of his fees in or about June and July 2006.

523.     In or about September 2006, Tharakan took emergency leave from his job in Dubai to attend his H-2B visa interview at the United States Consulate in India.  Because Tharakan had to wait almost two months for an interview date, his employer fired him.

524.     On the day of his flight to the United States, Tharakan traveled to Dewan's office, where he paid his final installment.  Dewan refused to give Tharakan his passport and ticket until he had paid his fees, given Dewan his receipts, and signed two or three blank pieces of paper.

525.     Upon arrival in the United States, Tharakan was shocked by the living conditions at Signal's Mississippi facility.  He was also surprised to learn that Signal would deduct $35 per day from his paycheck, even if he chose to live outside of the man camp.  Nonetheless, Tharakan did not feel that he could complain or leave his job due to his debt, Signal's threats of deportation, and his fears that Dewan might hurt his family.  In or about March 2007, a Dewan Consultants employee called Tharakan's family and told them that if Tharakan created any problems at Signal, his family would encounter problems in India.

526.     Moreover, in or about March 2007, Signal officials and Burnett told the workers during a camp meeting that Signal would extend their visas and file their green card applications.  Tharakan believed these promises and wanted to remain in the company's good favor so he would receive his green card.

527.     Tharakan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Tharakan felt intimidated into acquiescence and compelled to continue working for Signal.

*Kittayi Sunil Kumar Therattil*

528.     In or about July of 2006, Therattil saw a newspaper advertisement that offered the opportunity to work in the United States and obtain a green card.

529.     The next day, Therattil traveled to the Dewan Consultants address listed on the advertisement.  He met with Salimon, Dewan, and two Signal representatives.  Salimon told Therattil that he would get a good job at Signal and could bring his family to the United States

116

after approximately eight months.  The Signal employees asked Therattil about his work experiences and administered a written test, which they told Therattil that he had passed.  The Signal employees also told Therattil to speak with Dewan and Salimon to learn more about the details, including the cost, of the opportunity to travel to the United States.

530.     Dewan and Salimon told Therattil that he would travel to the United States on an H-2B visa and would receive a green card after nine to twelve months, at which point he could bring his family to the United States.  Dewan and Salimon also asked Therattil to fill out paperwork with information about his family.  They told Therattil that Signal would need this information to process his family's immigration paperwork.  Therattil only agreed to pursue the opportunity at Signal because Dewan and Salimon promised him that he could bring his family to the United States.

531.     Dewan told Therattil that this opportunity would cost 600,000 rupees (approximately $13,650), which Therattil paid in installments to Dewan, Pol, and Burnett.  Therattil also paid additional visa and medical fees.  To obtain this money, Therattil used his wife's wedding jewelry as collateral to obtain a loan at a 9.5 percent annual interest rate.  He also obtained additional loans with monthly interest rates of approximately 1.75 percent by using both his and his father-in-law's houses and land as collateral.  The 1.75 percent monthly interest rate would double if Therattil missed one payment.

532.     In or about August of 2006, Therattil traveled to Dewan's office to make payments to Pol and Burnett.  Dewan assured Therattil that he would be able to live comfortably in America and that everything would proceed as Dewan had promised.

533.     The next day, Therattil attended a large meeting, which was run by Dewan, Salimon, and an American.  Dewan explained that Therattil and other workers should tell the

117

U.S. consulate that they were traveling to the United States on temporary H-2B visas and would return to India after six to nine months.  Dewan assured Therattil and the other workers this was part of the process, and they had nothing to worry about.

534.    In or about December of 2006, Therattil traveled to Dewan Consultants' office in Mumbai to make his final payment to Dewan.  Just before Therattil left for the airport, Dewan demanded that he sign documents written in English.  Therattil did not know what was written in the papers because he could not read English well, and Dewan refused to read the papers to Therattil.  Dewan's staff demanded that Therattil sign the papers quickly, so he signed them.  Only after Therattil made his final payment to Dewan and signed the papers did Dewan give Therattil his passport.

535.    After his arrival in the United States, Therattil felt compelled to remain at Signal because of the substantial debt he had incurred.  Signal employees told him that if he left the company, he could not return to Signal or to the United States.  Therattil feared that if he left Signal or did not complete his work perfectly, he would be deported and would be unable to repay his debt.

536.    Therattil also felt compelled to remain at the man camp so that he could receive the green card that he had been promised.  In particular, during a meeting shortly after Therattil arrived at Signal, he told Signal employees about the substantial amount of money he had paid and asked when he would receive his green card.  Burnett, who was present at the meeting, told Therattil and other workers that they should wait, and Signal would take care of their immigration paperwork.

537.    Therattil later spoke with other Signal officials about the money he had paid to work for Signal.  Signal officials repeatedly assured Therattil that they would renew his H-2B

visa, and a Signal employee told him that if he worked hard, Signal would take care of his green card and permanent residency.

538.    In or about early 2007, Dewan traveled to the man camp.  Therattil and other workers asked Dewan about their permanent residency status.  They also requested refunds because of the deplorable conditions at Signal.  Dewan told them to continue working.

539.    Signal deducted $35 each day from Therattil's wages for room and board.

540.    Therattil relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Therattil felt intimidated into acquiescence and compelled to continue working for Signal.

*Moni Panikulangara Thomas*

541.    In or about May of 2006, Thomas saw a newspaper advertisement posted by Dewan Consultants, offering welders and fitters jobs for in the United States, H-2B visas, and green cards.

542.    In or about May 2006, Thomas attended a meeting where Dewan, Salimon, and an American introduced as Signal's attorney were present.  At this meeting, Dewan explained that Signal needed workers to repair oil rigs.  Signal was offering workers an H-2B visa and a green card, as well as accommodations, transportation, a salary of $18 dollars per hour, and benefits. Salimon told the attendees that they must pass a practical skills test, which would cost 2,500 rupees (approximately $554).  Thomas did not want to pay the money for the skills test, so he left the meeting.

543.     Approximately three days after the meeting, Salimon called Thomas and encouraged him to take the skills test, telling him that he would not need to pay a fee for the test. Thomas traveled to Cochin to take the skills test, which he passed.  Salimon, Dewan, and two Signal employees were present.  Dewan stated that the green card program was based upon the workers obtaining an H-2B visa.  Thomas told Dewan that he only wanted a green card, but Dewan replied that green cards were only available to those who accepted the H-2B option first.

544.     Dewan also informed Thomas that it would cost 200,000 rupees (approximately $4,430) in fees to obtain the H-2B visa, and an additional 400,000 rupees (approximately $8,860) in fees to obtain the green card.  Thomas paid the combined 600,000 rupees to Defendants in installments.  To obtain this money, Thomas depleted his life savings, including money he and his wife had earned working abroad that he had planned to use to build a house for his family. He also borrowed money from his brother.

545.     In or about July 2006, Salimon called Thomas and told him to travel to a hotel in Cochin on August 5, 2006 to pay the first installment.  On approximately August 5, 2006, Thomas traveled to the Trident Hotel in Cochin, where Dewan, Salimon, and Burnett were present.  Thomas made payments to Defendants.  He also filled out immigration forms, which Dewan said would be used for processing applications for his H-2B visa and green card.

546.     Around the beginning of November 2006, Thomas met with Salimon, Burnett, and Dewan at a hotel in Chennai to prepare for his interview at the U.S. consulate.  Dewan told Thomas that he would be interviewed about his H-2B visa application.  Dewan instructed Thomas to tell the interviewer that he would return to India before the visa expired.  Nonetheless, Dewan reassured Thomas that the H-2B visa would convert into a green card.  Salimon, Burnett, and Dewan also asked Thomas to sign additional paperwork.

547.     A few days after meeting with Salimon, Burnett, and Dewan, Thomas returned to Chennai for his interview with the consulate.  Thomas met with Dewan and Salimon before the interview, and Dewan reminded Thomas that, during the interview, he should say that he planned to return to India when the visa expired.

548.     A few weeks after the consulate interview, Salimon called Thomas to remind him to pay his outstanding payments.  After this conversation, Thomas called Dewan several times to ask about his passport; Dewan responded that Thomas would receive his passport once he arrived in Mumbai and made his final payment.

549.     On or about November 23, 2006, Thomas traveled to Dewan's office in Mumbai to make his final payment and collect his passport.  Thomas expressed concern to Dewan and told him that he needed the green card to be processed quickly.  Dewan told Thomas to be brave and that there would be no trouble.  Before giving Thomas his passport, Dewan demanded that Thomas sign various documents that were written in English, without offering him enough time to review them.  Thomas felt compelled to sign the documents so that he would receive his passport.

550.     After arriving in the United States, Thomas requested several times to change his living accommodations.  Signal officials told him that Signal would continue to deduct the cost of room and board from his paycheck even if he lived elsewhere.  Thomas felt he had no option but to continue to live at Signal's camp because he could not afford to repay his debts in India if he paid Signal's room and board fees in addition to paying rent to live outside the camp.

551.     While working at Signal, Thomas began to feel ill, and eventually traveled to a clinic in Dorchester, Mississippi.  At the clinic, the attending doctor took an echocardiogram, which revealed that Thomas's heart was enlarged.  Thomas then saw a cardiologist.  Two to

three days after seeing the cardiologist, Thomas had severe burning in his chest, pain in his left arm, and a high fever.   A doctor diagnosed Thomas with acute pericarditis (bacterial infection of the heart).  Due to this sickness, Thomas was unable to work at Signal for over one month and did not receive a salary during that time.  Upon returning to work, Signal cut Thomas's entire salary to compensate for the lost room and board payments for the entire time Thomas was unable to work, until that amount was fully paid.

552.    In approximately May 2007, Thomas still had severe chest pain and was taking medications.  Worried that he was not receiving adequate treatment in the United States, Thomas asked Signal if he could travel to India for treatment.  He was reluctant to put his job in jeopardy, but Signal gave him permission, specifying that Thomas could keep his job if he returned by a certain date.  After receiving treatment in India, Thomas returned to Signal.  He felt he had no choice but to return to Signal because he needed to repay his debts.  In addition, Signal continued to promise that he would receive visa extensions, a green card, and the opportunity to settle permanently in the United States with his family.

553.    Thomas relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would take adverse immigration action against him, Thomas felt intimidated into acquiescence and compelled to continue to work for Signal.

*Thenooran Kumaran Unnikrishnan*

554.    In or about June of 2006, Unnikrishnan was working in Dubai when he saw a newspaper advertisement promising the opportunity to work in the United States and to obtain a

122

green card.  Unnikrishnan called the phone number listed on the advertisement and spoke with Dewan's receptionist, who instructed Unnikrishnan to attend a meeting in Dubai.

555.    At the meeting, Unnikrishnan was interviewed by a Signal employee. Unnikrishnan later completed and passed a skills test.  A Dewan Consultants employee then told Unnikrishnan that he must pay Dewan approximately 25,000 rupees (approximately $550). Unnikrishnan borrowed money from co-workers in order to pay this fee.  Before paying the fee, Unnikrishnan asked a Dewan Consultants receptionist and another employee whether he would receive a refund if his visa application for travel to the United States was unsuccessful.  They told Unnikrishnan that Dewan Consultants would keep 500 dirhams (the currency of the United Arab Emirates, approximately $135, or 6,250 rupees), but would return the remainder to Unnikrishnan.  Unnikrishnan then paid the fee.

556.    After Unnikrishnan paid the fee, Burnett refused to meet with Unnikrishnan had paid him an additional installment of the "recruitment fees."

557.    On or about August 22, 2006, Unnikrishnan met with Burnett, Dewan, and Dewan's brother in Dubai.  Dewan told Unnikrishnan and that he would travel to the United States on an H-2B visa and that Signal would process his green card once he was in the United States.  He would then receive permanent residency.

558.    While Unnikrishnan was in Dewan's office, he learned that a fax arrived stating that 250 H-2B visas had been approved.  Dewan told Unnikrishnan that the first people to pay would be able to travel to the United States on one of those visas.

559.    At that meeting, Unnikrishnan signed three agreements with Burnett, Pol, and Dewan.  The agreements stated that Unnikrishnan would receive a green card and that this process would cost 700,000 rupees (approximately $15,400).

560.    Unnikrishnan paid this amount in installments to Dewan, Burnett, and Pol.  To raise the money, Unnikrishnan mortgaged his home at approximately 11 percent monthly interest and took out a second mortgage at approximately 2.6 percent monthly interest.  Unnikrishnan also borrowed money from his uncle, who obtained the money by mortgaging his own home at approximately 1 percent monthly interest.

561.    On or about October 4, 2006, Unnikrishnan quit his job in Dubai and traveled to India to meet with Burnett, Dewan, and Salimon in preparation for his interview at the U.S. consulate.  At the meeting, Burnett told Unnikrishnan that he should not tell anyone that he had been promised a green card.  Because Unnikrishnan had already paid over 200,000 rupees (approximately $4,400), he felt that he had no choice but to comply with Burnett's instructions.  After his consular interview, Salimon told Unnikrishnan that he would not receive his passport until he paid all of his "recruitment fees."

562.    On or about November 28, 2006, the day he was scheduled to fly to the United States, Unnikrishnan traveled to the Dewan's office in Mumbai to pay his final fee installment and obtain his passport.  At the office, he saw Dewan shouting at other recruits, telling them that he would not to give them their passports if they did not pay.  This frightened Unnikrishnan.

563.    When Unnikrishnan met with Dewan, Dewan demanded that Unnikrishnan quickly sign paperwork written in English.  Unnikrishnan did not have enough time to read it, but Dewan told him that the paperwork was for green card processing.  Unnikrishnan felt compelled to sign the paperwork quickly, give Dewan all the documents that he demanded, and pay Dewan so he would not miss his flight.

564.    Before Unnikrishnan left Dewan's office, Dewan informed him for the first time that Signal would deduct approximately $35 per day for room and board.  Dewan also told him

that he would travel to the United States on an H-2B visa, and Signal would not process his green card until eight months after Unnikrishnan arrived in the United States.  Unnikrishnan was devastated, but felt he had no choice but to continue to the United States because Dewan, for the first time, told Unnikrishnan that he could not receive a refund for the fees he had paid.

565.    Upon arriving in Mississippi, Unnikrishnan filled out and signed several documents.  He did not know what he was signing because the Signal employees told him to sign the documents immediately.  During his first week, Unnikrishnan also attended meetings at which Signal employees stated that Signal would apply for the workers' green cards, but that if the workers did not follow Signal's rules, they would be terminated without warning.  In addition, in or about February of 2007, Signal posted a notice stating that Unnikrishnan and other workers should submit copies of their immigration forms and passports to John Sanders for green card processing.  Even after the incident in March 2007 when a number of workers were deported, John Sanders again assured Unnikrishnan that his green card would be processed easily, and Dewan told him that Signal would arrange everything for him.  Unnikrishnan remained at Signal due to his heavy debts and Signal's repeated promises that he would receive a green card. In or about July of 2007, Malvern Burnett told Unnikrishnan that his visa extension was being processed and would soon be granted.

566.    Unnikrishnan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would institute adverse immigration action against him, Unnikrishnan felt intimidated into acquiescence and compelled to continue working for Signal.

*Benny Chittilappilly Vareed*

567.     In or about May of 2006, Vareed saw a newspaper advertisement placed by Dewan Consultants.  The advertisement offered the opportunity to work in the United States as a welder or fitter and to obtain a green card.

568.     In or about mid-May of 2006, Vareed attended a meeting led by Dewan, Burnett, and Salimon.  Burnett explained that Vareed could travel to the United States on an H-2B visa and work for Signal.  The H-2B visa would later be converted to a green card.

569.     Dewan explained that this process would cost 800,000 rupees (approximately $17,720); Vareed's H-2B visa would cost 300,000 rupees (approximately $6645) and his green card would cost 500,000 rupees (approximately $11,075).  However, Salimon later called Vareed and said that he could pay a total of 600,000 rupees (approximately $13,290).  Vareed paid this amount in installments to Defendants.  To obtain the money for his "recruitment fees," Vareed borrowed money from his wife's family and sold his wife's wedding jewelry.

570.     Vareed also took a welding test, which he passed.  The test was administered by Dewan, Salimon, and two or three Signal employees.

571.     In or about August of 2006, Vareed met with Dewan, Salimon, and Burnett at a hotel in India, where Vareed made a payment to Defendants.  Dewan, Salimon, and Burnett required Vareed to sign several forms written in English, which Vareed could not read well.  Vareed signed and completed forms based on Salimon's instructions.

572.     In or about the fall of 2006, Vareed met with Dewan, Salimon, and Burnett to prepare for his interview with the U.S. consulate.  Dewan told Vareed that he should not inform the consulate that he would receive a green card and, if he did so, Vareed's visa would not be

approved.  Vareed felt compelled to follow Dewan's instructions because he had already

incurred significant debt to pay Defendants.

573.    On or about November 19, 2006, Vareed traveled to Mumbai to make his final

payment to Dewan and retrieve his passport.  Dewan's brother and other Dewan Consultants

employees immediately demanded that Vareed sign paperwork written in English.  Vareed did

not know what the paperwork said, but felt compelled to sign because he had to leave for the

airport almost immediately.  Vareed also made his final payment to Dewan.  Only after Vareed

made this payment did Dewan give him his passport.  Vareed then hurried to the airport and flew

to the United States.

574.    Upon arrival in the United States, Signal reduced Vareed's wages from $19 to

$17.50 per hour.  Vareed pleaded with his foreman for Signal to increase his wages.  The

foreman agreed to increase Vareed's wages if he worked hard.  Because he had incurred

substantial debt to travel to the United States, Vareed felt compelled to agree to the wage

reduction.

575.    Signal also deducted $35 per day from Vareed's paycheck for room and board.

Vareed asked John Sanders if he could live outside the man camp, but Sanders informed him that

Signal would deduct this room and board fee even if Vareed lived elsewhere.  Vareed felt

financially compelled to remain at the man camp to repay his debt.  Vareed also felt compelled to

endure the deplorable conditions at Signal because his H-2B visa did not allow him to work for

any other employer in the United States.

576.    Vareed attended several meetings led by Signal officials.  At many meetings,

Vareed and other employees informed Signal officials that they had incurred substantial debt to

work for Signal.  They also asked about the status of their green cards.  In response, John

Sanders informed Vareed and other workers that Signal would only give green cards to workers who did good work according to Signal's standards.  Vareed felt that he had no choice but to obey all of Signal's demands if he wanted to obtain the green card he had been promised.

577.    After the March 9, 2007 incident discussed above, Vareed feared that, if he complained, Signal would retaliate against him and arrange for his deportation.  Vareed knew that if he were deported, he would then be unable to repay his debt.  Consequently, Vareed felt that he could not voice his concerns about the conditions at the man camp.

578.    Shortly thereafter, Vareed attended a meeting at the man camp led by Dewan and Burnett.  Both Dewan and Burnett promised Vareed and other employees that their green card processing would continue as promised.  In or about July of 2007, a Signal manager and Darrell Snyder assured Vareed and other Signal employees that their visa would be extended.  Based on these promises, Vareed continued to work at Signal.

579.    In or about May of 2007, Vareed returned to India after his young son became seriously ill.  He was reluctant to put his job in jeopardy, but Signal gave him permission, specifying that Thomas could keep his job if he returned by a certain date.  After just 14 days, Vareed returned to Signal.  He felt he had no choice but to return to Signal because he needed to repay his debts.  In addition, Signal had continued to promise that he would receive visa extensions and a green card.

580.    Vareed relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages,

and his fear that Signal or Burnett would institute adverse immigration action against him, Vareed felt intimidated into acquiescence and compelled to continue working for Signal.

### George Pulikkeparambil Varghese

581.     In or about November and December 2003, Varghese's sister-in-law's father told Varghese's son about an opportunity to work in the United States as a welder.  Varghese's sister-in-law told Varghese's son that there would be a meeting to learn more about the opportunity. Varghese's son attended the meeting.

582.     Soon thereafter, Varghese met with Dewan and Salimon.  Dewan told Varghese that his son could work in America as a welder.  He explained that this process would cost at least 500,000 rupees (approximately $10,700).

583.     Varghese and his son paid these fees to Dewan, Pol, and Burnett.  To make these payments, Varghese sold some gold jewelry owned by the family.  He also mortgaged his home to borrow a large amount of money from a bank at an interest rate of approximately 17.9 percent. Varghese and his son made their final payments to Dewan and Salimon in or about August 2004.

584.     For approximately two years after he made his final payment, Varghese's son remained in India but heard nothing from Defendants.  Varghese's son repeatedly called Salimon, who assured him that he would be able to go to the United States soon.

585.     In or about June 2006, Varghese and his son learned from friends that Dewan Consultants was still interviewing people.  Then in or about August 2006, Varghese saw a newspaper advertisement in which Dewan Consultants offered opportunities for pipefitters and welders to work in the United States.  Varghese's son called Dewan Consultants and spoke with Salimon.  Salimon explained that Dewan Consultants was conducting interviews for people to work for Signal and travel to the United States on an H-2B visa.  Salimon said that Varghese and his son should attend a meeting on or about September 8, 2006.

586.    At this meeting, Dewan and Salimon explained that they were looking for people to travel to the United States on H-2B visas, which would be extended while their green cards were processed.  Varghese's son decided to travel to the United States and work at Signal, but he failed his visa interview and could not go.  Salimon told Varghese that Varghese could work at Signal instead.

587.    Varghese completed his interview process and gave Dewan Consultants his passport for visa processing.  Salimon then told Varghese that he would have to pay an additional 278,000 rupees (approximately $6,308) in cash within one day.  Varghese paid this fee.  In order to raise the money, he borrowed some money from his brother and sisters, and used his savings to finance the remainder.

588.    On the day of his flight to the United States, Varghese traveled to Dewan's office in Mumbai.  A large number of people were waiting in Dewan's office, and Varghese had to wait almost the entire day before anyone at the office met with him.  When Dewan's brother finally met with Varghese, he told Varghese that he had to sign a document written in English before he could receive his plane ticket.  Because Varghese needed to leave for the airport immediately, he did not have enough time to read the document.  He signed quickly and left the office.

589.    After he arrived at Signal, Varghese worked for approximately two weeks.  Signal employees then told him that there was not enough work for him, and they would let him know when he could work again.  Varghese did not work for two weeks.  Then, Darrell Snyder told him that he could work, but only for $9 per hour.  Snyder said that if Varghese refused, he would have to go back to India.  Afraid of being sent back to India, where he would not be able to repay his debts, Varghese felt that he had no choice but to work for the lower wage.

590.    Varghese relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Varghese felt intimidated into acquiescence and compelled to continue working for Signal.

*Estate of Kuliyanickal Paily Varghese*

591.    In or about early June of 2006, K. Varghese saw a newspaper advertisement posted by Dewan Consultants.  The advertisement offered the opportunity to work as a welder and obtain permanent residency in the United States.  The advertisement specified that applicants should take a welding test in late June of 2006.

592.    On the day of the test, K. Varghese traveled to the testing facility in Kochi. Before K. Varghese took the test, Dewan and Salimon explained that the cost of employment and obtaining a green card would be 700,000 rupees (approximately $15,217).  Dewan also explained that applicants who passed the welding test would travel to the United States on H-2B visas, but their green card applications would be processed within six months, and they would then be able to bring their families to the United States.  A Signal employee administered K. Varghese's welding test and told him that he had passed.

593.    Approximately one week after the test, K. Varghese traveled to Salimon's office in Kerala to pay his first installment.  He also signed several forms, which he believed were related to his visa and permanent residency application.

594.    Approximately two weeks after he visited Salimon's office, K. Varghese received a letter from Dewan that explained that K. Varghese would pay Burnett, Pol, Dewan, and

Salimon in installments.  The letter also explained that K. Varghese's payments would go towards his employment and permanent residency in the United States.  To obtain the 700,000 rupees that he paid Defendants, K. Varghese sold his wife's gold and jewelry.  He also took out a loan for 550,000 rupees (approximately $11,957) at a 13.5 percent interest rate.

595.     About two weeks after receiving this letter, K. Varghese traveled to Salimon's office to make a payment to Defendants.  Dewan, Salimon, and Burnett were present.  Salimon explained that Burnett would process K. Varghese's paperwork.  Salimon also promised K. Varghese that he would receive employment and a green card in the United States.  Dewan, Salimon, and Burnett made similar promises throughout K. Varghese's application process.

596.     In or about October of 2006, K. Varghese traveled to Chennai to meet with Salimon, Dewan, and Burnett and to prepare for his interview with the U.S. consulate.  Salimon told K. Varghese that he should tell the consulate that he only intended to stay in the United States temporarily.  Burnett, Dewan, and Salimon nonetheless emphasized that even though K. Varghese was seeking an H-2B visa from the consulate, he would receive a green card approximately one year after arriving in the United States, and his family would also obtain permanent residency.  Based on these assurances, K. Varghese continued with the application process.

597.     On or about November 27, 2006, K. Varghese traveled to Dewan's office to make his final payment and retrieve his passport.  Dewan demanded that K. Varghese quickly sign paperwork without reading it.  Dewan also demanded that K. Varghese return all of his receipts and the letters that Dewan had sent him.  K. Varghese felt compelled to comply because he had already paid Dewan so much money and did not want Dewan to prevent him from traveling to the United States.  Only after K. Varghese returned the paperwork and paid Dewan did Dewan

give K. Varghese his plane ticket and passport.  K. Varghese then immediately left for the airport, where he boarded his flight to the United States.

598.    Upon arrival in the United States, K. Varghese learned that Signal would deduct $245 from each of his paychecks for room and board.  K. Varghese told Signal officials that he wanted to live outside the man camp, but they forbade him from doing so.  Afterward, workers told K. Varghese that even though he could leave, Signal would continue to deduct $245 each week.  Because Signal would charge him for room and board regardless of where he lived, K. Varghese felt that he had no option but to remain at the man camp.

599.    While at Signal, K. Varghese attended several meetings in which Burnett and Signal employees assured him that they would seek visa extensions for him.  K. Varghese remained at Signal so that he could receive the green card he had been promised and repay his substantial debts.

600.    Signal officials also repeatedly threatened to have K. Varghese deported if he did not obey all of Signal's rules.  Therefore, he felt compelled to remain at the man camp, fearing that Signal would have him deported if he left.

601.    K. Varghese relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, K. Varghese felt intimidated into acquiescence and compelled to continue working for Signal.

602.    On or about November 26, 2012, K. Varghese died in a car accident.  K. Varghese's claims against Defendants survive his death and are brought on behalf of his estate.

*Benny Kattukariyil Varkey*

603.    In or about February 2006, Varkey's co-worker told him about an opportunity from Dewan Consultants to work as a welder in the United States and obtain a green card. Varkey called Dewan Consultants and spoke with Salimon, who told him to attend a seminar in April or May.

604.    In or about March 2006, Varkey called Dewan Consultants again and spoke with Salimon, who invited him to come to his office.  Salimon explained that Varkey would travel to the United States on an H-2B visa that would later become a green card.  He said that the total cost would be 800,000 rupees (approximately $18,080).  Salimon told Varkey to look for an advertisement giving the details about a meeting at the Hilton Hotel.  That same day, Varkey saw the advertisement for the meeting.  This advertisement also offered the opportunity to obtain an H-2B visa and a green card.

605.    At the seminar, Salimon, Dewan, and an American whom Dewan explained was a lawyer for Signal gave a presentation about the jobs at Signal.  Dewan promised the workers that they would receive green cards.  Similarly, the American lawyer assured them that they would travel to the United States on H-2B visas that would become green cards after nine months. After the presentation, Dewan reiterated that the cost for the green card would be 800,000 rupees (approximately $18,080).  These fees would be paid to Dewan, Pol, and Burnett.

606.    In or about June 2006, Varkey took a skills test administered by a Signal employee.  Salimon and Dewan were also present.  The Signal representative informed Varkey that he passed.   Varkey began to raise the money to pay the Agents their "recruitment fees."

607.    To raise the money to pay the fees, Varkey depleted the savings that had set aside to buy a house for his family.  Varkey also borrowed money from his brother and used his wife's gold jewelry as collateral to obtain a second loan.  Varkey's wife had received this jewelry as a wedding gift from her parents, who had spent their life savings to purchase it.  Varkey and his brother mortgaged their properties to obtain additional loans.

608.    Varkey paid his first payment at Dewan's office in or about June 2006.  Salimon told Varkey to sign papers written in English, which he did not fully understand.  He told Varkey that the papers were for his green card processing.

609.    In or about August 2006, Varkey paid his second fee installment.  Shortly after he made this payment, Salimon called to tell him that the fees had been reduced to 600,000 rupees (approximately $12,960).

610.    Just before Varkey left for the United States, Varkey traveled to Dewan's office in Mumbai, where he paid his final installment.  Dewan told Varkey that $3 per hour would be deducted from his paycheck for room and board.  Dewan also informed Varkey that his H-2B visa would have to be extended for an additional nine months before the green card processing could begin.  He said that when Varkey's green card had been processed, he would return to India, after which he could go back to the United States with his family.

611.    Dewan's staff also required Varkey to sign English-language documents and return all documents relating to the green card opportunity he had been promised.  They refused to explain to Varkey what he was signing.  The office was crowded, Varkey felt rushed, and he knew that he would not receive a refund if he refused to sign.  Only after Varkey had paid his final fee installment, signed the English-language documents, and given Dewan the documents relating to green cards did he receive his passport.

135

612.     When Varkey arrived at Signal, he signed a number of English-language documents that he did not understand.  He later learned that Signal would deduct $35 per day from his paycheck even if he lived outside of the camp.  Varkey felt that he had no choice but to live at the camp because he could not afford to repay his debts if he paid rent on top of his room and board payment to Signal.  In addition, Varkey was afraid to leave his job because of his substantial debts.  He knew that if he returned to India, he would not be able to repay the loans.

613.     Varkey also believed that if he left Signal, he would not receive the green card that Signal and its Agents continued to promise him.  In or about late 2006 or early 2007, John Sanders told Varkey that the green card process was moving forward.  During the same time period, Varkey also attended a camp meeting at which Burnett said that Signal would process the workers' green cards.

614.     Varkey relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Varkey felt intimidated into acquiescence and compelled to continue working for Signal.

*Shahi Vijayan*

615.     In or about March or April 2006, Vijayan saw a newspaper advertisement placed by Dewan Consultants offering the opportunity to obtain permanent residency in the United States.  Vijayan called Dewan Consultants, and an employee invited him to an informational meeting.

136

616.     Dewan, Salimon, Burnett, and two Signal representatives attended the meeting. Dewan explained that if workers waited for their green cards before traveling to the United States, they would have to wait eighteen months.  However, if they traveled to the United States on H-2B visas, they could leave in six months.  Their green cards would be processed between three to six months after the workers arrived in the United States.  Dewan explained that Signal would be responsible for this process.   He said that the total cost would be 800,000 rupees (approximately $18,280).

617.     Signal's representatives provided the company's website address at the meeting. Vijayan reviewed the website and felt that Signal looked reputable.

618.     At this time, Vijayan also had an opportunity to work in Australia.  He mentioned this to Dewan, who assured him that working for Signal would guarantee Vijayan's permanent residency and allow him to bring his family to the United States.  Salimon also assured Vijayan that Signal was an excellent company.  Based on Dewan's and Salimon's assurances, Vijayan refused the job in Australia.

619.     Vijayan paid the fees demanded in approximately four installments.  In order to raise the money, he mortgaged his house and land at 12.5 percent interest.  He also sold his wife's gold jewelry and used her wedding necklace as collateral to obtain another loan at 12.5 percent interest.  Vijayan borrowed the remainder of the money from private lenders who charged high interest rates.

620.     In or about August 2006, Vijayan met with Burnett and made payments to Burnett and Pol.  At that meeting, Burnett guaranteed Vijayan that he would receive a green card if he worked for Signal.

621.     Just before Vijayan's flight to America, he traveled to Dewan's office in Mumbai. Dewan's employees required him to sign some documents in English, which Vijayan did not speak well.  Vijayan did not fully understand the documents.  Dewan's employees nonetheless rushed Vijayan and refused to give him his passport until he paid his final installment fees and signed the documents.  Vijayan felt intimidated.  He saw people crying because they did not have enough money to make their final payment and Dewan had refused to give them their passports. Vijayan signed the paperwork.

622.     When Vijayan arrived in the United States, Signal also required Vijayan to sign English-language documents that he did not understand.

623.     Upon arrival in Pascagoula, Vijayan learned for the first time that the company would deduct $35 from his paycheck each day for room and board, even if he chose not to live at the man camp.  Vijayan felt compelled to live and work at Signal because he was afraid of being sent back to India, where he would be unable to repay his debts.  Vijayan also stayed because Signal personnel convinced him during conversations that he could receive a green card if he remained.

624.     Vijayan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Vijayan felt intimidated into acquiescence and compelled to continue working for Signal.

*John Yohannan*

625.     In or about May 2006, Yohannan saw a newspaper advertisement that Dewan Consultants had placed, offering the opportunity to work in the United States and obtain a green card.  Yohannan called Dewan Consultants' local office and scheduled a meeting.

626.     At that meeting, Yohannan met with Salimon, who told Yohannan that he could work for Signal, obtain a green card after working for one year, and earn a good salary.  Salimon also told Yohannan that Signal was a reputable company.

627.     Shortly after that meeting, Yohannan took and passed a welding test administered by Michael Pol and a Signal employee.  Pol and the Signal employee told Yohannan to contact Salimon's office.  When Yohannan contacted the office, Salimon repeated his earlier promise that Yohannan would receive a green card.

628.     Yohannan later attended a larger meeting, where Pol, Salimon, and Dewan again stated that Signal was a reputable American company and that Yohannan and other workers could obtain a green card and U.S. citizenship.  They told Yohannan that he would earn $18 per hour at Signal and receive food and housing.  Pol, Salimon, and Dewan did not mention H-2B visas or any paycheck deductions.

629.     In or about August 2006, Yohannan met with Pol, Burnett, Dewan, and Salimon before his interview with the U.S. consulate.  They emphasized that if the consulate asked Yohannan anything about the fees he had paid for his recruitment, he should say that he paid nothing.

630.     Yohannan ultimately paid Dewan, Pol, and Burnett approximately 1,150,000 rupees (approximately $25,000) for this opportunity.  To pay for these fees, Yohannan used his savings and took out loans at a 12 percent interest rate.  He secured some of these loans by pledging his wife's jewelry as collateral.

631.     Before he left India, Yohannan also had an opportunity to work as a welder in Saudi Arabia.  Based on Defendants' promises, he gave up that opportunity and instead traveled to the United States to work for Signal.

632.     Just before Yohannan flew to the United States, he met with Dewan in his Mumbai office.  Dewan refused to give Yohannan his passport and airline ticket until Yohannan paid the remaining balance of his fees. Dewan demanded that Yohannan quickly sign various documents, but he rushed Yohannan and did not give him enough time to read them.  Feeling rushed and anxious to get to the airport in time for his flight, Yohannan signed the documents.

633.     In the United States, Yohannan learned that Signal would deduct approximately $260 each week from his paycheck for room and board.

634.     Yohannan and other Indian workers attended meetings where they asked Sanders and other Signal employees when they would receive their green cards.  The Signal employees told them that Signal would apply for their green cards at the appropriate time.

635.     Yohannan relied upon Defendants' promises of permanent residency and good working conditions and would not have sold assets, incurred substantial debt, or agreed to work for Signal in the absence of such falsehoods.  Based on his fear of mistreatment and abuse by Signal, his need to repay the substantial debt and interest he had incurred to pay Defendants' "recruitment fees," his fear that Signal would confiscate even more of his hard-earned wages, and his fear that Signal or Burnett would institute adverse immigration action against him, Yohannan felt intimidated into acquiescence and compelled to continue working for Signal.

## *FIRST CLAIM FOR RELIEF*

THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPRA") OF 2003

Forced Labor (18 U.S.C. § 1589) and Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor (18 U.S.C. § 1590)

636.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

637.    Each Plaintiff brings this claim against all Defendants.

638.    Each Plaintiff is authorized to bring these civil claims against all Defendants pursuant to the civil remedies provisions of 18 U.S.C. § 1595.

639.    Defendants Signal, Dewan, Burnett, and Pol attempted to and did subject each Plaintiff to forced labor in violation of 18 U.S.C. § 1589.

640.    Defendant Signal employed Plaintiffs in dangerous conditions at a guarded and gated man camp, and all Defendants falsely assured Plaintiffs that if they continued to work, Signal would assist them in applying for and receiving green cards.  Defendants controlled Plaintiffs' housing, food, access to medical care, and other basic needs, and if Plaintiffs did not continue working for Signal, they would have been cut off from those needs.

641.    Furthermore, the substantial "recruitment fees" that Defendants coerced Plaintiffs into paying forced Plaintiffs to work at Signal to pay off their substantial debts.

642.    Defendants knowingly attempted to and did physically restrain and/or threaten each Plaintiff with serious harm in order to obtain the labor and services of each Plaintiff in violation of 18 U.S.C. §1589(1).

643.    Defendants knowingly attempted to and did obtain the labor and services of each Plaintiff using a scheme, plan, or pattern which, in the totality of the circumstances, was intended

to coerce and did coerce each Plaintiff to believe that he would suffer serious harm if he were to leave the employ of Defendant Signal in violation of 18 U.S.C. § 1589(2).

644.    Defendants' scheme to isolate Plaintiffs, coerce them to live in conditions causing psychological harm, and limit their outside contacts, which included unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm if they were to leave the employ of Signal.

645.    Defendants threatened not to extend Plaintiffs' H-2B visas, not to sponsor Plaintiffs for green cards, to deport Plaintiffs, and to send them back to India if they complained about conditions at Signal, and also deceived Plaintiffs about the terms of their immigration status, each in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3). Defendants retaliated against Plaintiffs when they sought legal advice regarding their rights and immigration status.

646.    Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs so as to procure their labor and services in violation of laws prohibiting peonage, involuntary servitude, and forced labor within the meaning of the provisions of 18 U.S.C. § 1590.

647.    In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants knowingly recruited, transported, harbored and/or obtained the Plaintiffs for labor or services in furtherance of Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a.    enticing, persuading, or inducing the Plaintiffs to board an airliner and to travel to various locations throughout India and the United States, with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

b.      knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by the TVPRA, 22 U.S.C. §7102(5)(a) and (b), thereby violating 18 U.S.C. § 1584;

c.      removing, confiscating, or possessing Plaintiffs' and other class members' passports and other immigration documents in the course of violating, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, thereby violating 18 U.S.C. § 1592(a); and

d.      attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, thereby violating 18 U.S.C. § 1594(a).

648.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

649.    As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their persons, businesses, and property, as well as other damages.  Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including recruitment fees, other payments made to Signal agents, and attorneys' fees.

### *SECOND CLAIM FOR RELIEF*

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. § 1981

650.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

651.    Each Plaintiff asserts this claim pursuant to 42 U.S.C. § 1981 for declaratory relief and damages against Defendant Signal.

652.    Each Plaintiff is a member of a racial minority, as contemplated by 42 U.S.C. § 1981.

653.    The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs'

rights to enjoy and benefit from non-discriminatory employment relationships with Defendant Signal.

654.    Specifically, Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at Signal man camps in Pascagoula.  Defendant Signal did not subject its employees of non-Indian race, ethnicity, or alienage to the same or similar room and board arrangements.

655.    As set forth in the preceding paragraphs, Defendant Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which its employees of non-Indian race, ethnicity, or alienage were not similarly subject.

656.    As set forth in the preceding paragraphs, Defendant Signal also created and fostered a discriminatory work environment in which Indian workers were subjected to anti-Indian invectives throughout the time Plaintiffs were employed, and in which Signal forced Sikh workers to shave religiously mandated beards.  Signal employees of non-Indian race, ethnicity, or alienage or not of the Sikh religion were not subjected to a similar work environment.

657.    As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Plaintiffs and other Indian H-2B workers, Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race, ethnicity, religion, and alienage throughout the time Plaintiffs were employed.

658.    As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981 throughout the time Plaintiffs were employed.

659.    Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, ethnicity, religion, and alienage.

660.    Defendant Signal's hostile, abusive, and discriminatory treatment of Plaintiffs and other class members was unwelcome.

661.    Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights.

662.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

663.    As a direct and proximate result of Defendants' knowing, willing, and intentional actions, each Plaintiff has been injured, and is entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

### ***THIRD CLAIM FOR RELIEF***

### FRAUDULENT MISREPRESENTATION

664.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

665.    Each Plaintiff brings this claim against all Defendants.

666.    The actions of Defendants, as set forth herein, constitute fraudulent misrepresentation under Mississippi law.

667.    Specifically, Defendants, individually and through their agents, employees, and/or representatives, knowingly made materially false and untrue statements and representations to Plaintiffs regarding the nature, terms, and conditions of applications and opportunities for immigration status and employment in the United States.

668.    Defendants and/or their respective agents represented to each Plaintiff that (1) Plaintiffs would be eligible for permanent residency given their employment with Signal; (2) Defendants would apply for permanent residency in the United States on behalf of Plaintiffs no later than 24 months after the commencement of work; and (3) Plaintiffs would have steady and ongoing work opportunities in the United States with Defendant Signal.

145

669.   At the time each of these representations was made, Defendants knew they were false or misleading.

670.   Defendants intended that the false statements made by each Defendant and/or the Defendants' respective agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant "recruitment fees," would induce Plaintiffs to leave their homes and jobs abroad, travel to the United States, and work for Signal, and would induce Plaintiffs to pay the room and board fee and other fees extracted by Signal upon the workers' arrival in the United States.

671.   Each Plaintiff was entitled to, and did, rely on Defendants' representations.

672.   In reasonable reliance on the false representations of Defendants and their respective agents, employees, and/or representatives regarding green cards, employment opportunities, and employment conditions, Plaintiffs paid large sums of money and incurred substantial debt in the guise of "recruitment fees" and other travel and immigration-related fees. Signal knew of these payments, and permitted them to be made to the Agents.

673.   In reasonable reliance on the false representations of Defendants and their respective agents, employees, and/or representatives regarding green cards, employment opportunities, and employment conditions, Plaintiffs surrendered employment opportunities in India and abroad, left their homes and families behind, sold personal and real property, secured loans at usurious interest rates, traveled to the United States, and worked for Signal.  Further, once in the United States, Plaintiffs continued to work for Signal after receiving repeated assurances that Defendants' prior representations were in fact true.

674.   No later than the first day that Indian workers arrived at Signal, Defendants knew that Plaintiffs and their coworkers believed that Defendants had applied, or were intending to

apply, for permanent residency on behalf of Plaintiffs.  Defendants therefore had an obligation to tell Plaintiffs that this was not true.  Defendants failed to do so.

675.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

676.    As a direct and proximate result of Defendants' knowing, willing, and intentional actions, each Plaintiff has been injured, and is entitled to recover compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

### *FOURTH CLAIM FOR RELIEF*

### NEGLIGENT MISREPRESENTATION

677.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

678.    Each Plaintiff brings this claim against all Defendants.

679.    The actions of Defendants, as set forth herein, constitute negligent misrepresentation under Mississippi law.

680.    Specifically, Defendants, individually and through their agents, employees, and/or representatives, negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature, terms, and conditions of applications and opportunities for immigration status and employment in the United States.

681.    Defendants represented to each Plaintiff that (1) Plaintiffs would be eligible for permanent residency upon the conclusion of their employment with Signal; (2) Defendants would apply for permanent residency in the United States on behalf of Plaintiffs no later than 24 months after the commencement of work, (3) Plaintiffs would have steady and ongoing work opportunities in the United States with Defendant Signal.

682.    At the time each of these representations was made, Defendants should have known that they were false or misleading.

147

683.    Defendants should have known that the false statements made by each Defendant and/or the Defendants' respective agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant "recruitment fees"; would induce Plaintiffs to leave their homes and jobs abroad, travel to the United States, and work for Signal; and would induce Plaintiffs to pay the room and board fee and other fees extracted by Signal upon the workers' arrival in the United States.

684.    Each Plaintiff was entitled to, and did, rely on Defendants' representations.

685.    In reasonable reliance on the negligent representations of the Defendants and their respective agents, employees, and/or representatives regarding green cards, employment opportunities, and employment conditions, Plaintiffs paid large sums of money and incurred substantial debt in the guise of "recruitment fees" and other travel and immigration-related fees. Signal knew of these payments, and permitted them to be made to the Agents.

686.    In reasonable reliance on the negligent representations of the Defendants and their respective agents, employees, and/or representatives regarding green cards, employment opportunities, and employment conditions, Plaintiffs surrendered employment opportunities in India and abroad, left their homes and families behind, sold personal and real property, secured loans at usurious interest rates, traveled to the United States, and worked for Signal.  Further, once in the United States, Plaintiffs continued to work for Signal after receiving repeated assurances that Defendants' prior representations were in fact true.

687.    No later than the first day that Indian workers arrived at Signal, Defendants knew that Plaintiffs and their coworkers believed that Defendants had, or were intending to, apply for permanent residency on behalf of Plaintiffs.  Defendants therefore had an obligation to tell Plaintiffs that this was not true.  Defendants failed to do so.

688.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

689.    As a direct and proximate result of Defendants' negligent actions, Plaintiffs have been injured, and are entitled to recover compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

### *FIFTH CLAIM FOR RELIEF*

### BREACH OF CONTRACT

690.    Each Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

691.    Each Plaintiff brings this claim against all Defendants.

692.    The actions of Defendants, as set forth herein, constitute breach of contract under Mississippi law.

693.    Specifically, Defendants, individually and through their agents, employees and/or representatives, promised to assist Plaintiffs in applying for and obtaining permanent residency and immigration status for Plaintiffs in the United States no later than 24 months after the commencement of work, and promised Plaintiffs steady and ongoing work opportunities in the United States with Defendant Signal.

694.    These promises were made in exchange for each Plaintiff's payment of fees (including recruitment, immigration application, and travel fees) to Defendants and their employees, agents, and/or representatives, and in exchange for each Plaintiff's agreement to work for Signal.

695.    Each Plaintiff accepted Defendants' offers and promises; each Plaintiff paid the agreed upon fees, and performed the agreed-upon work.

696.    Defendants breached their respective contracts with each Plaintiff by failing to comply with their binding promises regarding assistance in applying for and obtaining permanent

residency and immigration status for Plaintiffs in the United States no later than 24 months after the commencement of work, and steady and ongoing work opportunities in the United States with Defendant Signal.

697.    In reliance on these promises, each Plaintiff paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

698.    Defendants' actions evince malice and/or reckless indifference towards Plaintiffs.

699.    As a direct result of Defendants' breach, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

### *PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs request the following relief:

1.    Compensatory relief, including prejudgment interest;

2.    Punitive damages;

3.    An award of reasonable Plaintiffs' costs, including attorneys' fees and costs;

4.    Such additional and further relief as the Court may deem proper and just.

### *DEMAND FOR JURY TRIAL*

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: August 1, 2013          Respectfully submitted,

LATHAM & WATKINS LLP

By: */s/ H. Gregory Baker*         

Miles N. Ruthberg, *pro hac vice*
Benton J. Campbell, *pro hac vice*
Christopher Harris, *pro hac vice*
H. Gregory Baker, *pro hac vice*
Jennifer Greenberg, *pro hac vice*
Daniel D. Adams, *pro hac vice*
Elizabeth C. Rowland, *pro hac vice* to be filed
Aaron M. Safane, *pro hac vice* to be filed
885 Third Avenue
New York, New York 10022
Tel: (212) 906-1200
Fax: (212) 751-4864
E-mail: miles.ruthberg@lw.com
E-mail: benton.campbell@lw.com
E-mail: christopher.harris@lw.com
E-mail: gregory.baker@lw.com
E-mail: jennifer.greenberg@lw.com
E-mail: daniel.adams@lw.com
E-mail: elizabeth.rowland@lw.com
E-mail: aaron.safane@lw.com

MCDUFF & BYRD
Robert B. McDuff, MS Bar No. 2532
Sibyl C. Byrd, MS Bar No. 100601
Jacob W. Howard, MS Bar No. 103256
767 North Congress Street
Jackson, Mississippi 39202
Tel: (601) 969-0802
Fax: (601) 969-0804
E-mail: rbm@mcdufflaw.com
E-mail: scb@mcdufflaw.com
E-mail: jake@mcdufflaw.com

*Attorneys for Plaintiffs*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2013, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of an electronic filing to all CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to non-CM/ECF participants who have been served, and will be causing copies to be personally served on those defendants who have yet to be served via formal process, at which time a proof of service as to those defendants will be electronically filed.

Dated: August 1, 2013

*/s/ H. Gregory Baker*
H. Gregory Baker, *pro hac vice*